LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief of Civil Litigation

MICHAEL S. GILMORE, ISB #1625
mike.gilmore@ag.idaho.us
CLAY R. SMITH, ISB #6385
clay.smith@ag.idaho.gov
CYNTHIA L. YEE-WALLACE, ISB #6793
cynthia.wallace@ag.idaho.gov
Deputy Attorneys General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-4130
Facsimile: (208) 854-8073
Attorneys for Defendants

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| K.W., by his next friend D.W, et al,<br><br>Plaintiffs,<br>vs.<br><br>RICHARD ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare, et al.,<br><br>Defendants. | **Case No. 1:12-cv-00022-BLW (lead case)**<br><br>**Case No. 3:12-cv-00058-BLW**<br><br>**DEFENDANTS' RESPONSE TO MOTION TO EXTEND THE PRELIMINARY INJUNCTION TO PROTECT THE CLASS (DKT. 82)** |
| TOBY SCHULTZ, et al.,<br><br>Plaintiffs,<br>vs.<br><br>RICHARD ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare, et al.,<br><br>Defendants. | |

**INTRODUCTION**

Plaintiffs K.W. *et al.* (collectively, "K.W.") seek to extend the preliminary injunctions entered previously in these consolidated cases beyond the named plaintiffs to the class for which certification is sought. *See* Dkt. 41, 49 (No. 1:12-cv-00022); Dkt. 17 (No. 3:12-cv-00058). In relevant part, the existing injunction requires Defendants Armstrong *et al.* (collectively, "Department") to

> restore and continue the plaintiffs' Medicaid services under the Idaho Developmental Disabilities waiver as provided in the Individual Support Plans in place for each plaintiff prior to July 1, 2011, and before the last "ANNUAL ICF/ID LEVEL OF CARE AND DD ELIGIBILITY APPROVAL NOTICE" and budget assignment notice sent to them and are prohibited from reducing or terminating Medicaid services under the Idaho Developmental Disabilities waiver to the plaintiffs based on their most recent assigned budget limits unless and until the defendants first provide adequate advance notice, approved by this Court, and the opportunity for a fair hearing prior to the reduction or termination of services. If the parties cannot agree, for any individual plaintiff, upon the level of services or Individual Support Plan to which he or she is to be reinstated, continued, or restored under this order, that plaintiff or the defendants may apply to this Court for clarification.

Dkt. 41 ¶ 1 (No. 1:12-cv-00022); *see also* Dkt. 17 at 11 (No. 3:12-cv-00058) (requiring plaintiffs to "submit proposed preliminary injunction order identical to that issued in *K.W. v. Armstrong, CV-12-22-BLW*").[1] K.W. argues that the Department "continues to use notice forms that do not provide any explanation of changes to individual circumstances or changes to the Medicaid system that affected a participant's budget." Dkt. 82-1 at 2. As that general allegation indicates, K.W. directs his challenge to the

[1] The preliminary injunction in No. 12-cv-00022 also required access to certain documents that the Department has subsequently made available to all putative class members. The only relief at issue, therefore, is that portion of the preliminary injunction quoted above. Although the Plaintiffs in No. 12-cv-00058 did not submit a proposed form of the preliminary injunction for entry, the Department assumes the existence of a preliminary injunction in that case applicable to the named plaintiffs in No. 12-cv-00058 identical in scope to the injunction entered in No. 12-cv-0022. The Department also assumes for purposes of this response that K.W.'s motion to certify a class action (Dkt. 81) is granted. Absent certification, class-wide preliminary injunctive relief is unavailable. *E.g.*, *McCormack v. Hiedeman*, 694 F.3d 1004, 1019-20 (9th Cir. 2012).

"budget notice forms" (Dkt. 82-1 at 3) and thus predicates the claimed irreparable harm on "[b]udget reductions based on unconstitutional notices" (*id.* at 8).

The motion should be denied in whole or in part for two reasons. *First*, submitted simultaneously with this response is a revised form that the Department will commence using no later than October 1, 2013 to advise participants in the Adults Developmental Disabilities § 1915(c) Home and Community-Based Services Waiver program ("1915(c) DD Waiver" or "Waiver Program") of their services budget for the next annual plan period. Although participants in the Waiver Program have no protected property interest in a particular *budget*—as opposed to the program's *services*—for procedural due process purposes, the notice satisfies Fair Hearing and *Goldberg*[2] requirements and addresses the concerns expressed by this Court in its August 2, 2012 Memorandum Decision and Order (Dkt. 66).[3]

*Second*, Idaho's immunity from nonconsensual federal court suit, as confirmed in the Eleventh Amendment, precludes the Court from extending the current preliminary injunction to the putative class because it would require restoration of an individual service plan ("ISP") or support and spending plan ("SSP") in place as of June 2011 to the extent a subsequent modification to it was "based on [the class member's] most recent assigned budget limits."[4] To do so not only would invite invalidation of current ISPs and SSPs on the basis of the alleged invalidity of a budget notification form used in connection with a *prior* ISP or SSP but also would require expenditure of additional state

---

[2] *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970). No court has suggested that compliance with Fair Hearing requirements falls short of federal-common-law procedural due process standards. Those standards nevertheless presumably inform the regulatory requirements' application.

[3] The Department has filed a motion for approval of the revised form simultaneously with submission of this request. Dkt. 97. The motion incorporates by reference the analysis in this memorandum appearing at pages 10 through 18 as the grounds for its granting.

