UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| K.W., by his next friend D.W., et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>RICHARD ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare; PAUL LEARY, in his official capacity as Medicaid Administrator of the Idaho Department of Health and Welfare; and the IDAHO DEPARTMENT OF HEALTH AND WELFARE, a department of the State of Idaho,<br><br>            Defendants. | Case No. 1:12-cv-00022-BLW (lead case)<br><br>**MEMORANDUM DECISION AND ORDER** |
| TOBY SCHULTZ, et al.<br>            Plaintiffs,<br>    v.<br>RICHARD ARMSTRONG, et al.,<br>            Defendants. | Case No.  3:12-CV-58-BLW |

**INTRODUCTION**

Before the Court are numerous motions filed by both sides.  The Court held oral argument and took the motions under advisement.  The Court explains its ruling on each motion below.

**LITIGATION BACKGROUND**

Plaintiffs are developmentally disabled adults who qualify for benefits under

Medicaid.  They are eligible for long-term institutional care but choose to live instead in their own homes or in community settings.  When their Medicaid payments were reduced, they brought this action against the Idaho Department of Health & Welfare (IDHW), alleging, among other things, that the notices sent by IDHW informing them of the reductions were insufficient.  The Court enjoined the reductions, and the parties eventually agreed to the terms of a preliminary injunction that maintained the status quo and provided plaintiffs with information regarding their budget reductions.  That injunction restored the Plaintiffs' budgets to the levels they were at prior to July 1, 2011, the date IDHW sent the unconstitutional budget notices.  The injunction also prohibited IDHW from reducing Plaintiffs budgets until it (1) provided Plaintiffs with  notices, approved by this Court, and (2) made available for copying specified documents it used to calculate Plaintiffs' budgets.

IDHW responded by filing a motion to approve the form of Notice that they sent to each plaintiff.  The Court denied the motion, holding that the Notice failed to provide due process because it did not explain budget reductions.  *See Memorandum Decision (Dkt. No. 66)* at p. 8.  The Notice provided by the IDHW made it very difficult for a participant to determine why his budget had been reduced and left him unable to effectively challenge the reduction.  Ultimately, the Ninth Circuit affirmed the Court's decision on the Notice and held that the injunction was necessary to preserve the status quo until proper Notices were approved.  *K.W. v. Armstrong*, 789 F.3d 962, 976 (9th Cir. 2015).

**Memorandum Decision & Order – page 2**

In the meantime, another group of named plaintiffs filed a nearly identical case entitled *Schultz v. Armstrong, CV-12-58-BLW.* On April 6, 2013, the Court ordered that case consolidated with the present case. *See Order (Dkt. No. 77)*

The plaintiffs then filed (1) a motion to certify a class; (2) a motion to extend the existing preliminary injunction to the proposed class members; and (3) a motion to file a consolidated class action complaint. IDHW filed a second motion to approve its form of Notice.

The Court denied IDHW's motion, finding that the Second Proposed Notice contained the same flaws as found previously – it failed to properly notify participants of the reasons for IDHW's actions. The Court granted plaintiffs' motions, certifying a class and extending the existing preliminary injunction to all members of the class. The Court's decision adopted the terms of the injunction verbatim as proposed by plaintiffs.

With regard to the class, the plaintiffs had sought to certify a class to challenge the generic policies and procedures that IDHW applies across-the-board to participants and applicants in the DDS Waiver program. Of the 3,600 or so participants in that program, 16 brought this case as representatives of all those similarly situated. They challenge several systemic components of the program, claiming that: (1) IDHW's budgeting methodology improperly reduces assistance for some recipients; (2) the notice that IDHW uses to inform participants of reductions in their assistance is insufficient; and (3) there is no fair pre-deprivation hearing prior to reducing assistance.

To encompass all the participants that are affected by these alleged system defects, the plaintiffs proposed – and the Court approved – the following class definition:

> All persons who are participants in or applicants to the Adult Developmental Disability Services program ("DDS program"), administered by the Idaho Department of Health and Welfare as part of the Idaho Medicaid program, and who undergo the annual eligibility determination or reevaluation process.

In addition to the class claims that challenge the system-wide processes of IDHW, there are individual claims brought by 16 named plaintiffs alleging that reductions to their budgets puts them at risk for being institutionalized. These individual claims are referred to as the *Olmstead* claims, after the Supreme Court decision requiring those in the position of plaintiffs to show that "the challenged state action creates a serious risk of institutionalization." See *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 607 (1999).

The Court denied IDHW's motion to bifurcate the *Olmstead* claims from the class-wide claims for pre-trial discovery and trial purposes under Rule 42(b).  In addition, the Court clarified the injunction as follows: (1) the injunction does not prevent IDHW from denying services based upon a finding that the participant is no longer eligible for those services; and (2) IDHW must provide a participant with a notice that contains an individualized explanation for the service plan denial.

## Currently Pending Motions

Currently pending before the Court are the following motions:  (1) Cross-motions for summary judgment on the class-wide claims; (2) Cross-motions for summary judgment on the individual claims; (3) Joint motion for preliminary approval of partial settlement; (4) Motions to Strike; (5) Plaintiffs' motion for interim attorney fees.

The Court will resolve each motion after reviewing the factual background of this case.

## FACTUAL BACKROUND

**Budget Setting Process for Participants**

Moving the disabled out of institutions, and into homes, can save money and improve care. *See Ball v. Rodgers*, 492 F.3d 1094, 1098 (9th Cir. 2006).  Medicaid recognized this by allowing states to set up "Home and Community-Based Services" ("HCBS") to allow the disabled to "waive" their entitlement to institutional care in return for receiving community-based care.  The State of Idaho participates in Medicaid and the HCBS program. In Idaho, the program is known as the Developmental Disabilities Waiver program ("DD Waiver program"), and is administered by IDHW.

The plaintiffs all participate in the DD Waiver program. The purpose of the program is "to prevent unnecessary institutional placement, provide for the greatest degree of independence possible, enhance the quality of life, encourage individual choice, and achieve and maintain community integration." IDAPA 16.03.10.700.

For each participant in the DD Waiver program, the IDHW annually prepares a "budget" that sets a limit on the expenses authorized for that person. The budget is calculated by IDHW's budget tool software based on inputs from Independent Assessment Providers (IAPs) hired by an IDHW contractor, the Idaho Center for Disabilities Evaluation ("ICDE").

