UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| K.W., by his next friend D.W., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD ARMSTRONG, et al.,<br><br>Defendants. | Case No. 1:12-CV-00022-BLW-CWD (lead case)<br><br>**REPORT AND RECOMMENDATION** |
| TOBY SCHULTZ, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD ARMSTRONG, et al.,<br><br>Defendants. | Case No. 3:12-CV-00058-BLW-CWD |

## INTRODUCTION

Before the Court is the parties' joint request for judicial resolution of three issues related to the implementation of a new resource allocation model under the terms of the settlement agreement. (Dkt. 473, 478, 485.) The issues have been referred to the undersigned by the presiding District Judge, for the purpose of conducting all necessary

**REPORT AND RECOMMENDATION – 1**

and proper proceedings related to the issues, and to submit proposed findings of fact and recommendations as to any disposition. (Dkt. 475.)

The parties filed briefing and other materials related to the issues presented. (Dkt. 470, 473, 476-480, 482, 484-487, 491-495.) The Court held a status conference on April 18, 2022, and heard oral argument from the parties on May 6, 2022. (Dkt. 483, 489, 490.) The parties submitted status reports following the hearing. (Dkt. 491-495.) After careful consideration of the parties' briefing and arguments, as well as the relevant portions of the record, the Court makes the following findings and recommendations.[1]

## BACKGROUND[2]

This case concerns the processes used by the Idaho Department of Health and Welfare ("the Department" or "IDHW") to determine Adult Developmental Disabilities Services program ("DDS Program") budgets provided to Idahoans with developmental disabilities who are eligible for Medicaid. These budgets allow some individuals with intellectual and developmental disabilities to access home and community-based services.

The Department provides DDS Program budgets as part of the enhanced Medicaid benefit and under a Medicaid waiver ("DDS Waiver"), which is approved by the Centers for Medicare and Medicaid Services ("CMS").

---

[1] Preliminarily, the undersigned notes that the presiding District Judge retains the discretion to modify the rulings contained in this report should he conclude the undersigned committed error. 28 U.S.C. § 636(b)(1)(A).

[2] The factual and procedural background are described in summary fashion, as the Court and counsel are familiar with the history of this litigation which has been set forth in detail in prior decisions and need not be repeated here.

**REPORT AND RECOMMENDATION – 2**

The dispute underlying this case originated in 2011 when IDHW implemented a tool for setting DDS Program budgets ("Budget Tool") that reduced budgets for some adults with intellectual and developmental disabilities receiving Medicaid services. (Dkt. 478.) Plaintiffs are developmentally disabled adults who qualify for benefits under Medicaid and are participants in or applicants to the DDS Program administered by the IDHW.[3] Plaintiffs are a class of individuals as well as sixteen individually named persons. (Dkt. 130, 224.) Defendants are the IDHW, its Director, and its Medicaid Administrator, in their official capacities (collectively "Defendants").

This lawsuit involves both class-wide claims brought by all Plaintiffs and individual claims brought by the separately named Plaintiffs. (Dkt. 131, 148, 478.) The class-wide claims allege, among other things, that the Department's existing budget setting methodology, fair hearing processes, and budget notices all violated the due process and equal protection clauses of the Fourteenth Amendment. (Dkt. 148, 478.) The individual claims allege the reductions to the named Plaintiffs' budgets placed them at risk of being institutionalized if the Budget Tool and budget setting processes were not modified, in violation of Section 1983, Title II of the Americans with Disabilities Act, and the Rehabilitation Act of 1973. (Dkt. 148, 478.)

On March 28, 2016, District Judge B. Lynn Winmill granted in part Plaintiffs' motion for summary judgment on the class-wide claims, finding: the Budget Tool's

---

[3] Additionally, another group of plaintiffs filed a nearly identical lawsuit which was consolidated with the lead case as reflected in the caption. (Dkt. 77.)

**REPORT AND RECOMMENDATION – 3**

unreliability and arbitrary nature violated Plaintiffs' rights to due process of law; that the notices utilized by the Department were inadequate to satisfy due process; and that to ensure due process, the Department must "receive a commitment from a suitable representative to assist the participant before proceeding to informal review and taking any action to confirm a budget reduction produced by the budget tool." (Dkt. 270, 478.) The parties thereafter negotiated and filed a joint Class Action Settlement Agreement ("CASA") with the Court on September 15, 2016. (Dkt. 306-1.)

