UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| K.W., by his next friend D.W., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD ARMSTRONG, et al.,<br><br>Defendants. | Case No. 1:12-cv-00022-BLW<br>(lead case)<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

This case settled six years ago, but the Court retained jurisdiction to enforce the parties' class-action settlement agreement. Two enforcement-related disputes are before the Court – one by way of a motion to compel and the other by way of a Report & Recommendation issued by United State Magistrate Judge Candy W. Dale.

In the motion to compel, plaintiffs argue that the Idaho Department of Health & Welfare has improperly refused to answer questions about the attrition rate between the Department's children's and adult programs. As for the Report & Recommendation, the key dispute is whether the settlement agreement allows the Department to implement a new tool to calculate budgets for developmentally disabled adults *before* the Court approves a "Suitable Representative Plan."

Plaintiffs argue that the new tool cannot be implemented before Court approval. The Department disagrees. Judge Dale's Report & Recommendation addresses this issue and two others, and the Department has objected to the recommendation regarding the Suitable Representative Issue. Neither side objected to the recommendations on the other two issues.

For the reasons explained below, the Court will rule deny Plaintiff's motion to compel and will partially adopt and partially reserve ruling on the Report & Recommendation.

## BACKGROUND

### 1.  The Lawsuit and the Class Action Settlement Agreement

Plaintiffs are developmentally disabled adults who qualify for benefits under Medicaid. They are eligible for long-term institutional care but choose to live instead in their own homes or in community settings. Over 10 years ago, when their Medicaid payments were reduced, plaintiffs sued the Idaho Department of Health & Welfare. Plaintiffs' central concerns were that: (1) the notices the Department sent telling them about the budget reductions were insufficient; (2) the tool used to develop their budgets was insufficient; and (3) the appeals hearing procedures were insufficient.

The Court certified a class consisting of "All persons who are participants in or applicants to the *Adult* Developmental Disability Services program ('DDS

program'), administered by the Idaho Department of Health and Welfare as part of

the Idaho Medicaid program, and who undergo the annual eligibility determination

or reevaluation process." *See* Dkt. 224 (emphasis added). And in March 2016, the

Court partially granted plaintiffs' summary judgment motion on the class-wide

claims. *See* Dkt. 270. In granting the motion for summary judgment, the Court

found that: (1) the budget tool's unreliability and arbitrary nature violated

plaintiffs' right to due process of law; (2) the notices utilized by the Department

were inadequate to satisfy due process; and (3) to ensure due process, the

Department must "receive a commitment from a suitable representative to assist

the participant before proceeding to informal review and taking any action to

confirm a budget reduction produced by the budget tool."  *See* Dkt. 270, at 20.

After the Court granted summary judgment, the parties settled. In the Class

Action Settlement Agreement, approved by the Court on January 12, 2017, the

Department agreed to develop a new budget tool (referred to as "resource

allocation model" in the Settlement Agreement) and to keep plaintiffs' benefits at

their prior high level until the new budgets could be approved and implemented.

*See CASA*, Dkt. 306-1, ¶¶ III.A.1 & V.A. Additionally, the Department agreed to

develop and finalize a "Suitable Representative Plan" – that is, a plan to ensure that

all class members received a commitment from a suitable representative – and to

submit that Suitable Representative Plan to the Court for approval. *Id.* ¶¶ V.A.2 &

4 at 9-10 (10-11 of 91).

### 3.    Efforts to Implement the Settlement Agreement

To effectuate the Department's agreement to adopt and implement the new budget tool, the parties agreed that the Department would undertake 24 "Action Steps," with the goal of completing the action step within 24 months of having convened an inaugural meeting with Department staff.  *See* Dkt. 306-1, at 8 (9 of 91). The Department did not meet that goal, and in December 2020, this Court established a completion deadline of June 30, 2022.

June 30 has come and gone, and the Department has not implemented the new budget tool. There are at least two reasons. First, so far as the Court is aware, the Department has not received the necessary approvals from the Centers for Medicare & Medicaid Services (CMS). *See State Objection,* Dkt. 497, at 7 (approval not received as of June 23, 2022); *see generally Settlement Agreement,* Dkt. 306-1, at 27 of 91. Second, during 2021, the Department accepted federal funding under the American Rescue Plan Act (ARP). Those funds have strings attached, which prohibit the Department from cutting Medicaid eligibility services or rates while it uses ARP money. *See Mtn. Mem.* Dkt. 505-1, at 2. Plaintiffs explain that if a class member enters the program during ARP, the Department must compute that person's budget using both the old and new budget tools, and then assign the higher of the two. *Id.* at 3; *see also Joint Status Report,* Dkt. 478, at

6-7 (discussing "ARP Budgets" as compared to "Advisory Budgets," which would be determined by the new budget tool). The Department has a slightly different take on the issue; it says that it will not use the old budget tool to calculate the "ARP Budget." Rather, it would simply use historical budget amounts to ensure that funding is not reduced in violation of ARP. *See R&R,* Dkt. 496, at 8.