[4] The existing and proposed class-wide preliminary injunctions refer only to ISPs. However, approximately 11 percent of Waiver Program participants receive services pursuant to a SSP. Dkt. 94-1 ¶ 34. The Department accordingly construes the proposed injunction to encompass both types of service plans.

funds as a result of that alleged invalidity—a backwards looking remedy not encompassed with the limited Eleventh Amendment exception established under *Ex parte Young*, 209 U.S. 123 (1908).

## GENERAL FACTUAL BACKGROUND

**A.** Idaho's 1915(c) DD Waiver Program has been in place since October 1992. It has been modified over the years, with its most current version available at http://healthandwelfare.idaho.gov/Portals/0/Medical/DD%20Waiver.pdf (last visited June 30, 2013). The Program provides a wide range of services. *See* IDAPA 16.03.10 (enhanced Medicaid plan benefits). They include, as identified in the 1915(c) DD Waiver, residential habilitation; respite; supported employment; community support; financial management; support broker services; adult day health; behavior consultation/crisis management; chore services; dental services; environmental accessibility adaptions; home delivered meals; non-medical transportation; personal emergency response system; skilled nursing; and specialized medical equipment and supplies. 1915(c) DD Waiver at App. C-1; *see also* IDAPA 16.03.10.703.

The scope of covered services has importance to the Fair Hearing requirements imposed under the Waiver Program and related regulations in 42 C.F.R. § 431, Subpart E. *See* 1915(c) DD Waiver at § 6.G & App. F. As the regulations provide, a state agency "must grant an opportunity for a hearing to the following . . . [a]ny person who requests it because he or she believes the agency has taken an action erroneously." 42 C.F.R. § 431.220(a)(1). The regulations define "action" as including "a termination, suspension, or reduction of Medicaid eligibility or covered services." *Id.* § 431.201. Only a state agency "action" triggers the Fair Hearing notice and related provisions. *See id.* § 431.210 (contents of notice); § 431.211 (advance notice); § 431.220(a)(2) (when hearing required); § 431.221(d) (period of time to request hearing); § 431.230(a)(1) (mandatory maintenance of services); § 431.231(a) (discretionary maintenance of

services). Although the Fair Hearing regulations do not define the term "services," another federal regulation addresses the types of "home or community-based services" that may be offered under the Waiver Program. *Id.* § 440.180. Consequently, for "action" and related Fair Hearing purposes, the issue is whether a putative class member's *services* will be terminated, suspended or reduced from their existing levels.

**B.** The parties have not described in full the process for determining services for a plan year in their previous submissions. It consists of several discrete steps: (1) the Department's assessment of the participant's status and the formulation of an annual budget; (2) notification to the participant of the prospective budget determination; (3) the participant's selection of either the "traditional waiver services" or the "consumer directed services" path; (4) development of an ISP by "traditional waiver services" participants or a SSP by "consumer directed services" participants; (5) submission to and review by the Department of the proposed ISP or SSP; and (6) issuance of notification to the participant approving or disapproving the services in the proposed ISP or SSP. *See* Dkt. 94-1 ¶¶ 3-31 (Evans declaration explaining overall process). K.W. predicates the requested preliminary injunction exclusively on the first notification form; *i.e.*, he does not challenge the other components of the services-determination process for Rule 65 purposes. A summary review of each step nevertheless helps to place his objection to the form in proper context for purposes of the class-wide relief requested.

1. The Ellison and Christensen declarations address process's first step. Dkt. 25-2 ¶ 3; Dkt. 25-3 ¶¶ 2-4. Their explanation corresponds to the 1915(c) DD Waiver that states the Department establishes a prospective individual budget amount "based on information entered on an Inventory of Individual Needs, an assessment tool designed to capture the participant's functional abilities, behavioral limitations, medical needs and other individual factors related to their developmental disability." 1915(c) DD Waiver at App. C-4. The assessment tool itself calculates the budget in accordance with

a regression analysis model. *Id.* The assessment's highly particularized nature means that each putative class member's budget, regardless of the precise amount, will differ with respect to anticipated needs. *See* IDAPA 16.13.13.190 (describing "individualized budget" process for "consumer directed services" participants). The budget setting process, as the Christensen declaration explained, thus "assess[es] needs" and leaves determination of the participant's complement of services—*i.e.*, how the budget amount is actually used—for later determination. Dkt. 25-3 ¶ 11. The assessed needs, lastly, are measured with respect to the participant's current medical, behavioral and psychiatric status. *See* IDAPA 16.03.10.512.

2. The parties have been unable to agree on a budget notification form. The Department, however, has attempted to meet the concerns expressed in this Court's August 2012 Memorandum Decision (Dkt. 66). Page 1 of the revised three-page notification letter advises the participant generally about the prospective, or calculated, budget and appeal rights:

> You have qualified for developmental disability services for this year. Effective ___________ (insert date that the budget goes into effect), your budget is $___________ for ______ (insert budget year). This is (+ or -) $ ___________ than last year's budget. Your budget is (insert *higher* or *lower*) than last year's budget. You may ask for a review (or change) of this budget.
>
> **At this point you need to either submit a service plan or ask for a review.**
>
> **If you agree with the budget:**
>
> > **Submit a service plan to the department by __________**(insert deadline date) **to specify your services** if this budget is correct and you do not want to ask for a review**. The cost of the services on the service plan must be within your budget of $__________** (insert budge amount).
>
> **If you disagree with the budget:**
>
> > **Within 28 days from the <u>date this Notice was mailed,</u> by _____________** (insert due date) you must fill-out and send the **Review Request Form** (the next page). **If you request an administrative**

> **hearing within this time period your current services will stay the same until a decision is made after the administrative hearing.** You may argue your case yourself, or have an attorney or another person of your choice to represent or help you. If you are uncertain about how well you can argue your case (based on laws, rules, and budget tools) you should have an attorney or other person help you.
>
> Mail or fax the completed Review Request Form to:
>
> Administrative Procedures Section
> Department of Health and Welfare
> 450 West State Street
> PO Box 83720-0036
> Boise, ID 93720-0036
> Phone: (208) 334-5564
> FAX: (208) 334-6558
>
> If it is decided that the Department's calculation was wrong for any reason, changes to this year's budget will be made. If the decision is that the calculation was correct **you may have to repay any extra funds** to the extent permissible under federal regulations. If you have any questions regarding this Notice, please contact the Regional Independent Assessor at the Idaho Center for Disabilities Evaluation (ICDE) at the telephone number listed below.