The IAPs visit with participants and a "respondent," typically the legal guardian or family member, to assess that person's needs. See *Whilhite-Grow Declaration* (Dkt. No. 42-6) at ¶¶ 2-3.  The IAP will also examine any medical provider's records. *Id.*

Following these evaluations, the IAP fills out a form called an "Inventory of Individual Needs." *See Exhibit C* (Dkt. No. 53-5) at p. 20. The form has numerous boxes to check that in aggregate describe how the participant is affected by her disability. For example, the boxes to be checked describe such things as (1) type of disability, (2) need for psychotropic medications or nursing services, (3) level of hearing, vision and mobility, (4) assistance needed for feeding, dressing, and toileting, and (5) living situation, among other things. *Id.* The Inventory is roughly 6 pages long. *Id.*

The IAP fills out the Inventory by hand, and then enters the information into a computer form known as an Individualized Budget Calculation (IBC). The IBC contains fields corresponding to categories of needs. For example, there are fields for "Feeding," "Toileting," and "Need for Nursing Services," among others, corresponding to the boxes described above in the Inventory of Individual Needs. The IAP carries over the data from the Inventory into the IBC.

When a field is completed on the IBC, the IDHW's budget tool software automatically calculates what Medicaid would pay toward meeting that need. For example, the IAP has four options to describe the level of assistance that a participant might need with toileting: (1) independent, (2) supervision, (3) assistance, or (4) total support. On the IBC, there is a "Toileting" field; if the IAP enters "assistance" in that field, the budget software automatically calculates the dollar amount Medicaid would pay toward meeting the need of assistance with toileting. If the IAP enters "total support" instead, the software would automatically enter a higher dollar figure. The important

point here is that the IAP describes the need, and the budget software calculates the dollar figure Medicaid pays for that need.

The budget tool software program runs a spreadsheet that lists all the need categories and their corresponding dollar amounts. The software starts with a dollar figure for the budget calculation that is called the "constant."  That is the budget the participant starts with, and it is either reduced or increased depending on the IAP's evaluation of the various needs of the participant.  For example, in the case of plaintiff K.C. for the period 2011 to 2012, her constant was $24,476.75.  *See Exhibit C* (Dkt. No. 43-4). When the IAP entered K.C.'s age in the appropriate field in the IBC, the budget tool software subtracted $3,190.68 from the constant.  *Id.*  When the IAP inputted her specific type of living situation, the software added $8,881.87 to the constant.  *Id.*  There were other reductions and additions to the constant until the final budget – the Assigned Budget Amount – was calculated by the software.

When the IAP has finished filling out all the fields on the IBC, and the budget tool software has calculated an Assigned Budget Amount, the software automatically exports this data into a Notice that is then sent to the participant.  This is the Notice that has been the subject of dispute in this case.  As stated above, the Notice contains an attachment that includes copies of the IBC and the Inventory of Individual Needs for that participant.

## From Budget to Service Plan

Once a participant receives his budget Notice, the next step is for the participant to develop a service plan designed to meet his needs.  The cost of the service plan must stay within the participant's budget.  *See* IDAPA 16.03.13.190 ("The participant must work

within the identified budget and acknowledge that he understands the budget figure is a fixed amount.").  The participant then submits his service plan to a "Care Manager" employed by IDHW for review.

After reviewing the plan, the Care Manager makes a determination that the plan meets the participant's needs and is within budget or not.  If the Care Manager approves the plan, it goes into effect for the next budget year.  If Care Manager is not satisfied with the plan, either because it does not meet the participant's needs or is over budget, the Care Manager can work with the participant to address those issues.  In those cases where resolution cannot be reached, the Care Manager will deny the plan in total, or in part. Whatever the determination, the Care Manager then prepares a "Service Plan Notice."[1] *E.g.*, Dkt. 94-1 at 59-61.  The Service Plan Notice informs the participant of what services were approved or denied, and it notifies him of his right to appeal the Care Manager's decision.

If the participant files an appeal within 28 days of receipt of the Service Plan Notice, a hearing is held before a hearing officer.  The hearing officer has the authority to affirm the Care Manager's decision or remand the matter back to the Care Manager to reevaluate his decision.  However, the hearing officer has no authority to modify a budget or approve services rejected by the Care Manager.

---

[1] The generic term "Notice" refers to the budget notice, not the Service Plan Notice.

The losing party at the hearing then has the right to appeal to the Director of IDHW or his designee.  The Director's decision can then be appealed to this court.

**The Application Process**

An individual applying to the program goes through the same process described above after completing two preliminary steps.  First, the applicant must submit the necessary financial information so that his eligibility for Medicaid can be verified.  If the applicant passes this step, the second step is for the applicant to submit documentation that allows an IAP to make a preliminary determination that the applicant has a developmental disability.  If the IAP so determines, the applicant is treated exactly like a participant throughout the budget and service process.

## ANALYSIS

**Plaintiffs' Motion for Interim Attorney Fees**

The plaintiffs seek $400,234.26 in attorney fees for work done over the last four years that this case has been pending.  Plaintiffs did not include in that total any work done on the motions currently pending.  IDHW does not dispute the hourly rate or the total hours spent, and they do not dispute that plaintiffs are entitled to their fees for their work on the Notice dispute, the Ninth Circuit appeal, and the partial settlement making available information relating to the budget-setting process.  IDHW proposes deferring a decision on $173,547.50 of the fee award because that sum is not devoted to the issues on which plaintiffs have thus far prevailed.

Both sides agree that this Court has the discretion to award fees under 42 U.S.C. § 1988.  This case is immensely complex, and has now stretched out for over four years.

**Memorandum Decision & Order – page 9**

Plaintiffs have prevailed at every turn, both here and at the Ninth Circuit.  It is true that an award of interim fees is the "exception rather than the rule." *Taylor v. Westy,* 525 F.3d 1288, 1290 (9th Cir. 2008).  But this case is the exception.  In cases like this, "[t]o delay a fee award until the entire litigation is concluded would work substantial hardship on plaintiffs and their counsel and discourage the institution of actions despite the clear congressional intent to the contrary" expressed in § 1988. *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 723 (1974).

IDHW seeks to back out $173,547.50 of fees on the ground that they were incurred for issues either unresolved or on which plaintiffs did not prevail.  But in examining these matters, the Court finds that these fees were necessarily incurred in presenting the issues on which plaintiffs have prevailed.  In a case of this magnitude and complexity, a comprehensive record is an absolute necessity.  This is especially true here where IDHW has fought plaintiffs on every issue.  Plaintiffs have filed thousands of pages of material to lay a foundation for all their prevailing arguments.  To deny plaintiffs the fees for establishing this record would be unfair.  For example, IDHW seeks to back out fees related to the investigation of the budget tool.  But understanding that budget tool was crucial to the prevailing arguments made by plaintiffs throughout this litigation.