Judge Winmill approved CASA on January 12, 2017. (Dkt. 331). The Court retained jurisdiction over the matter for the purpose of assuring compliance with the terms of CASA until its termination. (Dkt. 306-1 at V.O.) The parties have amended CASA two times, with the court's approval. (Dkt. 338, 352.)[4] CASA contains twenty-four action steps Defendants are required to complete. On December 14, 2020, Judge Winmill set a reasonable completion deadline of June 2022 for the twenty-four action steps. (Dkt. 429.) Since then, the Court and counsel have conducted periodic status conferences.

Most recently, on January 6, 2022, a status conference was held where the parties jointly requested that the Court resolve the following three issues:

1. Bridge Period: Whether the Bridge Period provided in CASA ends on its own terms under the plain language of CASA upon implementation of the new resource allocation model, or will be deemed to end after the ARP era.

---

[4] The amendments added greater specificity concerning the matters to be reviewed during the Suitable Representatives training and payment of attorney fees to class counsel for providing Suitable Representatives training during the Bridge Period. (Dkt. 335, 338, 351, 352.)

**REPORT AND RECOMMENDATION – 4**

2.    <u>Suitable Representative</u>: Whether the new budget allocation model can be used to determine member budgets prior to obtaining Court approval of a plan providing for a Suitable Representative.

3.    <u>Production of Contract Documents</u>: Whether the contract documents related to the assessment tool utilized by the new resource allocation model, the Supports Intensity Scale – Adult Version® ("SIS-A"), should be produced to class counsel.

(Dkt. 473, 478.)[5] Judge Winmill referred consideration of the issues to the undersigned

for the purpose of conducting a hearing and other proceedings as necessary. (Dkt. 475.)

## DISCUSSION

**1.    Bridge Period**

Under the terms of CASA, a Bridge Period was created to provide a period of time

when the class members are afforded certain protections to address the concerns with the

prior Budget Tool, and during which the Department would undertake the steps necessary

to transition from the prior Budget Tool to implementation of the new resource allocation

model. The Bridge Period is defined as:

1.    <u>Bridge Period</u>: means the time period between the date that the Court approves this Settlement Agreement and the date that the new resource allocation model is fully implemented. The new resource allocation model will be deemed "fully implemented" on the day in which class members' budgets are no longer being calculated using the Budget Tool, but are instead being determined by the new resource allocation model outlined in Section V.A.1-2. of this Agreement.

(Dkt. 306-1 at III.A.1.)

---

[5] Although the parties disagree regarding how to phrase the three issues, the questions presented are the same. (Dkt. 478.) The Court's description of the three issues is a fair and neutral statement of the matters presented for resolution.

**REPORT AND RECOMMENDATION – 5**

The parties disagree concerning when the Bridge Period ends. Plaintiffs argue the Bridge Period does not end until after the American Rescue Plan Act of 2021 ("ARP") "maintenance of effort" requirement concludes in March 2024 (the "ARP era"). (Dkt. 477.) In contrast, the Department asserts the Bridge Period ends under the terms of CASA when the IDHW begins using the new resource allocation model to calculate members' budgets. (Dkt. 476.)

The Court finds under the plain language of CASA the Bridge Period ends when the new resource allocation model is "fully implemented," which occurs on the day class members' budgets are no longer calculated using the prior Budget Tool and are instead determined by the new resource allocation model. (Dkt. 306-1 at III.A.1.) However, the Court cannot conclusively determine whether the new model will be "fully implemented" upon being put into use, because the parties have taken conflicting positions on whether the prior Budget Tool will be completely retired, or will continue to be used to calculate member budget amounts during the ARP era.[6]

Under Idaho's DDS Program, during the ARP era it is anticipated that members will receive the highest budget amount when comparing their budgets calculated for the prior year and the new plan budget. How this will be accomplished is unclear. (Dkt. 493.) The Department represents that the budget amount utilized for comparison will be based on historical calculations contained in members' IDHW files and, thus, the prior Budget

---

[6] Defendants recently submitted a status report indicating the new resource allocation model will not be implemented before the Court's deadline of June 2022, because the Department is still awaiting CMS approval. (Dkt. 494, 495.)

**REPORT AND RECOMMENDATION – 6**

Tool will no longer be used to make any further calculations. Plaintiffs disagree, arguing the prior Budget Tool will still be used to calculate the budget amount members would have received using the old model in comparison to the budget amount using the new resource allocation model during the ARP era. (Dkt. 493.)