**4.      The Suitable Representative Plan**

In spite of these complications, in March 2022 – roughly 10 weeks before the June 30, 2022 completion deadline – the Department notified class counsel that it had finalized its Suitable Representative Plan. *See* Dkt. 497 at 5. Class counsel has objected to the plan. *Id.*

**ANALYSIS**

**1.  The Report  & Recommendation**

This Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b)(3). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a de novo determination of those portions of the [report and recommendation] to which objection is made." 28 U.S.C. § 636(b)(1). Where a party fails to object, however, the court is not required to conduct "any review at all ... of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Indeed, the

Ninth Circuit has recognized that a district court is not required to review a magistrate judge's report and recommendation where no objections have been filed. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1118-19 (9th Cir. 2003).

## A. Disputes Related to Court Approval of the Suitable Representative Plan

Judge Dale addressed three issues in her Report & Recommendation. The parties did not object to her recommendations on two of those issues, meaning that the main issue before the Court is whether the Court must approve the Suitable Representative Plan before the Department may fully implement the new budget tool. The United States Magistrate Judge made the following recommendation:

> IT IS HEREBY RECOMMENDED . . . that the Court find a suitable representative plan must be finalized, or alternatively, CASA must be modified to ensure due process protections are in place before the new resource allocation model can be fully implemented and used to calculate member budgets. And, that the Court set a deadline for the parties to report on the status of their discussions finalizing the suitable representative plan and a deadline for the parties to submit the final suitable representative plan to the Court for approval.

*R&R,* Dkt. 496, at 20-21 (paragraph divisions omitted). The Department objects to this recommendation. Although the parties have submitted briefing on this issue, the Court will require further briefing before deciding the issues. Specifically, the Court has the following question:

> If the Court concludes that the Settlement Agreement unambiguously allows the new budget tool to be fully implemented before the Court approves the Suitable Representative Plan, does the Department's proposed Suitable

Representative Plan violate the implied covenant of good faith and fair dealing? *See generally Gordon v. U.S. Bank Nat'l Ass'n*, 455 P.3d 374, 390 (Idaho 2019).

The Court will require the parties to file simultaneous briefing on that topic. Until that issue is briefed, the Court will reserve ruling on the Suitable Representative issue.

## B.  Other Issues Resolved by the Report & Recommendation

In addition to the Suitable Representative Issue, Judge Dale made recommendations on two other issues, framed as follows:

1. Bridge Period: Whether the Bridge Period provided in CASA ends on its own terms under the plain language of CASA upon implementation of the new resource allocation model, or will be deemed to end after the ARP era; and

2. Production of Contract Documents: Whether the contract documents related to the assessment tool utilized by the new resource allocation model, the Supports Intensity Scale – Adult Version® ("SIS-A"), should be produced to class counsel.

*See R&R,* Dkt. 496, at 5. The parties have not objected to Judge Dale's findings and recommendations on these two issues. Nonetheless, the Court conducted a de novo review of these portions of the Report & Recommendation. On both counts, the Report is thorough and well-reasoned, and the Court will adopt the relevant recommendations.

First, regarding the Bridge Period, the Court finds that the Bridge Period ends upon the new resource allocation model being fully implemented and the

MEMORANDUM DECISION AND ORDER - 7

prior Budget Tool is no longer being utilized to make new budget calculations.

Second, regarding the Contract Documents, for all the reasons discussed in the Report & Recommendation, *see* Dkt. 497, at 16-20, the Court will order the Department to produce the unredacted SIS-A contract documents to Plaintiffs' counsel within seven days of this Order. The Court is cognizant of the Department's argument that if it is forced to turn over these documents, it will potentially lose access to a tool to accurately access participants' support needs, which would consequently set implementation of a new resource allocation model back years.] *See Objection,* Dkt. 497, at 2-3. That issue, however, is beyond the scope of what is before the Court. For all the reasons explained in the Report & Recommendation, the Settlement Agreement obligates the Department to provide these documents, come what may.

## 2.  The Motion to Compel

The final issue is whether the Department has breached the Settlement Agreement by refusing to answer class counsel's questions about the attrition rate between children's and adult programs. The Settlement Agreement provides as follows:

> The Department . . . shall produce any records and answer any questions reasonably requested by class counsel within 30 days, at no cost to Plaintiffs or class counsel. If at any time the Department believes that class counsel's request are unreasonable, the Parties will commence . . . dispute resolution procedures . . . .

*Settlement Agmt.*, § V.J.1., Dkt. 306-1, at 26. The nub of the parties' dispute is whether the pending request for information is "reasonable."

A basic tenet of contractual interpretation is the Courts must give unambiguous contractual terms their plain and ordinary meaning. *See, e.g., Rice v. Sallaz*, 357 P.3d 1256, 1261 (Idaho 2016). Black's Law Dictionary defines "reasonable" as "Fair, proper, or moderate under the circumstances; sensible." *Black's Law Dictionary* (11th ed. 2019) (emphasis added). Merriam-Webster defines "reasonable" to include these meanings:

1a:    being in accordance with reason [as in] a *reasonable* theory

1b:    not extreme or excessive [as in] *reasonable* requests

1c:    Moderate, Fair [as in] a *reasonable* chance or a *reasonable* price

1d:    Inexpensive.