Dkt. 97-1 at 1. The second page contains a Review Request Form.

The third page is captioned "Additional Information" and states:

> **Why Your Budget Has Changed:**
>
> Several changes in laws, rules, or tools may have affected your budget. The Department can also explain which of these affected your budget and why it was changed. Your budget has changed because of a combination of the following:
>
> 1. Changes in your *Inventory of Needs.* See the following cover letter and attached documents to see changes made in your *Inventory.*
> 2. Changes in the *Scales of Independent Behavior – Revised.* A summary of the answers used in this interview is attached. Your budget was affected by:
>    [ ] General Maladaptive Index
>    [ ] Broad Independence Age
>    [ ] Neither
> 3. Changes in the Medicaid budget tool. Several variables were added or changed, including "living situation."

4. Changes in Idaho Law. Idaho Code §56-255 (3)(f)(ii)

**Attached Documents:**

1. *Cover Sheet*—explanation of your budget calculation
2. This year's completed *Inventory of Needs* (number of pages)
3. Last year's completed *Inventory of Needs* (number of pages)
4. Summary comparison of this and last year's *Inventory of Needs* (number of pages)
5. *Individualized Budget Calculations* from both this and last year including all calculations and spreadsheets (number of pages)
6. *Blank Inventory of Individual Needs* with explanations of all categories (6 pages)
7. *Report of Adaptive Behavior* (number of pages)

**For More Information:**

The attached documents include all the information that was used to calculate your budget. Additional information about the laws and regulations affecting your budget include the following. Help in understanding these is always available through the Department of Health and Welfare, 450 West State Street, Boise, Idaho. 208-334-5564.

1. Federal regulations about appeals, prompt and accurate responses: 42 CFR 431.200 *et seq*.
2. Idaho Laws related to disabilities:
   a. Idaho Code sections 66-402(5) and §56-255(3)(f)(ii)
   b. Intermediate Care Facility for People with Intellectual Disabilities—Medicaid Enhanced Plan rules (IDAPA 16.03.10.584)
3. Medicaid Enhanced Plan rules (IDAPA 16.03.10.584)
4. Annual Notification Regulations—42 CFR 441.302(c) and IDAPA 16.03.10.514
5. Federal regulation about repayment of benefits: 42 CFR. 431.230(b)
6. Budget tool methodology: http://www.healthandwelfare.idaho.gov/Medical/DevelopmentalDisabilities/AdultDDCareManagement/tabid/211/Default.aspx.

Dkt. 97-1. The revised form thus identifies (a) the documents used in calculating the prospective budget and attaches them; (b) the prospective budget amount and the difference between it and the prior year's budget; and (c) the systemic and any individual

participant-related reasons for the difference, and (d) documents that can be reviewed that reflect the changed individual participant-related factors. Like earlier forms, it advises participants of their right to request an administrative hearing within 28 days of the notification's mailing to challenge the prospective budget and that current services will remain in place until a decision after the hearing.

3. Participants develop their preferred mix of services through one of two possible methods: traditional waiver services or consumer directed services. 1915(c) DD Waiver at App. D-1.a; *see also* Dkt. 53-2 ¶ 3, 94-1 ¶¶ 18-20. Participants opting for the first method may use a paid or unpaid plan developer to assist in the ISP's formulation. Compensated developers must possess service coordinator qualifications. IDAPA 16.03.10.729. Other individuals may be included as part of the "person centered planning team" with the participant's consent. 1915(c) DD Waiver at App. D-1.c. Participants opting for consumer directed services must utilize a support broker. IDAPA 16.03.13.135. They "decide[] who will participate in the planning sessions in order to ensure the participant's choices are honored and promoted" and may create a "circle of support" including individuals who "commit to work within the group to help promote and improve the life of the participant in accordance with the participant's choices and preferences[] and [to] meet on a regular basis to assist the participant to accomplish his/her expressed goals." 1915(c) DD Waiver at App. D-1.c; *see also* IDAPA 16.03.13.160 (SSP development procedures and requirements); *id.* 16.03.13.180 (circle of supports' description and requirements).

4. "Traditional waiver services" participants must develop and submit their ISPs to the Department for review and authorization no less than 45 days before the beginning of their next plan year. 1915(c) DD Waiver at App. D-1.d. "Consumer directed services" participants must develop and submit their proposed SSPs to the Department that then has ten days to review the proposal and to suggest any

modifications and another five days to enter the requisite authorizations. *Id.* No mandatory time limits are imposed on submission of the proposed SSP so as "to allow for extensive, comprehensive planning and thoughtful support and spending plan development." IDAPA 16.03.13.170.05.