For all these reasons, the Court finds that the motion will be granted.  The Court will award plaintiffs $400,234.26 in fees and $481.46 in costs.

**Cross-Motions for Summary Judgment on Class-Wide Claims**

Both sides seek summary judgment on the plaintiffs' class-wide claims.  Those claims focus on three general categories of issues: (1) the budget tool; (2) the appeals process from a budget calculation; and (3) the Notice used to inform participants of their calculated budget amounts.  The Court will turn first to the challenges to the budget tool.

**Budget Tool**

To build its budget tool, IDHW started with 2009 and 2010 data from 3,512 participant records.  *See Exhibit 8 (Dkt. No. 189-44).*  The Department had to discard about 37%, or 1,300, of the records because they were plainly erroneous.  *Id.; see also Snow Deposition (Dkt. No. 189-42)* at pp. 35-37.  Of the remaining records, the Medicaid ID number in about 30%, or 643, of them did not match anything in IDHW's systems. *Snow Deposition, supra* at p. 38; *Exhibit 8, supra.*  Over 18% of the remaining records contained incomplete or unbelievable information, like one participant's budget amount of $24 million, *Snow Deposition, supra* at p. 41, and 243 records had obviously incomplete paid claims totals.  *Id.* at pp. 42-44; *IDHW (Snow) Deposition* at pp. 59-62. Ultimately, although the Department loaded 998 records into its statistical software to build the tool, the software could only use 733 of those records.  *See Snow Deposition, supra,* at pp. 40-41; *Exhibit 7 (Dkt. No. 189-43).*  At the time, IDHW did not determine why those records could not be used.  *See IDHW (Snow) Deposition, supra,* at pp. 42-43. The reason, a later analysis showed, was that crucial IIN assessment data was missing. *See Snow Declaration (Dkt. No. 208-5)* at ¶ 10; *Remington Declaration (Dkt. No. 189-24)* at ¶ 12.

In other words, 66% of the original sample size was not used to build the tool because of unmatched Medicaid IDs, missing IIN assessment data, and missing paid claims data.  IDHW argues that the final sample size was statistically significant so it is irrelevant that the final sample size was reduced by 66% due to various errors.  *See Snow Declaration (Dkt. No. 208-5)* at ¶¶ 32-33.  But even if that is true, a substantial number of *known* errors signals two things:  (1) the existence of substantial *unknown* errors; and (2) a lack of quality control.  Indeed, when IDHW Principal Research Analyst Derrick Snow examined the data, he discovered that Region 3 – including Caldwell and surrounding areas – was underrepresented in the data compared to the representation the Region should have received given its size.  *See Snow Declaration (Dkt. No. 208)* at ¶ 33.  The error was not insignificant – Snow testified that it was a "substantial difference" and was due, in his judgment, to "a transition in database recordkeeping in Region 3 that affected data completeness."  *Id.*  In other words, errors were made.  The record reveals yet another reason to doubt the reliability of the budget tool.

So it comes as no surprise that IDHW estimates that the budget tool will not produce an adequate budget for up to 15% of the participants.  *See Christensen Declaration (Dkt. No. 25-3)* at ¶ 6 (statement of IDHW Program Manager that "approximately 15% of the BDDS program participants have a calculated budget that may need to be enhanced due to the significance of their level of need"); *see also IDHW (Snow) Deposition, supra,* at p. 25 (estimating that budget tool produces inadequate budgets for up to 10% of participants).

**Memorandum Decision & Order – page 12**

IDHW counters these statements with statistics showing that for the average participant, utilized budgets are lower than authorized budgets.  *See Snow Declaration (Dkt. No. 208)* at ¶¶ 18-20.  But averages do not negate specifics, and indeed they can exist comfortably side-by-side. While the average participant might be satisfied with his budget, 10% to 15% of participants are not, and that means hundreds of participants have budgets that are not adequate for their needs.

To counter these problems, regular testing must be done to ensure that the budget tool is working as intended.  But, although IDHW knows that the tool needs to be recalculated annually, IDHW has not done that. *See Snow Deposition, supra* at p. 60; *IDHW (Snow) Deposition, supra,* at p. 74.  IDHW has never checked to determine how many participants are actually assigned insufficient budgets.  *See Snow Deposition, supra,* at pp. 108-110, and it has never checked to ensure that the current tool is not reducing participant budgets arbitrarily.  *Id.* at pp. 93-98. [2]

The result of the use of the budget tool?  Before elimination of the reconsideration process – a human review of the budget tool figure for a participant – 62% of the budgets were increased following reconsideration.  *See Christensen Declaration, supra,* at ¶ 5. These facts raise serious questions about the reliability of the budget tool.   Consequently, IDHW's system for correcting errors becomes vitally important, and must be carefully examined.

---

[2] Program Manager Jean Christensen testified that IDHW did examine complaints to determine if the outcomes were accurate, but she admitted that this was not "a real good process at that time to look at outcomes."  *See Christensen Deposition (Dkt. No. 189-31)* at p. 35.

**Appeal Process**

Every participant who believes their calculated budget is too low may appeal to IDHW.  The first stage of every appeal is an "informal review" of the case file by either Program Manager Jean Christensen or her counterpart, Program Manager Annette Wilkinson.  They may increase a budget only if they decide that a higher budget is needed for the participant's "health and safety."  *See Christensen Deposition, supra,* at pp. 53-54.  This "health and safety" standard was mandated by the Idaho Legislature in Idaho Code § 56-255, passed in 2011.