If, as the Department explained during the hearing, the prior Budget Tool will not be used to calculate any class member budgets after the new resource allocation model is implemented, the Court finds the Bridge Period will be at an end. In that scenario, the new resource allocation model will be "fully implemented" on the day it is put into use, because the prior Budget Tool will no longer be used to calculate member budgets. However, if the Department is incorrect and the prior Budget Tool will continue to be used during the ARP era to calculate member budgets, the new resource allocation model will not be fully implemented and the Bridge Period will not be at an end.

Plaintiffs' arguments to the contrary are two-fold. (Dkt. 477.) First, Plaintiffs assert the budgets generated using the prior Budget Tool will continue to be used during the ARP era to determine whether a member's existing budget or new budget is higher. As such, Plaintiffs contend that the new resource allocation model will not be "fully implemented," because the calculations from the prior Budget Tool will still be used, and/or the prior Budget Tool will continue to be used, to calculate members' budget amounts during the ARP era. (Dkt. 477, 492, 493.) Second, Plaintiffs assert members new to the program have no prior budget calculation to compare and, therefore, must rely exclusively on the new resource allocation model without the protections afforded in

**REPORT AND RECOMMENDATION – 7**

CASA to challenge the budgets calculated under the new model. The Court respectfully disagrees with both of Plaintiffs' contentions.

Plaintiffs' arguments effectively seek to extend the Bridge Period through the ARP era to preserve the safeguards and protections of CASA to allow class members to contest potential "flaws" with the new resource allocation model. However, challenges to the budgets calculated under the new resource allocation model are outside the scope of CASA. The parties expressly agreed in CASA "that the class-wide claims…do not cover acts or omissions under the final plans or new resource allocation model that the Department must develop under this Settlement Agreement." (Dkt. 306-1 at V.S.) (emphasis added). Accepting Plaintiffs' argument to extend the Bridge Period so individuals may contest budget calculations made under the new resource allocation model would effectively expand the scope of CASA beyond its stated purpose.

Similarly, the budget comparisons that will be performed during the ARP era for purposes of applying Idaho's DDS Program were not within the contemplation of the parties when CASA was negotiated and approved by the Court.[7] Plaintiffs' argument that the new ARP era budget calculations warrant extending the Bridge Period exceeds the scope of CASA.

Further, the Court finds the Department's use of historical budget amounts contained in the IDHW's files, including those amounts calculated by the prior Budget Tool, does not preclude full implementation of the new resource allocation model. Under

---

[7] ARP was enacted in March of 2021, five years after the Court approved CASA.

**REPORT AND RECOMMENDATION – 8**

the plain language of CASA, the new resource allocation model "will be deemed fully implemented" on the day class members' budgets are no longer being calculated using the prior Budget Tool, but are instead being determined by the new resource allocation model. Nothing in CASA precludes the Department from ever again using budget amounts previously calculated by the prior Budget Tool. Instead, CASA requires the prior Budget Tool not be further used to calculate budgets. Thus, the Department's use of historical budget calculations contained in members' files to determine their budget during the ARP era does not estop full implementation of the new resource allocation model under CASA.

To the extent Plaintiffs seek to contest budget amounts calculated under the prior Budget Tool, they may do so as provided under the terms of CASA.[8] That ARP may give class members a new and unforeseen basis for challenging their budget calculations does not justify allowing Plaintiffs to now read into CASA a term or condition that is not present and was not contemplated by the parties when the contract was formed, however. The proper course for addressing the impact of ARP on the class members and the implementation of the action steps, is for the parties to consider and discuss a modification to CASA. (Dkt. 306-1 at V.P.) Absent a modification, the Court finds the

---

[8] The Court makes no determination concerning whether members will be limited to scrivener's error challenges to the budget calculations made between April 2021 and May 2022 as argued by Defendants. (Dkt. 479 at 5.) Whether any member may challenge a budget calculation made using the old Budget Tool under the terms of CASA is not before the Court at this time. Here, the Court finds only that challenges to budgets calculated using the new resource allocation model are outside the scope of CASA. The parties should consider crafting a modification to CASA that would address the discrepancy created by the ARP in the members' ability to contest their budget calculations.