*See* https://www.merriam-webster.com/dictionary/reasonable (last visited Oct. 6, 2022).

Given the definition of the word "reasonable," plaintiffs' lead-off argument – that the Settlement Agreement authorizes them to pose as many questions as they want, on any subject – is unfounded. *See Mtn. Mem.,* Dkt. 505-1. Rather, determining whether a request is "reasonable" necessarily requires the Court to consider the context of the request, which, in turn, requires the Court to consider the Settlement Agreement as a whole, including the issues that were resolved by

that agreement. Again, Black's is instructive, as it says something that is "reasonable" is something that is fair, proper, or moderate *under the circumstances.*

So let's consider the relevant circumstances. The Court will begin by observing that this case has nothing to do with children's programs, or with the transition between children's and adult programs. Rather, the case is about the Department's services for *adults* with developmental disabilities. The complaint itself begins with this sentence: "The plaintiffs are some of the most vulnerable ***adults*** in Idaho." *See Am. Compl.,* Dkt. 45, ¶ 1 (emphasis added). Consistent with that allegation, the background section of this Court's many decisions typically begin with a sentence similar to this one: "Plaintiffs are developmentally disabled ***adults*** who qualify for benefits under Medicaid." *See* Dkts. 66, 130, 140, 171, 270, 309, 337, 362, 396, 420, 449, 463 (emphasis added). And in certifying the class, the Court likewise referred to adult programming: The class is defined as "All persons who are participants in or applicants to the ***Adult*** Developmental Disability Services program . . . ." *See* Dkt. 224, at 1. Similarly, the parties opened their settlement agreement this sentence: "Plaintiffs are ***adults*** with developmental disabilities who qualify for Medicaid services through Idaho's Medicaid Adult Developmental Disability Services program." Dkt. 306-1, at 1 (emphasis added). And throughout the settlement agreement, the parties refer to the relevant

programing and services for **adults**. *See, e.g., id.* 2, 3, 6, 26, 28, 41, 54, 74, 83 of

91. Until now, there has been zero reference to children's programming or services

– either in the parties' pleadings or in the Settlement Agreement itself.[1] By straying

from the core subject matter of the Settlement Agreement, plaintiffs already face

an uphill battle in establishing that their request is "reasonable."

To be sure, "reasonable" requests theoretically could include topics that are

not explicitly addressed in the Settlement Agreement. Everything is relative. And

that is what plaintiffs say is going on. They say that given how implementation of

the Settlement Agreement has unfolded – particularly regarding delays in

implementing the new budget tool – they need to know "whether adult program

applicants will be harmed by additional application burdens." Dkt. 505-1, at 6.

They explain that [m]easuring children-to-adult program attrition gives both a

sense of how burdensome that process already is as well as a baseline for

comparison once the new system rolls out." *Id.* at 6-7. And, more broadly,

plaintiffs say class members and their families are worried about the attrition

between the children's Medicaid program and its adult counterpart. Specifically,

---

[1] The words "child" and "children" appear only in the context of giving background information about a separate entity, Human Services Research Institute (HSRI). *See* Dkt. 306-1, at 70 of 91. As part of the Settlement Agreement, the parties agreed that the Department would retain HRSI to work with and assist the Department in adopting and implementing the new budget tool. *See id.* at 7.

they say, "Many people aging out of children's program eligibility feel daunted and overwhelmed, and some give up or delay in enrolling in the adult program because they cannot navigate the transition on their own." *Id.* at 3.

The Court is not persuaded that asking the Department to turn over information about the attrition rate is a "reasonable" request. Throughout this litigation, children have presumably aged out of children's programming and have become eligible for adult programming. Yet neither this lawsuit nor the settlement agreement address—or even touch upon—any alleged barriers to entry into the relevant adult program. And the fact that certain applicants may have to undergo dual assessments does not persuade the Court that parties need information regarding the attrition rate to continue implementing the settlement agreement – even in the context of ARP. Accordingly, the Court finds that under these circumstances, plaintiffs' request is unreasonable. The motion to compel will therefore be denied.

## ORDER

**IT IS ORDERED that:**

1. The Report & Recommendation (Dkt. 496) is **ADOPTED in part** as follows: Aside from the resolution of the Suitable Representative issue, the Report & Recommendation is ADOPTED as the decision of this Court and, to that extent, is incorporated herein by reference.

2. The Court will **RESERVE RULING** on this Suitable Representative issue addressed in the Report & Recommendation. **Within 14 days of this Order, the parties shall submit supplemental briefing as described above**.

3. The Department shall produce the unredacted SIS-A contract documents to Plaintiffs' counsel within seven days of this order.

4. Plaintiffs' Motion to Compel (Dkt. 505) is **DENIED.**

5. The Court will conduct a Zoom status conference in this matter. That status conference will be set by separate order. **The parties are directed to file a short, joint status report with the Court seven days before that status conference.** The report should include the status of the Suitable Representative Plan.

DATED: October 28, 2022

B. Lynn Winmill
United States District Judge