5. The Department sends notifications to participants advising them of whether the services contained in their ISPs or SSPs have been approved, denied in part, or denied in whole. Dkt. 94-1 at ¶¶ 23-25 & Ex. B. The form provides for entry of the specific reasons for the latter two actions. It further provides a right of appeal within 28 days of the notification's mailing and advises the participant that "[i]f you request an administrative hearing, you may continue receiving benefits until the hearing is held and a decision is mailed to you" and that "[i]f the hearing officer decides that the Department's decision was correct, the Department may take action to collect the cost of those benefits from you, as allowed by 42 C.F.R. § 431.230(b)." Dkt. 94-1, Ex. B. The focus of the appeal is whether the services not approved are appropriate given the participant's needs; *i.e.*, whether the participant's budget is adequate to provide for the participant's otherwise established needs does not control the appeal's outcome. Dkt. 94-1 ¶ 25.

**C.** The current number of participants who are subject to the process described above is approximately 3525. Dkt. 94-1 ¶ 34. Of that number, 3143 participants have ISPs; the remainder has SSPs. With the exception of the named Plaintiffs in this proceeding and 65 other participants whose pre-July 2011 budgets have been extended, all ISPs and SSPs are funded through budgets determined on or after July 1, 2011. Department data indicates with respect to participants with actual budgets established during calendar year 2013, 60 percent (2102) have budgets less than those established during 2012, with a negative difference of $16,357,498, while 33.3 percent (1163) have increased budgets, with a positive difference of $19,849,187. *Id.* The

Waiver Program added 948 participants with ISPs or SSPs since July 1, 2011. *Id.*

## FED. R. CIV. P. 65(a) STANDARDS

Preliminary injunctions under Fed. R. Civ. P. 65(a) have as their animating purpose maintenance of the status quo *pendente lite*. *E.g.*, *Chalk v. United States District Court*, 840 F.2d 701, 704 (9th Cir. 1988). The general standards controlling disposition of K.W.'s motion for extension of the preliminary injunction to the putative class members were summarized recently in *Pimentel v. Dreyfus*, 670 F.3d 1096 (9th Cir. 2012):

> A plaintiff seeking a preliminary injunction must establish (1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the public interest. . . . Under the "sliding scale" approach to preliminary injunctions observed in this circuit, "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." . . . "[A]t an irreducible minimum," though, "the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation."

*Id.* at 1105-06 (citations omitted). Resort to sliding scale is unnecessary when the moving party establishes, or fails to establish, a likelihood of success on the merits. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013). When the probability-of-success factor is satisfied with respect to alleged deprivation of a constitutional right, irreparable injury is presumed. *Rodriguez v. Robbins*, No. 12-56734, 2013 WL 1607706, at *13 (9th Cir. Apr. 16, 2013).

## ARGUMENT

### I. THE REVISED BUDGET NOTIFICATION FORM SATISFIES ANY APPLICABLE PROCEDURAL DUE PROCESS REQUIREMENTS

**A.** The starting point for procedural due process-related analysis is the definitions that govern Fair Hearings under the Subchapter XIX of the Social Security Act ("Medicaid"), 42 U.S.C. §§ 1396-1396w-5. As discussed above, federal regulations define "action" to mean, for present purposes, "a termination, suspension, or reduction of

Medicaid eligibility or covered services." 42 C.F.R. § 431.201. The regulations define the term "notice" with reference to the requirements in 42 C.F.R. § 431.210. Those requirements are straightforward:

> A notice required under § 431.206(c)(2), (c)(3), or (c)(4) of this subpart must contain--
> (a) A statement of what action the State, skilled nursing facility, or nursing facility intends to take;
> (b) The reasons for the intended action;
> (c) The specific regulations that support, or the change in Federal or State law that requires, the action;
> (d) An explanation of–
> (1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or
> (2) In cases of an action based on a change in law, the circumstances under which a hearing will be granted; and
> (e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

Section 431.206(c)(2) provides that a state agency must provide information identified in the preceding subparagraph "[a]t the time of any action affecting his or her claim." The information includes written notification of the participant's "right to a hearing[,]" "the method by which he may obtain a hearing" and "[t]hat he may represent himself or use legal counsel, a relative, a friend, or other spokesman." 42 C.F.R. § 431.206(b).

Other regulations address appeal rights with respect to actions. Section 431.220(a)(1) directs state agencies to grant a hearing opportunity, *inter alia*, to "[a]ny beneficiary who requests it because he or she believes the agency has taken an action erroneously." Agencies also "must allow the . . . beneficiary a reasonable time, not to exceed 90 days from the date that notice of action is mailed, to request a hearing." 42 C.F.R. § 431.221(d). A beneficiary's services may not be terminated or reduced as an ordinary matter until a decision is made after hearing on the appeal where "the beneficiary requests a hearing before the date of action" (*id.* § 431.230 (a)), and the state agency is given discretion to reinstate services "if a beneficiary requests a hearing not

more than 10 days after the date of action" (*id.* § 431.231(a)). The regulations define "date of action" as "the intended date on which a termination, suspension, reduction, transfer or discharge becomes effective." *Id.* § 431.201.

The regulations accordingly make clear that the state agency's "action" subject to the Fair Hearing requirements is the actual reduction or elimination of "services." *See Granato v. Bane*, 74 F.3d 406, 413 (2d Cir. 1996); *Martin v. Wing*, No. 95-CV-1274, 1996 WL 191974, at *3 (N.D.N.Y. Apr. 16, 1996). The Department's determination as to budget amounts may have an effect on what services are contained in a proposed ISP or SSP, but it is not an "action." Under the relevant federal regulations on their face and as applied by the Department, the participant has the right to include within an ISP or SSP any services deemed appropriate in light of her or his assessed needs and to appeal from the Department's reduction or denial of those services that does embody an "action." *See* Dkt. 94-1 ¶ 25.