In determining whether the participant has satisfied the "health and safety" test, Project Manager Christensen looks at both physical and mental health, and evaluates whether the participant's "quality of life [has] deteriorated to result in some health and safety issues . . . ."  *See Christensen Deposition, supra* at p. 55.  To satisfy the safety prong, she is looking for "[s]afety in regard to environment, safety in regard to behaviors that they may have that put themselves and others at risk."  *Id.* at 55-56.  She needs "documentation specific to the individual, and not the general DD population."  *Id.* at p. 56.  Her criteria is based on her own judgment because the Legislature did not define the phrase in the statute and IDHW has not drafted any regulations defining the phrase.  *See IDHW (Evans) Deposition (Dkt. No. 189-38)* at p. 41.  While IDHW asserts that the participant may challenge the denial of her informal review at the eventual appeal

hearing, *id.* at p. 42, the participant is only notified of the denial and not told why the claim was denied.  *See Evans Deposition (Dkt. No.189-38)* at p. 41-42.[3]

In addition to having to guess at the reasons for a denial and the standards that must be satisfied, the challengers must also overcome their own disabilities to pursue an appeal.  When IDHW Program Manager Jean Christensen was asked how a participant is expected to pursue a process as complex as an appeal, she answered that "[w]e don't expect people with developmental disabilities to read these notices in isolation, or make decisions on their own. That is why they have person-center planning teams, guardians, and plan developers.  So we expect them to use the person-center planning team and their supports to help them understand it."  *See Christensen Deposition, supra,* at p. 77.  But almost 39% of the participants as of March 2015 do not have a legal guardian or conservator.  *See Stipulated Facts (Dkt. No. 200)* at ¶ 14.  Of those without a legal guardian or conservator almost 21% (or 859 participants) do not currently live with a parent, sibling, child, or other close relative.  *Id.*  In the past, IDHW reimbursed DDS Program Service Coordinators for their work in "advocating for the unmet needs of the participant."  *IDAPA* 16.0310.727.01.b (prior IDHW Rule).  But in 2009, IDHW deleted that language.  *See Exhibit 105 (Dkt. No. 189-10)* at 285 (showing deleted language).[4]

---

[3] Another appeal route called "exception review" is only available for participants eligible for high or intense supported living services and employment support services.  That means it is not available to about one-third of the participants, whose only avenue of relief is an appeal and informal review, discussed above.

[4] Service coordinators can be reimbursed for up to 4.5 hours per month, hardly a drop in the bucket of the substantial time necessary for pursuing an appeal.  *See Klossner Third Declaration (Dkt. No. 189-19)* at ¶ 5.

**Memorandum Decision & Order – page 15**

That left any advocate for the participants to work for free on the appeal, as IDHW

Program Manager Christensen made clear in her deposition:

> Q.    Okay. How does the Department ensure that participants who have no family, no guardian, and no personal advocate, and who wish to have their budgets increased, have access to the appeal process . . . .?"
> A.    Every participant has a plan developer who is a service coordinator and an advocate.  They also have a personal center planning team, which includes providers, the service coordinator. They have a team of people that have been identified to support that person in these kinds of things.
> Q.    And can any of those people get reimbursed for time they spend pursuing an appeal?
> A.    Not specifically, no.
> . . . .
> Q.    So how does the Department ensure that for a participant without family, guardian, or a personal advocate, and with a plan developer who does not want to volunteer his or her time to pursue an appeal, that those appeals do get filed when they need to be filed?
> A.    I'm not aware that we do anything.

*See IDHW (Christensen) Deposition, supra,* at pp. 75-77.  And an appeal is not

something that can be put together slap-dash.  The time and skills needed to help a

participant prepare for an appeal were described by Penny Klossner, a service coordinator

with IDHW:

> You have to spend hours gathering documentation, and sometimes you have to get new documentation or talk to providers to get information and get their commitment to testify at the hearing or gather other information. Then you have to prepare for the hearing itself, by going through the documents and trying to figure out what documents are needed for the hearing and which documents and testimony will be needed to explain the situation to the hearing officer or IDHW. Then you have to get everyone together before the hearing to go over the plan for the hearing. The hearings themselves usually take two to four hours alone. Then there is usually some followup—either providing additional documents to the hearing officer or, if the hearing officer rules against you, writing up materials for Director review of the hearing officer's decision.

In my experience, most guardians, family members, and direct care providers struggle to figure out how to do an appeal. They hardly ever know anything about the IDHW rules and Medicaid regulations that apply. They don't know which documents are relevant or even how the hearing process will go. For them, the number of hours that it would usually take to do an appeal for a participant would be far more than what I would need. In fact, there are other Service Coordinators and Support Brokers who struggle with helping with an appeal. I know this because they contact me for help.

Maybe it goes without saying, but none of my clients would be able to handle an appeal of their budget or services without help. Most are not even able to read the notice itself. Almost none of them could fill out and send in a fair hearing request, and none at all could gather the necessary documentation and prepare and present their case without lots of help. Most of the adult DD Waiver participants I am aware of just do not have anyone able and willing to provide that help, unless they are lucky enough to have a Service Coordinator or Support Broker willing and able to volunteer for many hours to help them. The Person Centered Planning Teams are just not equipped or funded to ensure an appeal is filed and properly handled when needed.

*See Klossner Third Declaration (Dkt. No. 189-19)* at ¶¶ 6-9.

For example, IDHW's Jean Christensen requires specific documentation in reviewing appeals: "[A] psych eval[uation], a physician's report, a medical report, a PT report, whatever the specific person's significant needs are, we are waiting for some kind of documentation that validates, without this level of increase, what the barrier is for this person for health and safety." *Id.* at pp. 57-58. Christensen herself spends "[a] lengthy amount of time" examining an appeal, *See Christensen Deposition, supra,* at p. 81, and so it stands to reason that the process demands the same attention to detail and time of a disabled participant.

## Legal Analysis of Budget Tool & Appeal Process

The discussion above demonstrates that the budget tool will produce an inadequate budget for between 10% and 15% of the participants. This puts a premium on testing the

tool for accuracy and establishing a robust appeal process where the inevitable errors can be corrected.  But that testing is not being done, and the appeal process is far from robust. An appeal is complex under any circumstances, but is especially challenging here because the participants receive no explanation for the denial, have no written standards to refer to for guidance, and often have no family member, guardian, or paid assistance to help them.

As the Ninth Circuit held in this case, the plaintiffs have "a property interest in their benefits," and a reduction in those benefits "deprives them of this property interest." *See K.W. v. Armstrong,* 789 F.3d 962, 973 (9th Cir. 2015).  They are therefore entitled to "such procedural protections as the particular situation demands."  *Mathews v. Eldridge,* 424 U.S. 319, 321 (1976).

The Supreme Court has identified the factors to be considered in determining what process is due where a protected property interest is in jeopardy: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Id.* at 333

One of those procedural protections is the establishment of clear ascertainable standards that "insure fairness and . . . avoid the risk of arbitrary decision making."

**Memorandum Decision & Order – page 18**

*Carey v. Quern,* 588 F.2d 230, 232 (9th Cir. 1978). "This absence of any ascertainable standard for inclusion and exclusion is precisely what offends the Due Process Clause." *Smith v. Goguen,* 415 U.S. 566, 578 (1974). Due process requires IDHW to "establish written standards and regulations." *White v. Roughton,* 530 F.2d 750, 754 (7th Cir. 1976).