REPORT AND RECOMMENDATION – 9

Bridge Period ends by its own terms when the new resource allocation tool is fully implemented and the prior Budget Tool is no longer used to calculate member budgets.

For these reasons, the Court finds that, if the Department's representations are correct and the prior Budget Tool will no longer be used to calculate members' budgets after the new resource allocation model is implemented, the Bridge Period will end when the new model is "fully implemented" and used as the only tool to calculate member budgets. However, full implementation of the new resource allocation model, and consequently the end of the Bridge Period, are impacted by the need to finalize a suitable representative plan as discussed more fully below.

**2.     Suitable Representative Plan**

Plaintiffs argue the Department cannot impose new system budgets before the Court approves a suitable representative plan. (Dkt. 477.) Plaintiffs contend it would be contrary to the Court's summary judgment decision and CASA to allow the IDHW to submit a final suitable representative plan after it begins assigning new system budgets to participants, because all participants would not be ensured a suitable representative before proceeding with informal review. (Dkt. 477 at 15.) Plaintiffs insist that, without a Court approved suitable representative plan in place before the new budget tool is implemented, the Department will be violating the due process rights of those class members who receive notices imposing new system budgets on them and who do not have a suitable representative. (Dkt. 480 at 4.)

Plaintiffs further assert that if the Bridge Period ends when the new budget tool is implemented and before the suitable representative plan is approved, the suitable

representative plan currently in place for the prior Budget Tool will also come to an end,

leaving every member of the class without a suitable representative in violation of their

due process rights. (Dkt. 480 at 5.) Thus, Plaintiffs contend the Bridge Period must be

extended to ensure all class members who keep their prior budgets during the ARP era

will retain the necessary procedural safeguards, and the Department must finalize the

suitable representative plan or extend the Bridge Period protections to new applicants

before the new budget tool can be deemed "fully implemented." (Dkt. 480 at 5-6.)

      The Department argues nothing in CASA mandates Court approval of a suitable

representative plan before the new resource allocation model can be fully implemented.

(Dkt. 476, 479.) The three events required for termination of CASA, the Department

contends, need not occur in any particular order. Rather, termination is triggered by the

latest of the three events – 1) Court approval of the final plan for regular testing; 2) Court

approval of the final plan for confirmation of a Suitable Representative; and 3) the date

the new resource allocation model is fully implemented. (Dkt. 306-1 at V.K.1.a-c.)[9]

---

[9] CASA terminates twenty-four months after the latest of the following dates:
a.   The date the Court approves the final plan for regular testing.
b.   The date the Court approves the final plan for confirmation of a
Suitable Representative.
c.   The date the new resource allocation model is fully implemented.
The new resource allocation model will be deemed "fully implemented" on the
day in which class members' budgets are no longer being calculated using the
Budget Tool, but are instead being determined by the new resource allocation
model outlined in Section V.A.1-2. of this Agreement.

(Dkt. 306-1 at V.K.1.) The monitoring and access provisions of CASA similarly contemplate
that all three events must be completed before CASA terminates. (Dkt. 306-1 at V.J.2) (requiring
the Department to provide regular updates "until the new resource allocation model is fully
implemented and both final plans are approved by the Court.").

**REPORT AND RECOMMENDATION – 11**

Further, the Department maintains that implementation of the new model before the Court approves the final suitable representative plan does not pose any practical problems as feared by Plaintiffs, given the timing for disclosure and approval of the plan, and the assurance that members will be awarded the higher of the two budget calculations during the ARP era. (Dkt. 476 at 11.)

Having carefully reviewed the submissions and arguments of the parties, as well as the record, the Court finds the suitable representative plan for the new resource allocation model must be finalized before the Department can proceed with informal review or take any action to confirm a budget reduction for member budgets calculated using the new model. That is to say, the new resource allocation model cannot be "fully implemented" before the suitable representative plan is in place.

While there is no dispute that a final plan to obtain a suitable representative is required under CASA, the parties left open in the agreement the question of when the Department is required to obtain a commitment from a suitable representative for class members. (Dkt. 306-1 at V.A.4) ("The Parties do not agree on what the Court intended to be the triggering event giving rise to the Department's court-imposed requirement to obtain a commitment from a Suitable Representative for class members (i.e., whether it is the budget appeal and request for fair hearing), and therefore, reserve the right to contest this issue at any time. Notwithstanding any other provision in this Agreement, the Parties do not waive their rights: to file any motions available to them regarding this issue, proceed to trial on this issue, or to appeal any ruling of the Court or seek any other available relief in connection with this issue."). The terms of CASA therefore do not

resolve this issue. *See e.g.*, (Dkt. 306-1 at V.A.6) ("If class counsel object to the final

plan for regular testing or the final plan for confirmation of a Suitable Representative,

and if the Parties cannot otherwise reach agreement through negotiation, the Parties will

commence the dispute resolution procedures outlined in Section V.M. below.").