K.W. relies exclusively for preliminary injunction purposes on the *budget* notification form and so effectively admits that adequate due process exists with respect to the *services* notification provided to participants with respect to the actual "action" taken by Department. The dispositive quality of the services provided to participants for "action" purposes is reflected in the existing preliminary injunction to the extent that it prohibits the Department "from *reducing or terminating Medicaid services* under the Idaho Developmental Disabilities waiver to the plaintiffs based on their most recent assigned budget limits unless and until the defendants first provide adequate advance notice, approved by this Court, and the opportunity for a fair hearing prior to the reduction or termination of services." Dkt. 41 ¶ 1 (emphasis added).

The uncontested compliance with the Fair Hearing regulatory requirements with regard to the Department's "actions" fatally undermines any claim that the budget notification form itself must satisfy constitutionally mandated procedural due process

considerations.[5] Stated alternatively, the determination of the budget form's constitutional sufficiency cannot be isolated from its subsidiary role in a regulatory structure that provides Waiver Program participants with an admittedly adequate measure of due process as to the involved property interest—actual ISP or SSP services—before that interest can be subject to an "action" by the Department. However, even if analyzed independently with reference to constitutional standards, the form passes muster.

**B.** This Court found one core flaw in the budget notification form submitted for approval last year: It did not "contain a sufficient explanation of changes to the participant's budget"—*i.e.*, "a brief summary of changes affecting the participant's budget caused by either (1) changes in the individual's condition or circumstances[] or (2) changes to the Medicaid system." Dkt. 66 at 13. The revised form addresses these concerns.

The new form, like its predecessors, consists of a letter to the participant and appended documents related to prospective budget's development and actual calculation. The letter portion identifies, *inter alia*, the increase or decrease in the prospective budget from the current year's budget and the general factors affecting the budget's determination: (1) system-wide 2011 adjustments in the "budget calculation tool" to increase the calculation's statistical validity; (2) statutory limitations on the Department's authority to increase budgets imposed under 2011 Idaho Laws Chapter 164, § 9 (codified at Idaho Code § 56-255(3)(f)(ii)); (3) changes in the participant's Inventory of Individual

[5] *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (deriving from various decisions "the truism that '(d)ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances") (some internal quotation marks omitted); *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 584 F.3d 1232, 1236 (9th Cir. 2009) ("[d]ue process, rather than being 'a technical conception with a fixed content unrelated to time, place and circumstances[,] . . . is flexible and calls for such procedural protections as the particular situation demands'") (quoting *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (internal quotation marks and citation omitted)); *United States v. Alisal Water Corp.*, 431 F.3d 643, 657 (9th Cir. 2005) ("[t]he process that is due varies according to the nature of the right and the type of proceedings").

Needs ("Inventory") from that used in determining the current year's budget and that used for the prospective budget; and (4) changes in the Scales of Independent Behavior-Revised ("SIB-R"). The attached documents include (1) a general explanation of how the prospective budget was calculated; (2) the participant's completed Inventory used in the prospective budget calculation process; (3) a blank Inventory reflecting the questions asked during the participant's assessment; (4) a summary document reflecting the Inventory responses used for purposes of determining the participant's current and prospective budgets; (5) the participant's Individualized Budget Calculation forms for the current and prospective budgets; (6) supporting spreadsheet breakdowns for the current and prospective budgets; and (7) the Report of Adaptive Behavior as to SIB-R results.

The only document not provided is the SIB-R interview book and response booklet. Dkt. 95-1 ¶ 5. Under protocols instituted by the Idaho Center for Disabilities Evaluation that actually administers the SIB-R process, the test instrument itself and "ancillary" test materials may not be released, the participant or an appropriate representative may be allowed "to look at specific questions contained in the SIB-R test booklet in order to provide an explanation regarding the scores received in a particular section of the SIB-R." Dkt. 95-1 at Ex. 2, pp. 63-67. The review process "does not allow a requestor to receive open access to the participant's entire test booklet" or to copy or transcribe questions from the booklet. Dkt. 95-1 at Ex. 2, p. 64.

These restrictions comport with contractual limitations on the SIB-R and its ancillary testing materials' dissemination from the test instrument's publisher. Dkt. 95-2 ¶¶ 5, 7 & Exs. 1, 2. They stem from (1) ethical considerations—*i.e.*, the need to limit distribution to professionals qualified to administer the test and interpret its results; (2) test integrity considerations—*i.e.*, to prevent the test's utility from being undermined through rehearsed responses developed with pre-knowledge of the questions in the test instrument; and (3) copyright infringement and/or trade secret considerations—*i.e.*,

substantially devaluing the potential market for the test instrument not only through diminishing its utility but also through disclosure of testing methodology and structure for use by competitors. Dkt. 95-2 ¶ 6.[6] Substantially affecting the practical significance of the prohibition against the SIB-R's disclosure is the fact that the budget notification includes a copy of the Report of Adaptive Behavior, which summarizes the results of the SIB-R interview and thereby informs the participant of what this aspect of the assessment showed. These confidentiality concerns and the compensating effect of the Report's analysis negate any contention that more due process is due with respect to advising participants of the reasons for the budget determination and the underlying data or information. *Cf.*, *Mathews*, 424 U.S. at 335 (identifying as relevant to the determination of the amount of process due, *inter alia*, "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail").