In this case, those standards need to define the crucial phrase "health and safety" on which appeals often turn. In the *Mathews* balancing analysis, there is no dispute that a reduction in benefits impinges on a substantial private interest. The cases cited above recognize the high risk of an erroneous deprivation if standards are not clear and ascertainable. Finally, while the drafting of standards would involve some cost, their existence would streamline hearings, allowing the participants and decision makers to more expeditiously and accurately resolve challenges, saving money that would offset or mitigate the cost of writing new standards. Due process therefore requires that IDHW write standards defining the phrase "health and safety" and describing the documentation and other material required of the participant to satisfy that standard.

Another procedural protection is notice of the reasons for the denial of the informal review. In past decisions in this case the Court has explained how the lack of adequate notice violates the Due Process Clause. That discussion will not be repeated here. IDHW must give notice of its reasons for denying informal review.

Notice and an explanation will mean little, however, if the disabled participant is required to pursue an appeal alone. "[T]he prosecution of an appeal demands a degree of security, awareness, tenacity, and ability which few dependent people have." *Goldberg v. Kelly,* 397 U.S. 254, 269 at n. 16 (1970). Due process requires that the IDHW "reach

out to a suitable representative, possibly including a competent family member, or appoint or seek judicial appointment of an advocate or guardian, before conducting the hearing and proceeding to a determination adverse to the [participant]." *Blatch ex rel. Clay v. Hernandez,* 360 F.Supp. 2d 595, 621-22 (S.D.N.Y. 2005).   For those with no family or guardian to assist them, it is not enough to hope that an IDHW service coordinator or other team member will assist in a volunteer capacity:  "It obviously cannot be assumed that a volunteer will continue to pursue a claim on behalf of [a medically impaired claimant to an entitlement benefit]." *Culbertson v. S.H.H.S.,* 859 F.2d 319, 324 (4th Cir. 1988) (cited with approval in *Udd v. Massanari,* 245 F.3d 1096, 1102 at n. 4 (9th Cir. 2001)).

Due process requires more than just assuming someone will volunteer to assist the participant; it requires that IDHW receive a commitment from someone competent to assist the participant in the appeal.  That commitment could be from a family member, guardian, volunteer, or other person, if competent.  But the IDHW must receive that commitment before proceeding to informal review and taking any action to confirm a budget reduction produced by the budget tool.

The plaintiffs urge the Court to open up the exception review process to all participants.  Presently, for those qualifying for exception review, their service coordinators may be reimbursed for their time spent assisting on appeals, so by opening up exception review to all participants, they could all obtain paid assistance.  This might be the only way to obtain suitable representation.  Even if a family member or guardian committed to assist the participant, they would often need substantial assistance from

someone at IDHW to navigate the thickets of the regulations and the "health and safety" standard. And commitments may be very difficult to obtain if time is not compensated.

But IDHW may have other creative solutions and the Court is not foreclosing them at this time. The Court will order that IDHW submit a plan to ensure that all participants receive a commitment from a suitable representative to assist the participant before proceeding to informal review and taking any action to confirm a budget reduction produced by the budget tool.

The plaintiffs also urge the Court to order the IDHW to allow into evidence as part of the appeal process a booklet used by IAPs and the IDHW to determine eligibility for benefits. The booklet is known as the Scales of Independent Behavior – Revised (SIB-R). It contains a series of prompts to be used by an IAP to determine the equivalent age of the participant and the extent of anti-social behaviors. The scores on these two tests must be used to determine eligibility, and individual budgets, under the IDHW regulations.

The SIB-R booklet is about 20 pages in length. *See SIB-R Booklet (Dkt. No. 189-22)*. About 13 pages are devoted to prompts that help an IAP determine age equivalency. Each of these 13 pages focuses on a different ability category such as "fine motor skills," "eating and meal preparation," and "toileting." For each ability category, the booklet lists numerous tasks such as (1) "copies a circle from an example," (2) "asks for food to be passed," (3) "says last name when asked," and (4) "controls bowels during the day." For each task, the IAP must assess how well the participant could complete that task, ranging from "never or rarely" to "does very well." Depending on the participant's ability, the

IAP gives a point score at the bottom of the page.  The IAP then transfers these point scores spread over 13 pages to a single-page worksheet on which the age equivalency will be calculated from these scores.

Another 4 pages of the booklet are devoted to determining the extent of anti-social behaviors, if any.  There are prompts to assist the IAP in determining if the participant is "hurtful to self" or "destructive to property."  For example, under the latter category, prompts ask the IAP to determine if the participant "breaks, defaces, or destroys things" and if so, how often and how severe is the problem caused by this behavior.  Again, the IAP must then transfer these answers to a separate worksheet on which is calculated a "Maladaptive Behavior Index", a score that becomes part of the scoring determining the participant's budget.  The IAP then enters these scores into the IIN software that uses the budget tool to calculate a final budget for the participant.  *See Densley Declaration (Dkt. No. 187-22) at ¶ 17.*

From this description, the potential for errors in the final scores is obvious. Ultimately, the IAP must manually transfer scores from a number of pages to three worksheets and calculate sums from the numbers transferred.  This process could challenge even the most precise IAP.  Moreover, there is the possibility for substantive errors.  Perhaps the IAP misunderstood the participant's ability to do a specific task or overestimated the severity of an anti-social behavior.  The impact could be large because just a few points can alter the budget by thousands of dollars.

IDHW does allow the participant and representative to "review specific SIB-R interview book questions and responses for the purpose of explaining scores received in a

particular section of the interview but [they] may not copy the questions or responses themselves." *See Densley Declaration (Dkt. No. 187-22)* at ¶ 15.  In appeals, IDHW takes the position that the SIB-R cannot be used at the hearing, and the IDHW hearing officers have refused to compel IDHW to provide the SIB-R materials for use at the hearings.  *See Order (Dkt. No. 189-23).*

IDHW does not explain how the participant can prove errors in the SIB-R booklet if IDHW can ban the SIB-R booklet from the hearing.  Indeed, it would be impossible, and IDHW does not argue otherwise.

IDHW justifies this by submitting the Declaration of Tracy Boney, Vice-President of Product Management and Strategy at Houghton Mifflin Harcourt Publishing Company, the company that developed the SIB-R and holds the copyright on that work.  *See Boney Declaration (Dkt. No. 100-2).*  He alleges that the company will suffer substantial economic loss if the SIB-R is copied, and that its confidentiality prevents the "teaching to the test" phenomenon.  *Id.* at ¶ 6(b).