Nevertheless, the requirement for a suitable representative plan is without question

central to CASA and the due process concerns addressed in the Court's summary

judgment decision.

The Court determined at summary judgment that due process required IDHW to

submit a plan that would "ensure that all participants receive a commitment from a

suitable representative to assist the participant before proceeding to informal review and

taking any action to confirm a budget reduction produced by the budget tool." (Dkt. 270

at 20-21.) The due process concerns raised by the absence of a suitable representative

relate to the appeals process, rather than the shortcomings of the prior Budget Tool or

notices. (Dkt. 270 at 24) ("To this point, the Court's legal analysis has focused on the

appeal process.").

To that end, CASA requires the Department to submit a final plan to the Court that

ensures all participants who need and want a suitable representative will receive a

commitment from a suitable representative who will assist members through the review

and appeals processes for budgets calculated using the new resource allocation model.

(Dkt. 306-1 at III.A.10 and V.A.4.) The assurance of a suitable representative is also

afforded to all class members during the Bridge Period applicable to appeals of budgets

calculated using the prior Budget Tool. (Dkt. 306-1 at V.B.2.)

**REPORT AND RECOMMENDATION – 13**

During the hearing before the undersigned, the Department argued the Suitable Representative Plan will be finalized before any informal review or appeals process occurs, in accord with the Court's decision. Plaintiffs disagree, arguing the plan will not be finalized before informal review occurs given the class members have sixty days to object to the proposed plan but only twenty-eight days from the date of their Budget Notices to appeal, which triggers the Informal Review. According to Plaintiffs, CASA requires the IDHW to provide the final suitable representative plan to class counsel and allow sixty days for the class to determine whether to object to the plan (Dkt. 306-1 at V.A.6.a), and then provide the plan to the Court for its review and approval (Dkt. 306-1 at V.A.4 and V.K.1).

The Department's proposed suitable representative plan was first provided to class counsel on March 14, 2022. (Dkt. 476 at 11); (Dkt. 477 at 14). On May 13, 2022, Plaintiffs notified the Department of the class members' objection to the proposed plan, and requested to meet and confer with the Department's counsel regarding the objection. (Dkt. 492.) Resolution of the objections to the suitable representative plan is not before the undersigned, and it is not known how long it will take to finalize the suitable representative plan.[10] To facilitate the process, the undersigned will recommend that the presiding judge consider setting deadlines for the parties to report the status of their discussion to the Court and to submit the final suitable representative plan for approval.

---

[10] The most recent status reports indicate the parties are currently in the midst of discussions concerning Plaintiffs' objections to the proposed suitable representative plan and the Department's responses to the same. (Dkt. 494, 495.)

**REPORT AND RECOMMENDATION – 14**

As it presently stands, individuals who will receive a notice of their budget calculated using the new resource allocation model would have twenty-eight days to appeal without any Suitable Representative Plan in place. (Dkt. 306-1 at III.A.7, III.A.8, and Ex. 4.) Despite the assurances from the Department that the suitable representative plan will be finalized before any notices are sent, the demands of due process require more than assurances. (Dkt. 270 at 20) ("Due process requires more than just assuming someone will volunteer to assist the participant; it requires that IDHW receive a commitment from someone competent to assist the participant in the appeal.").

As the Court concluded on summary judgment, due process requires a "plan to ensure all participants receive a commitment from a suitable representative to assist the participant before proceeding to informal review and taking any action to confirm a budget reduction produced by the budget tool." (Dkt. 270 at 36.) Given the timing for members to request informal review and the uncertainty over when the suitable representative plan will be finalized, the Court finds that the suitable representative plan for the new budget resource allocation model must be finalized before the model is used to calculate budgets. To conclude otherwise would result in class members being without a suitable representative before the twenty-eight day appeal window closes, in violation of the their due process rights.