Where, as here, the participant is given substantially all the information gathered by the Department in the Inventory and where the prospective budget is generated through application of statistical program using that information and whose basic methodology and outputted data are explained to the participant, any claimed violation of federal Medicaid regulations, or procedural due process principles more generally, is untenable. The Inventory, the methodology explanation and the generated budget data supply "the reasons for the intended action." 42 C.F.R. § 431.210(b). The appended

[6] *See* 17 U.S.C. § 107(4); *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 543 (3d Cir. 1986) ("[a]lthough [the Scholastic Aptitude and Achievement Test] Review asserts that it is not in competition with ETS, use of ETS' materials by Review renders the materials worthless to ETS"); *Ruston v. DOJ*, 521 F. Supp. 2d 18, 20 (D.D.C. 2007) ("[t]est questions, answers, manuals and related materials are 'highly confidential, proprietary trade secrets' which the publisher seeks 'to protect from disclosure beyond what is absolutely necessary for the purpose of administering the tests'"); *Chicago Sch. Reform Bd. v. Substance, Inc.*, 79 F. Supp. 2d 919, 933-34 (N.D. Ill. 2000) ("The tests' value lies in the Board's ability to used them repeatedly in the future. Defendants' publication of the tests significantly decreased that value, and the court need not determine at this time the monetary damage Defendants caused. The court finds no difference between a copyright holder losing future profits because of a copyright infringement and the Board losing its future educational value of its copyrighted work.").

documents, moreover, not only give the participant the information used to calculate the prospective budget but also the same information used to calculate the current year's budget, thereby allowing the participant to make an informed determination whether to contest the prospective budget. The appended documents thus correspond substantively to "Personal Care Assessment Tool" whose provision as part of in-home care services reduction or elimination notice was deemed sufficient to cure the procedural due process violation found in *Baker v. State*, 191 P.3d 1005 (Alaska 2005).[7]

---

[7] The *Baker* court rejected the state agency's contention that the assessment tool's inclusion as part of the reduced or eliminated hours' notice was not necessary to comply with due process. It reasoned in part:

> The goal of the assessment process is to take raw information from the service recipient and translate it into hours of service needed. This requires analysis, and it follows that documentation of that analysis, to the extent that it exists, should be provided to the recipient. It may be that the PCAT is only a part of that analysis, but it is a critical component, and the department has not advanced a compelling argument for why it should not include the PCAT or otherwise provide the information that it used to determine the numbers on the service plan. If the only burden is an administrative one, the cost and inconvenience of copying the PCAT and attaching it to the notice is not unreasonable under the circumstances here.

191 P.3d at 1012-13; *see also Allen v. State*, 203 P.3d 1155, 1167 (Alaska 2009) ("[d]ue-process-compliant notices are designed to protect recipients from erroneous deprivation of benefits by allowing them to assess whether or not the agency's calculations are accurate"). Other courts have deemed similar disclosure of statistical or arithmetic data adequate for due process purposes where they serve to explain the reasons for the agency action and to provide the affected person with information upon which an intelligent decision to seek a hearing can be reached. *See, e.g.*, *Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005) (agreeing with district court that "the defendants violated the requirements of due process by their failure to provide budgetary information, or other information which was sufficiently detailed as to allow [Home Energy Assistance Program] applicants to understand the reasons for the defendants' benefits determination") (footnote omitted); *Banks v. Trainor*, 525 F.2d 837, 842 (7th Cir. 1975) (notice reducing food stamp entitlement deemed inadequate where they "did not contain a breakdown of income and deductions so that the recipients could determine the accuracy of the computations"); *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir. 1980) (per curiam) ("[d]ue process can be satisfied by simply photocopying the work papers and enclosing them with the notice approved by the district court" with respect to reduction or elimination of aid to dependent children program payments); *Ford v. Shalala*, 87 F. Supp. 2d 163, 178 (E.D.N.Y. 1999) ("When the calculations are critical to the determination of eligibility or benefit amount, written notice must explain the formula by which the benefit amount was calculated, . . . identify the underlying facts upon which the calculations were based, . . . and include a breakdown of the sums attributable to each factor in the equation") (citations omitted).

**C.** The revised notification form does not modify the 28-day appeal period contained in earlier versions. This Court noted in the August 2012 memorandum decision that an arguable conflict exists between 42 C.F.R. § 431.221(d)—which obligates state agencies to provide a reasonable appeal period "not to exceed 90 days from the date that the notice is mailed"—and 42 C.F.R. § 431.230(a)—which requires maintenance of current *services* until a decision after a hearing when "the beneficiary requests a hearing before the date of action" except in certain circumstances. Dkt. 66 at 15. As a threshold matter, reconciling these provisions is unnecessary for present purposes because the budget notification does not constitute an "action." The Department's later determination as to the participant's appropriate mix of services, the fifth step of the overall process described above, is the "action." The two provisions, however, can be reconciled by reading them *in pari materia*.

Section 431.221(d) imposes the hearing requirement referred to in § 431.230(a) but additionally authorizes state agencies to prescribe a "reasonable" period after the notice of action's mailing within which the hearing may be requested so long as the period does not exceed 90 days. Section 431.230(a) confers a substantive entitlement to maintenance of existing services through a hearing request that, by its literal terms, operates independently of any appeal period specified under § 431.221(d); *i.e.*, the participant is entitled to continuation of existing services by submitting a hearing request prior to the date of the action. Consequently, if the hearing request is made subsequent to the conclusion of the state agency prescribed appeal period but prior to the action's effective date, a hearing must be granted, and the participant's services must be maintained until the hearing decision. If the hearing request is made after the action date but prior to expiration of any state agency-prescribed appeal period, a hearing must be granted, and 42 C.F.R. § 431.231 controls the state agency's authority to *reinstate* the prior services. *See Stenson v. Blum*, 476 F. Supp. 1331, 1341 (S.D.N.Y. 1979).