*Mathews* requires that the Court weigh this potential harm against the importance of the SIB-R to the participant's budget and the risk of erroneous deprivation.  The SIB-R scores are very important in the overall IIN scoring that establishes a budget for the participant, and determines the available services.  IDHW's ban prevents participants from challenging errors or effectively cross-examining IAPs who claim their assessments are accurate.  Finally the risk of error – either mathematical, clerical, or substantive, as discussed above – is substantial.  These risks of erroneous deprivation outweigh the harm described above; the *Mathews* analysis compels a finding of a due process violation.  *See*

*American-Arab Anti-Discrimination Committee v. Reno,* 70 F.3d 1045, 1069 (9th Cir. 1995) ("the very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error").

The Court recognizes the concerns of the copyright holder. But any such harm could be substantially mitigated – and perhaps entirely alleviated – by (1) protecting the SIB-R material in a particular case with a Protective Order; (2) granting access to only those portions necessary for full confrontation – typically, that would be the scoring pages and worksheets concerning the age-equivalency and maladaptive behavior sections, and would not necessarily include all the other material.

The Court will direct IDHW to draft a plan so that participants can not only view all portions of the SIB-R necessary to fully challenge a budget reduction but also be able to present any challenged portion of the SIB-R analysis to a hearing officer or other decision maker during an appeal.

The plaintiffs also challenge IDHW's practice of having ex parte contacts with hearing officers. In response, IDHW states as follows: "To assure fairness in the hearing process, the Attorney General hearing officers will not have any ex parte communications about any pending appeal with either any representative of IDHW or any participant appealing an IDHW decision." *Christensen Declaration (Dkt. No. 187-21)* at ¶ 6. The Court relies on this statement in finding the dispute moot.

To this point, the Court's legal analysis has focused on the appeal process. Turning now to the budget tool, the Court finds that its unreliability – discussed above – arbitrarily deprives participants of their property rights and hence violates due process.

**Memorandum Decision & Order – page 24**

Precisely how to correct the budget tool's deficiencies is a subject vigorously debated by two experts, one for each side.  *Compare Remington Declaration (Dkt. No. 189-24) with Snow Declaration (Dkt. No. 208-5).*

These disputes create genuine issues of material fact that render summary judgment inappropriate.  Of course the parties can proceed to an evidentiary hearing on this matter, and incur substantial costs.  But that seems unnecessary when both sides want an accurate budget tool.

IDHW Program Manager Jean Christensen stated in her deposition that IDHW intended all along to regularly test the budget tool to ensure that it was producing valid results but that IDHW received legal advice to halt any such testing or improvement during this litigation.  *See Christensen Deposition (supra)* at pp. 58-60.  But now that the Court has held that the budget tool is deficient, the parties should be able to agree to a plan to improve the tool and institute regular testing to ensure its accuracy.

The Court is not requiring perfection here.  But there is substantial room for improvement.  An agreement by the parties on a revised budget tool will be far superior to any Court-imposed remedy.  But if the parties are unable to agree, the Court will impose a remedy.

The Court will therefore direct IDHW to prepare a plan – working together with plaintiffs'' counsel – to improve the budget tool and conduct regular testing to ensure its accuracy.

<u>**Notice**</u>

**Memorandum Decision & Order – page 25**

IDHW has submitted a third proposed notice that would be used annually to notify participants of their budgets, and, most importantly, of any reductions in their budgets from the prior year.  The Court rejected the two prior notices submitted by IDHW, and on appeal the Circuit held that one of those notices was "inadequate because [it] did not specify why participants' budgets had decreased" and thereby violated the due process requirement that the notice must give participants "sufficient detail that [they] can prepare a responsive defense." *K.W.,* 789 F.3d at 973.[5]  That decision guides this analysis.

The Court begins its analysis by describing that portion of the newly proposed notice that explains the reasons for any budget reduction.  The notice is to be filled out by the IAP and contains 3 boxes that an IAP can check to describe generally the changes that led to a reduction in a budget:

□   Your answers to the IIN or SIB-R changed from last year to this year;
□   The assessor [IAP] observed or verified this change;
□   Other, see below.

To the left of these boxes are spaces for the IAP to explain more specifically the changes to the SIB-R or IIN scores.  Below those spaces is a larger space labeled "Other Reasons:  (explain if applicable)" that would be filled out if the third box above is checked.

IDHW explained the instances where an IAP would need to check the "other" box and provide an explanation in the "Other Reasons" space:

---

[5] The Circuit held that it lacked jurisdiction to consider the second proposed notice.  *Id.* at 976.

> There will be however, some instances when more explanation can be provided by checking the "Other" box and then providing a brief explanation under the "Other Reasons" section of the form. For example, further explanations can be provided under the "Other Reasons" section of the form: (1) when a participant has transitioned from the traditional service path to the self-directed support path (and vice versa); (2) when information is obtained from more than one Respondent; (3) when there is documentation relied on by the IAP that changes an assessment rating based upon that documentation; (4) when an assessment rating is made based upon a narrative response from the Respondent; (5) when an assessment rating is made because the IAP observed the participant and the IAP's observations directly contradict the Respondent's answer; or (6) when a participant has moved from receiving State plan DD services only to receiving DD Waiver services as a DD Waiver participant. If this Court requires these types of explanations, the IAPs will provide them. The IAPs have already been trained that they will need to check the "Other" box when there are assessment changes that result from sources other than the Respondent, and that when that box is checked, they will then need to provide a brief explanation for the assessment change in the "Other reasons" section of the form.

*See Haws Declaration (Dkt. No. 230-4)* at ¶ 4.  A simple example illustrates how the notice would work.  Assume the IAP observed that the participant had improved in his language expression and dressing ability.  The IAP would make the necessary changes to the SIB-R and IIN scores, the participant's budget would be reduced, the IAP would fill out the notice by checking the first two boxes, and then explain in the spaces to the left of the boxes that the changes in the SIB-R and IIN scores were due to the participant's improved performance in language expression and dressing ability.  In that example, the notice would comply with the due process requirement that the participant have the necessary detail to "prepare a responsive defense."  *Id.*

But the notice gets confusing if the IAP is relying on information outside of her own observations.  Assume that the IAP made the same finding on language expression and dressing ability but did so based entirely on the comments of another (or documents

of some sort) rather than on her own observations.  This is common.  *See Densley Deposition* at p. 58.  Could the IAP simply check the first and second box (because she "verified" the change) and provide no explanation?  That seems to be a reasonable response to the notice's prompts, as they are written now.[6]  But it would not comply with due process.  In that example, the participant would have no idea why the IAP concluded that he had improved in language expression and dressing, making it impossible for the participant to challenge the budget reduction.