Accordingly, the Court finds it is not presently feasible for the Department to implement the new resource allocation model before finalizing the suitable representative plan. Alternatively, the parties could agree to modify CASA to extend the protections of the Bridge Period until the suitable representative plan is finalized or toll the time to

**REPORT AND RECOMMENDATION – 15**

appeal budgets calculated under the new resource allocation model until class members are provided a suitable representative. Such a modification would provide the due process protections contemplated by the Court's summary judgment decision and CASA.

### 3.    Production of SIS-A Contract Documents

Plaintiffs request production of the contract documents relating to SIS-A, the standardized assessment tool utilized by the new resource allocation model. (Dkt. 477.)[11] The SIS-A is published by the American Association on Intellectual and Developmental Disabilities ("AAIDD"). AAIDD has contracted with Liberty Healthcare Corporation ("Liberty"), to allow Liberty's use of SIS-A in conjunction with the Department's calculation of member budgets under the Idaho Medicaid program.[12] AAIDD is a nonparty to this lawsuit who asserts proprietary interests pertaining to certain information contained in the contract documents. (Dkt. 486.)

---

[11] The prior Budget Tool utilized inputs from an assessment known as the Scales of Independent Behavior – Revised ("SIB-R"). (Dkt. 478 at 3.) The SIS-A is designed to measure the pattern and intensity of supports that a person aged 16 years and older with intellectual and developmental disabilities requires to be successful in community settings. (Dkt. 486.) The SIS-A calculates a set of scores for individual items and a series of subscales based on responses to questions regarding the adult service recipient's ability to perform certain tasks and the amount of support they need to do so. The Department uses the SIS-A scores in conjunction with other verification review processes to assign a support level that determines the services, supports, and budget for each individual. (Dkt. 478 at 5.)

[12] Liberty is the Department's DDS Program assessment contractor that conducts assessments for the Medicaid DDS Program in Idaho and issues the IDHW's budget notices. (Dkt. 477 at 17.)

**REPORT AND RECOMMENDATION – 16**

The Department produced redacted copies of AAIDD's contract documents to class counsel the day before the undersigned's May 6, 2022 hearing. (Dkt. 491.)[13] During the hearing, however, Plaintiffs argued production of the unredacted contract documents was necessary, as the redactions omit information concerning pricing and units that is critical to class counsel's ability to meaningfully monitor and ensure adequate quality insurance under the new budget tool. In response, the Department suggested it could confer further with AAIDD concerning production of the redacted pricing and unit information requested by Plaintiffs. The Court agreed and directed the Department to do so and to submit a status report regarding the same. (Dkt. 489.)

The Department complied and submitted a timely report stating AAIDD has agreed to provide the contract to Plaintiffs' counsel with the pricing information included for attorney eyes only. (Dkt. 491.) Plaintiffs' counsel considered the proposal but declined to agree to the "attorney eyes only" restriction on access to the redacted information. (Dkt. 491.) Therefore, the Department reported the issue is unresolved and the Court will need to rule on the production of the contract documents and the redacted information. (Dkt. 491.) Accordingly, the Court has carefully considered the parties' arguments and submissions, and finds the unredacted contract documents should be produced for the reasons that follow.

---

[13] The Department also provided the redacted contract documents to the Court and all counsel in an email on May 5, 2022 at 5:36 p.m.

**REPORT AND RECOMMENDATION – 17**

Plaintiffs argue broad and uninhibited production of the contract documents is required under CASA's monitoring provisions. (Dkt. 477, 487.) Further, Plaintiffs contest AAIDD's claims of proprietary interests in the pricing and unit information. (Dkt. 487.) The Department has no objection to production of the contract documents, but referred Plaintiffs to AAIDD who has raised objections. (Dkt. 476.) Plaintiffs maintain the obligation to produce the contract documents is on the Department. (Dkt. 487.)

By its terms, CASA provides Plaintiffs broad monitoring and access to information during the settlement agreement, requiring the Department to "produce any records and answer any questions reasonably requested by class counsel within 30 days, at no cost to Plaintiffs or class counsel. If at any time the Department believe that class counsel's requests are unreasonable, the Parties will commence the dispute resolution procedures outlined in Section V.M. below." (Dkt. 306-1 at V.J.1.)[14] Further, CASA obligates the Department to "provide class counsel with regular updates on the development of the new resource allocation model, the final plan for regular testing, and

---

[14] **M.   Dispute Resolution**.