The interrelationship of 42 C.F.R. §§ 431.221(d) and 431.230(a) thus becomes uncertain only when the appeal period expires before the date of action. As *Stenson* suggests, it appears that § 431.221(d) is predicated on the assumption that the state agency-designated appeal period would terminate after the action date.[8] That understanding of the regulations is buttressed by the relatively short advance notice of action—at least ten days—required generally under 42 C.F.R. § 431.211 and the relatively long maximum appeal period—90 days—provided under § 431.221(d). K.W.'s challenge to the budget notification form, again, does not raise this issue because the budget determination does not constitute an "action" as defined in 42 C.F.R. § 431.201. If eventually presented with respect to an action, it would be resolved by giving effect to § 431.230(a).

## II. *EX PARTE YOUNG* DOES NOT AUTHORIZE EXTENDING THE CURRENT PRELIMINARY INJUNCTION *IN HAEC VERBA* TO THE PUTATIVE CLASS

K.W. asks this Court to "extend" the existing preliminary injunction beyond the named Plaintiffs to the putative class. Dkt. 82. Among the provisions sought to be extended is Paragraph 1 of the injunction entered on March 12, 2012. Dkt. 41.[9] That paragraph, if extended, would require the Department to reinstate ISPs or, presumably,

[8] The *Stenson* court incorrectly characterized the newly issued regulations as requiring the participant to request a hearing within ten days of the notice of action's mailing. 476 F. Supp. at 1341 ("These regulations clearly contemplate that state Medicaid payments to a terminated recipient must be reinstated if, but only if, the recipient requests a hearing within ten days of the mailing of notice of termination by the State. If a recipient fails to request a hearing within that period, the terminated recipient can still gain a hearing by submitting a request within 'a reasonable time, not to exceed 90 days from the date that notice of action is mailed'"). The court's characterization plainly assumed that the § 431.211 notice would be given on the last permissible day.

[9] The proposed preliminary injunction substantively modifies the existing injunction only by adding a definition of "class member" as Paragraph 1 and substituting that term for "plaintiffs" or "plaintiffs'" where the latter terms appear in the first paragraph of the existing injunction. Paragraph 2 of the current preliminary injunction—which requires production of certain materials upon request—extends to "any participant of the Idaho Medical Adult Developmental Disabilities Program" and thus captures all putative class members as defined in paragraph 1 of the proposed injunction.

SSPs that were in effect before July 1, 2011 "unless and until the defendants first provide adequate advance notice, and the opportunity for a fair hearing prior to the reduction or termination of services." Dkt. 82 at 2 (¶ 2). The predicate for the proposed extension is that procedural due process was denied with respect to the setting of the ISPs that are currently "in place." Such an injunction would have a retroactive effect and, therefore, would fall outside the limited authorization for relief against state officials under *Ex parte Young*.

**A.** The decisions in *Green v. Mansour*, 474 U.S. 64 (1985), and *Papasan v. Allain*, 476 U.S. 265 (1986), point the way here. In *Green*, the Supreme Court held that *Young* did not authorize "notice" relief that would have declared unlawful Aid to Families With Dependent Children ("AFDC") payments calculated under a formula that, during the district court litigation, Congress made lawful. The issue, as framed by the Court, was whether a federal court could "issue a declaratory judgment that state officials violated federal law in the past when there is no ongoing violation of federal law." *Id.* at 67.

In resolving this issue in the negative, the Court deemed the "notice" relief approved in *Quern v. Jordan*, 440 U.S. 332 (1979), distinguishable from that requested by the AFDC program petitioners because, under *Quern*, "a request for a limited notice order will escape the Eleventh Amendment bar if the notice is ancillary to the grant of some other appropriate relief that can be 'noticed'"—a situation not present where, as was the situation in *Green*, "no continuing violation of federal law" existed to enjoin. 474 U.S. at 71. The only issue thus was whether a declaratory judgment could issue with respect to "the past lawfulness of respondent's action." *Id.* at 73. The Court said no because "the award of a declaratory judgment in this situation would be useful in resolving the dispute over the past lawfulness of respondent's action only if it might be offered in state-court proceedings as res judicata on the issue of liability, leaving to the

state courts only a form of accounting proceeding whereby damages or restitution would be computed"—relief that "would have much the same effect as a full-fledged award of damages or restitution by the federal court." *Id.*

The Supreme Court decided *Papasan* seven months after *Green*. The question was whether local school officials and students could obtain relief declaring unconstitutional an 1856 state statute selling certain lands conveyed for school purposes by Congress to Mississippi twenty years earlier and seeking other relief to remedy the allegedly improper disposition. 476 U.S. at 274-75.

Responding to the contention that the relief merely attempted to remedy "the continuing withholding of accrued benefits[,]" the Court stated:

> We discern no substantive difference between a not-yet-extinguished liability for a past breach of trust and the continuing obligation to meet trust responsibilities asserted by the petitioners. In both cases, the trustee is required, because of the past loss of the trust corpus, to use its own resources to take the place of the corpus or the lost income from the corpus. Even if the petitioners here were seeking only the payment of an amount equal to the income from the lost corpus, such payment would be merely a substitute for the return of the trust corpus itself. That is, continuing payment of the income from the lost corpus is essentially equivalent in economic terms to a one-time restoration of the lost corpus itself: It is in substance the award, as continuing income rather than as a lump sum, of "'an *accrued* monetary liability.'"

*Id.* at 281 (footnote omitted). It reached a different conclusion, however, with respect to the officials and students' claim that the disparity in "'the use and benefits'" of income from congressionally conveyed school lands violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* As to this allegation, "the complaint alleged a present disparity in the distribution of the benefits from the State's Sixteenth Section lands" and thus an "ongoing constitutional violation—the unequal distribution by the State of the benefits of the State's school lands—is precisely the type of continuing violation for which a remedy may permissibly be fashioned under *Young*." *Id.* at 282. "A remedy to eliminate this current disparity, even a remedy that might require the expenditure of state

funds, would ensure compliance *in the future* with a substantive federal-question determination rather than bestow an award for accrued monetary liability." *Id.* at 283 (internal quotation marks omitted).