Fortunately, it appears that the cure is simple:  Separate out instances where the IAP "observes" the change from instances where the IAP "verifies" the change, and include a space for the IAP to explain how she verified the change, if that box is checked.  The result would look something like this:

The reason for this change is because:
    ☐ Your answers to the IIN or SIB-R changed from last year to this year;
        ☐ The assessor observed these changes;
        ☐ The assessor verified these changes (if this box is checked, an explanation must be provided);
            ☐ Explanation of verification: _____
    ☐ Other changes (other than changes to the IIN and SIB-R)[7] (if this box is checked, an explanation must be provided);
        ☐ Explanation of other changes: _____

---

[6] It appears from the Declaration of Aaron Haws that IDHW is training its IAPs to explain in the "other" section any reasons for a budget reduction that come from sources other than the observations of the IAP.  *See Haws Declaration, supra* at ¶¶ 3-4.  But it is not clear from the notice whether those instances fall under the category of "verification."

[7] The Court is assuming here that budget can be reduced from changes other than a change to the IIN or SIB-R scores.

The Court proposes this as an example only.  The parties will undoubtedly be able to come up with a more elegant solution through agreement with this guidance from the Court.[8]  Crucial here is that the notice provide the reasons for the budget reduction so that the participant can challenge the reduction, and this requires the IAP to explain what she relied upon to reduce the IIN and/or SIB-R scores, or what she relied upon outside those scores.  That appears to be the intent behind the third proposed notice, but its language raises the potential that a full explanation might not be provided in certain instances.  Accordingly, the Court rejects the third proposed notice.

**Cross Motions for Summary Judgment on Individual Claims**

Both sides have filed motions for summary judgment on the claims of the individual class representatives, referred to earlier as the *Olmstead* claims.  The Court will begin by evaluating the cross-motions on plaintiffs' claim of facial discrimination.

Both sides seek summary judgment on plaintiffs' claim that they are victims of facial discrimination because IDHW imposes budgetary restrictions on them that they would not suffer if they went into a formal institution, or even if they needed home- and community-based services not specifically targeted for people with developmental – instead of physical or mental – disabilities.  Plaintiffs argue that because those with physical or mental disabilities are not subject to budgetary limitations, the plaintiffs – who are subject to budgetary limitations – are victims of facial discrimination in violation of the ADA and Rehabilitation Act.

---

[8] Both sides agree that the notice need not attach evidence supporting the budget reduction.

But the plaintiffs' claim – that certain groups do not face budgetary pressures – is not correct.  No state entitlement comes without budgetary limitations.  Indeed, the statutory language governing plaintiffs is identical with that governing those covered by the program for the aged and disabled known as "A&G Waiver"– for both programs services must be "within the determined budget."  *See Idaho Code §§ 56-255(3)(d)(ii) & (e)(ii).*

Plaintiffs argue that the facial discrimination takes the form of being short-changed, and they point out that funds available to institutionalization patients are three times higher than the most expensive service plan for plaintiffs.  *See Reply Brief (Dkt. No. 231-1)* at p. 5.  But that argument does not support a claim for *facial* discrimination because plaintiffs point to nothing in the statutory language that compels that result.

Plaintiffs also claim that they must overcome a "health and safety" hurdle discussed earlier that other disabled groups do not have to satisfy.  But the health and safety requirement applies to all disabled groups under 42 U.S.C. § 1396n(c)(2)(A).  There is no facial discrimination here.

For all of these reasons, the Court finds that plaintiffs' motion for summary judgment on its claim of facial discrimination must be denied, and IDHW's motion for summary judgment on the facial discrimination claim must be granted.

In the alternative, plaintiffs seek a ruling that any reduction in medically necessary services due to a budget cut would, as a matter of law, put them at risk of institutionalization.  This, they argue, violates the antidiscrimination provisions of the ADA, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794(a).  Both sides

seek summary judgment on this claim.  Because the applicable provisions of the ADA and the Rehabilitation Act are "co-extensive," the Court will discuss both claims together, focusing on the ADA.  *M.R. v. Dreyfus,* 697 F.3d 706, 733 (9th Cir. 2011).

The Supreme Court interpreted the ADA as forbidding the arbitrary segregation of the disabled in large state institutions.  *Olmstead,* 527 U.S. at 603.  An ADA plaintiff "need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care in order to state a violation of the integration mandate." *Dreyfus,* 697 F.3d at 734.  Rather, a plaintiff "need only show that the challenged state action creates a serious risk of institutionalization."  *Id.*  Imminent risk of institutionalization is not required.  *Id.*  Rather, "[t]he elimination of services that have enabled Plaintiffs to remain in the community violates the ADA, regardless of whether it causes them to enter an institution immediately, or whether it causes them to decline in health over time and eventually enter an institution in order to seek necessary care."  *Id.* at 734-35 (quoting with approval from DOJ Statement).

Plaintiffs seek a ruling that any reduction in their services caused by budgetary reasons would, as a matter of law, create a "serious risk of institutionalization" for each plaintiff.  In essence plaintiffs want a ruling that Idaho must ignore budgetary restrictions.

But plaintiffs cite no court so holding, and the breadth of their request goes beyond precedent.  The Supreme Court has held that "[t]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not boundless." *Olmstead,* 527 U.S. at 603.  Plaintiffs essentially ask this Court to rule as a

matter of law that Idaho must ignore budgetary considerations in the waiver program.
Yet this is precisely the argument rejected in the language cited above.

Moreover, substantial questions of fact preclude a ruling as a matter of law for
either side.  The disability for each plaintiff is unique.  The developmental disabilities
suffered by the individual plaintiffs differ significantly, and include severe epilepsy;
muscular dystrophy; mental retardation, seizure disorder and depression; Down's
Syndrome; mental retardation together with seizure disorder, diabetes, high blood
pressure and glaucoma; autism; mental retardation and attention deficit disorder;
Asperger's Syndrome and developmental delays; schizophrenia; posttraumatic stress
disorder and orthopedic difficulties related to balance and standing.  Some of the
plaintiffs require round-the-clock assistance or have a history of substantial
institutionalization. *See Amended Complaint (Dkt. No. 148)* at ¶¶ 2, 3, 8, 12, 13.  Others
appear more independent. Id. at ¶¶ 4, 9, 11.