    1. Parties Will Continue to Confer. The Parties agree that, during the term of this Agreement, they will continue to engage in good faith negotiations regarding all terms and conditions of this Agreement.

    2. Dispute Resolution Procedure. In all cases where the terms of this Agreement require or allow the Parties to follow dispute resolution procedures, class counsel and Defendants' counsel shall meet and confer in person at a mutually agreeable time and place and use their good-faith, best efforts to discuss and resolve the dispute. If the Parties are unable to resolve the dispute within 14 days, or another time frame mutually agreeable to the Parties, either Party may file an appropriate motion with the Court in this matter to address the issue(s) or dispute(s) that could not be resolved through the dispute resolution procedures.

(Dkt. 306-1 at V.M.)

**REPORT AND RECOMMENDATION – 18**

the final plan to obtain Suitable Representative commitment…until the new resource

allocation model is fully implemented and both final plans are approved by the Court."

(Dkt. 306-1 at V.J.2.)

Critically, CASA's terms are binding upon all parties and outside service

providers. The Department is required to ensure that those "in active concert or

participation with the Department take any actions necessary for the Department to

comply with" CASA's provisions. (Dkt. 306-1 at V.R.)

After considering the parties' arguments and submissions, the Court finds

Plaintiffs' request for production of the unredacted SIS-A contract documents is

reasonable and required under the terms of CASA. The contract documents relate to the

specialized assessment tool that will be used by Liberty to administer the Department's

DDS Program. (Dkt. 477, 487.) The redacted portions of the contract documents relates

to units and pricing information which is relevant to Plaintiffs' review and monitoring of

the SIS-A assessment tool for reliability and quality assurance. (Dkt. 477, 487.)

The information related to units and pricing does not appear to contain proprietary

information warranting redaction or restriction of the disclosure to attorneys eyes only.

Plaintiffs have identified similar contracts between AAIDD and other states using the

SIS-A to administer their Medicaid Program where the units and pricing information is

not redacted or otherwise restricted. (Dkt. 487-1, Dec. Eppink.)[15] Accordingly, the Court

---

[15] The Court recognizes that the contracts identified by Plaintiffs were made between the state and AAIDD, whereas the contract here is between Liberty and AAIDD. Nevertheless, the disclosure provisions of CASA are binding on Liberty and AAIDD, as contractors and outside providers of services. (Dkt. 306-1 at V.R.)

**REPORT AND RECOMMENDATION – 19**

will recommend that Plaintiffs' request for production of the unredacted contract documents between AAIDD and Liberty be granted.

Further, the Court finds the Department has made reasonable efforts to ensure compliance with CASA's disclosure provisions by attempting to facilitate production of the contract documents to Plaintiffs' counsel, albeit unsuccessful. (Dkt. 491.) Nevertheless, the Department is ultimately responsible for providing the contract documents to Plaintiffs' counsel and ensuring compliance with the provisions of CASA. (Dkt. 306-1 at V.J.2 and V.R.) Accordingly, the Court will recommend that the Department be ordered to provide the unredacted contract documents to Plaintiffs' counsel within fourteen days of the order adopting this report and recommendation, absent a further showing that the information is proprietary or otherwise demands that the production be restricted.

## **RECOMMENDATION**

**NOW THEREFORE IT IS HEREBY RECOMMENDED** as follows:

1. The Bridge Period: that the Court find the Bridge Period ends upon the new resource allocation model being fully implemented and the prior Budget Tool is no longer being utilized to make new budget calculations.

2. Suitable Representative: that the Court find a suitable representative plan must be finalized or, alternatively, CASA must be modified to ensure due process protections are in place before the new resource allocation model can be fully implemented and used to calculate member budgets. And, that the Court set a deadline for the parties to report on the status of their discussions finalizing the

**REPORT AND RECOMMENDATION – 20**

suitable representative plan and a deadline for the parties to submit the final

suitable representative plan to the Court for approval.

3. <u>Production of Contract Documents</u>: that the Court order the Department to

produce the unredacted SIS-A contract documents to Plaintiffs' counsel within

seven (7) days.


Written objections to this Report and Recommendation must be filed within

fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or

as a result of failing to do so, that party may waive the right to raise factual and/or legal

objections to the United States Court of Appeals for the Ninth Circuit.


DATED: June 9, 2022

_____
Honorable Candy W. Dale
United States Magistrate Judge

**REPORT AND RECOMMENDATION – 21**