The Ninth Circuit has recognized, consistent with *Green* and *Papasan*, that "it is the purpose of the relief rather than its form which is relevant" for *Young* purposes. *Cardenas v. Anzai*, 311 F.3d 929, 936 (9th Cir. 2002); *Native Vill. of Noatak v. Blatchford*, 38 F.3d 1505, 1512 (9th Cir. 1994) ("we must analyze the substance, not the form" of relief to determine whether relief is prospective or retroactive). So, for example, the Court of Appeals rejected a request for injunctive relief related to the effects of a past wrong in *Ulaleo v. Paty*, 902 F.2d 1395 (9th Cir. 1990). The alleged federal law violation arose from a 1986 land exchange by the Hawaii Board of Land and Natural Resources, with the plaintiffs' seeking "at a minimum . . . the return of the land, to be followed by an appropriate procedure and consideration of the trust purposes before an exchange is made." *Id.* at 1397. The panel found the claim substantively indistinguishable from *Papasan*:

> Although *Papasan* is at least superficially different from this case in that its trust corpus ceased to exist completely, what is important is the Supreme Court's characterization of the relief sought in the violation of a trust. The complaint is that sometime in the past, the BLNR undertook an action, the land exchange, which allegedly injured the plaintiffs by violating the trust of which the plaintiffs are beneficiaries. There is no allegation that the Board is continuing to violate its trust duties in other ways or that it is likely to do so in the future. The immediate relief plaintiffs seek would require the state to purchase the lands from its present holder by way of cash or other land. We hold that to grant the requested relief would be a retrospective remedy, as opposed to stopping an ongoing violation of federal law. If the trust duty was violated, it happened when the BLNR executed the exchange.

*Id.* at 1399-1400; *see also Fla. Ass'n of Rehab. Facilities, Inc. v. Florida Dep't of Health & Rehabilitative Servs.*, 225 F.3d 1208, 1219 (5th Cir. 2000) ("*Ex parte Young* has been applied in cases where a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the

past"); *Mello v. Woodhouse*, 755 F. Supp. 923, 929 (D. Nev. 1991) (alleged unconstitutional contract impairment through statutory repeal that affected ongoing retirement entitlement barred by Eleventh Amendment; "[s]ince the breach has ceased, an award to plaintiffs would necessarily relieve a constitutional violation that is not ongoing"). Consequently, where the complainant relies on and, in practical or legal effect, seeks to remedy a past rather than an ongoing wrong, *Young* relief cannot be had.

**B.** The original Plaintiffs and 65 other participants aside, all putative class members are subject to ISPs or SSPs that commenced after June 2011. Dkt. 94-1 ¶ 34. Indeed, 31.4 percent of them are subject to ISPs or SSPs that succeeded plans that commenced after June 2011; *i.e.*, second generation post-June 2011 ISPs and SSPs. *Id.* Extension of the existing preliminary injunction accordingly would not be premised on the alleged unconstitutionality of a budget notification form used in connection with the class members' present ISPs and SSPs or, more critically, the form used to notify them of prospective budgets for their next plan year. The proposed injunction, in other words, imposes a new liability—potentially increased budget levels—on the basis of an alleged past wrong. K.W. also does not allege that *existing* ISPs or SSPs provide services less than those required by Medicaid and thereby constitute continuing violations of federal law. He actually presupposes the contrary given the sole limitation on the Department's authority: Not reducing *current* ISP or SSP services because of individual participant budget considerations. There is thus no claim before this Court for purposes of preliminary injunctive relief that, as a class, Waiver Program participants are not presently receiving services consistent with the Medicaid Act.

No legally meaningful distinction exists between the requested extension and the backward-looking notice relief held unavailable under *Young* in *Green* and *Papasan*. Here, as there, restoring pre-July 2011 services would not redress an ongoing violation of federal law with respect to the Waiver Program services provided participants under their

existing ISPs and SSPs. Here, as there, "restor[ation]" of those services would be predicated on the insufficiency of the budget notification provided with respect to the plan year beginning on or after July 1, 2011 and thus would address not an ongoing wrong but one long-since completed. And here, as there, the injunction's intended effect would be to extract additional funds from state coffers predicated on a past due process violation; *i.e.*, increasing the services covered and, therefore, the Waiver Program's costs. *Young* relief encompasses none of these rationales or effects.

In sum, even if class-wide preliminary injunctive relief is appropriate, it must be predicated on the insufficiency of the budget notification provided to the participant for her/his next ISP or SSP. K.W.'s request for blanket extension of the current injunction consequently seeks a provisional remedy that this Court lacks jurisdiction to enter. The Court must tailor the injunction to the alleged constitutional or statutory violation—instantly the particular participant's budget notification for the upcoming plan year. *See, e.g.*, *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).

## **CONCLUSION**

The motion to extend the preliminary injunction to protect the class should be denied or, alternatively, limited to prohibiting reduction of the putative class members' current ISP or SSP services in future plan years until this Court's approval of a budget notification form.

DATED this 1st day July 2013.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

By___________*/s/*___________

CLAY R. SMITH
Deputy Attorney General

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 1, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Richard Alan Eppink
ritchieepink@idaholegalaid.org

James Piotrowski
jpiotrowski@idunionlaw.com

Marty Durand
marty@idunionlaw.com

*/s/*
Clay R. Smith