In an earlier decision, the Court stated that "[t]he *Olmstead* determination [that is,
whether any individual plaintiff is facing a serious risk of institutionalization due to
budget cuts] will require a fact-based inquiry into whether the assistance for these
individuals is sufficient to keep them from being institutionalized." *See Memorandum
Decision (Dkt. No. 171)* at p. 5.  There are simply too many questions to rule as a matter
of law on this issue.  How will a future budgetary restriction – unknown at this time –
affect each plaintiff?  If one service is reduced do alternatives exist?  *See IDHW Brief
(Dkt. No. 196)* at pp. 19-32 (pointing out numerous alternatives if a particular service is

reduced that would avoid institutionalization). These are just a few of the questions which can only be answered through a case- and fact-specific evaluation.

Consequently, the Court will deny the motions filed by both sides on the issue whether budget cuts will result in a serious risk of institutionalization for any particular plaintiff. As discussed above, the Court will grant summary judgment dismissing plaintiffs' claim of facial discrimination.[9]

## Joint Motion for Preliminary Approval of Partial Settlement

The parties have filed a joint motion seeking preliminary approval of their partial settlement and approval of their class notices. Under the partial settlement, the parties propose that the Court enter a declaratory judgment ensuring that applicants and participants in the DD program will have the right to inspect and copy information and data about the IDHW's budget setting methodologies, models, and tools. The right to inspect and copy will extend to past, present, and future information and data. The judgment will also ensure that the public has the right to inspect and copy the IDHW's budget setting methodologies, models, and tools, as well. The information and data will not be altered or redacted, except when necessary to protect identifying information of an applicant or participant, or to preserve an otherwise lawful privilege. The judgment will also make clear that the information and data is not exempt from public disclosure under certain provisions of the Idaho Public Records Act.

---

[9] IDHW has filed a motion to strike portions of the Second Declaration of Shawna Murdoch (Dkt. No. 189-28) and the Third Declaration of Wendy Kotts (Dkt. No. 193). The Court relied on neither and so deems the motion to strike moot. The same result applies to two other motions to strike (Dkt. Nos. 229 & 241). The final motion to strike (Dkt. No. 246) will be denied as the material was properly submitted.

The plaintiffs agree, as part of the settlement, that a permanent injunction to ensure public availability of this information and data is not necessary at this time. The judgment does not address the right to inspect or copy the Scales of Independent Behavior–Revised ("SIB-R") interview book, response booklet, or software program, because the parties are instead asking the Court to decide that issue. Under the settlement, the defendants have waived their right to appeal the partial judgment or to contest the Court's jurisdiction to enter the partial judgment.

This joint motion proposes to give notice to the class about the proposed partial settlement and about the plaintiffs' recent motion for attorneys' fees.  Rule 23(e)(1) requires that the Court "direct notice in a reasonable manner to all class members who would be bound by" the parties' proposed partial settlement.  Rule 23(h)(1) requires that the Court direct notice of class counsels' motion for an award of attorney's fees and nontaxable costs.

The parties propose to satisfy these notice requirements by the doing the following:  (1) Mailing a copy of that notice to every known class member; (2) Mailing a copy to every known guardian of a class member; (3) Mailing a copy to every current adult DD service coordinator, plan developer, or Support Broker; and (4) Providing a copy by email or mail to organizations that provide advocacy services or other assistance to class members.

Rule 23(e) requires court approval for class settlements. The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir.1992).

**Memorandum Decision & Order – page 34**

The process begins with a "preliminary determination." *See Manual for Complex Litigation, Fourth* § 21.632 (FJC 2004). The Court's task at the preliminary approval stage is to determine whether the settlement falls "within the range of possible approval." *Lilly v. Jamba Juice Co*., 2015 WL 1248027 at *6 (N.D.Cal.2015).  Preliminary approval of a settlement is appropriate if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval." *Id.* The Court may consider a number of factors, including: (1) the strength of plaintiffs' case; (2) the risk, expense, complexity and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; and (7) the reaction of the class members to the proposed settlement.  *Id.* at *7.

After preliminary approval, the Court must hold a hearing pursuant to Rule 23(e)(2) to make a final determination of whether the settlement is "fair, reasonable, and adequate." Here, the parties ask the Court to take the first step in granting preliminary approval to the proposed class and the proposed settlement.

The Court has examined the partial settlement and the proposed notice, and finds that they meet all the requirements of Rule 23.  Accordingly, the Court will grant the motion and set a hearing for final approval of the partial class settlement.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that plaintiffs' motion for interim attorney fees (docket no. 185) is GRANTED, and that plaintiffs have from defendants the sum of $400,234.26 in attorney fees and $481.46 in cost.

IT IS FURTHER ORDERED, that the motion for summary judgment on class-wide claims filed by defendants (docket no. 187) is DENIED.

IT IS FURTHER ORDERED, that the motion for summary judgment on individual claims filed by defendants (docket no. 196) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks to dismiss plaintiffs' claim of facial discrimination. It is denied in all other respects.

IT IS FURTHER ORDERED, that the motion for partial summary judgment on class-wide claims and individual claims filed by plaintiffs (docket no. 189) is GRANTED IN PART AND DENIED IN PART. The motion is granted to the extent it seeks to compel IDHW to file within 90 days the following: (1) A plan for participants to view all portions of the SIB-R necessary to fully challenge a budget reduction and to present any challenged portion of the SIB-R analysis to a hearing officer or other decision maker during an appeal; (2) A plan to ensure that all participants receive a commitment from a suitable representative to assist the participant before proceeding to informal review and taking any action to confirm a budget reduction produced by the budget tool; (3) A plan defining the phrase "health and safety" and describing the documentation and other material required of the participant to satisfy that standard; (4) A plan to improve the budget tool and conduct regular testing of the tool to ensure its accuracy. The motion is denied in all other respects.

**Memorandum Decision & Order – page 36**

IT IS FURTHER ORDERED, that the joint motion for entry of judgment and preliminary approval of settlement (docket no. 210) is GRANTED.

IT IS FURTHER ORDERED, that the motion to approve the notice of the preliminary approval of settlement (docket no. 186) is GRANTED.

IT IS FURTHER ORDERED, that the motion for judgment (docket no. 183) is GRANTED subject to the hearing on the final approval of the class settlement.

IT IS FURTHER ORDERED, that the motions to strike (docket nos. 214, 229 & 241) are DEEMED MOOT.

IT IS FURTHER ORDERED, that the motion to strike (docket no. 246) is DENIED.

DATED: March 28, 2016

B. Lynn Winmill
Chief Judge
United States District Court