Richard Eppink
reppink@acluidaho.org
Idaho State Bar no. 7503
Dina Flores-Brewer
DfloresBrewer@acluidaho.org
Idaho State Bar no. 6141
**AMERICAN CIVIL LIBERTIES UNION
OF IDAHO FOUNDATION**
P.O. Box 1897
Boise, Idaho  83701
(208) 742-6789 ext. 3

Daniel L. Brown
Katherine Anne Boy Skipsey
**SHEPPARD, MULLIN, RICHTER
& HAMPTON, LLP**
30 Rockefeller Plaza
Floor 39
New York, NY  10112
(212) 653-8700
*Admitted pro hac vice*

James M. Piotrowski
Marty Durand
**PIOTROWSKI DURAND, PLLC**
P.O. Box 2864
Boise, Idaho  83701
(208) 331-9200
(208) 331-9201 (fax)

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| K.W., by his next friend D.W, *et al.*, | ) | Case No. 1:12-cv-00022-BLW |
| | ) | (lead case) |
| Plaintiffs, | ) | |
| | ) | **OPPOSITION TO** |
| vs. | ) | **DEFENDANTS' MOTION TO** |
| | ) | **PRECLUDE DISSEMINATION** |
| RICHARD ARMSTRONG, in his official capacity | ) | **OF THE SIS-A USER'S** |
| as Director of the Idaho Department of Health and | ) | **MANUAL TO CLASS** |
| Welfare, *et al.* | ) | **MEMBERS, FILED 3/7/23** |
| | ) | **(Dkt. 539)** |
| Defendants. | ) | |

Defendants' motion is a disguised attempt to relitigate the same due process issues they

lost at summary judgment. The Department's existing budget system assesses class members

using the SIB-R—the "Scales of Independent Behavior – Revised." (Dkt. 200 (Joint Statement of

Stipulated Facts) ¶ 17.) When the Court took up summary judgment in this case during 2015–

2016, the Department argued—just as it does now—that the assessment publisher's proprietary

interests prohibited IDHW from disseminating the SIB-R booklet to class members. *K.W. v.

Armstrong*, 180 F. Supp. 3d 703, 717 (D. Idaho 2016).

It's déjà vu all over again. The Department's arguments for withholding the manual for

the "Supports Intensity Scale – Adult," or SIS-A, the new assessment it wants to use, are the very

same ones it made about the SIB-R booklet. As it does now, IDHW previously argued that:

- The assessment publisher "strictly limits SIB-R's sale to appropriate specialists who can administer the test" (Dkt. 265-3 at 23);

- The assessment's validity required "limiting availability of [the] assessment tool's text through adequate security and non-dissemination policies or protocols" (*id.*);

- "[E]thical considerations" prohibited dissemination to class members (Dkt. 100 at 12);

- The assessment's "integrity" would be "undermined" if disseminated to the class (*id.*);

- Disseminating the assessment would infringe copyrights and disclose trade secrets (*id.*);

- The assessment's publisher would "suffer substantial economic loss if the assessment instrument's contractually and ethically imposed confidentiality goes by the wayside" (Dkt. 265-3 at 23); and

- IDHW's budget notice includes a copy of the assessment report, "which summarizes the results" and therefore contains "substantially all" the relevant information, thus no more process is due (Dkt. 100 at 13).

Back then, the Department at least submitted a declaration from a Vice President of the

assessment's publisher, Houghton Mifflin Harcourt Publishing Company ("Houghton

Mifflin"),testifying about how the company controlled the sale of the SIB-R instrument, even

requiring purchasers to sign a written certification form to obtain it. ((Dkt. 100-2.) ¶ 5 & ex. 1.)

The VP also averred that the Standards for Education and Psychological Testing, published by

the American Education Research Association, the American Psychological Association, and the

National Council on Measurement in Education, impose an ethical duty to maintain the

confidentiality of questions and answers in secured tests and release them only to those with that duty. (*Id.* ¶ 6(a) & ex. 2.) Also, just the same as IDHW now tries to contend as to the SIS-A, the VP averred that the assessment's "ongoing validity as a reliable assessment of behavior, and therefore its economic value, is tied closely to its circumscribed availability," and that "only" by prohibiting dissemination to class members would the SIB-R remain reliable. (*Id.* ¶ 6(b).)

This Court considered all of that evidence and IDHW's corresponding arguments.Even though IDHW allowed class members and their representatives to visually review the SIB-R booklet—which IDHW will not allow for the SIS-A manual—the Court held that class members must be able to actually get the SIB-R booklet themselves and introduce it as evidence in proceedings to challenge their budgets. *K.W.*, 180 F. Supp. 3d at 717. The Court expressly weighed the risk that the assessment's publisher would "suffer substantial economic loss" and dissemination would undermine the assessment's validity, engaging in the *Mathews v. Eldridge* due process balancing analysis. *Id.* Because "IDHW's ban prevents participants from challenging errors or effectively cross-examining IAPs [Independent Assessment Providers]," the Court ruled that "the *Mathews* analysis compels a finding of a due process violation." *Id.* This Court quoted *American–Arab Anti–Discrimination Committee v. Reno*, reminding that "the very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." 70 F.3d 1045, 1069 (9th Cir.1995).

The Court later approved and ordered the Class Action Settlement Agreement, which ensures class members have access to the SIB-R booklet, along with screenshots of raw ratings in the SIB-R software, whenever the class member signs a form warning that copyright restrictions may apply and stating that IDHW believes disclosing the booklet may "undermine the value and usefulness of the SIB-R instrument." (Dkt. 306-1 at 78 (ex. 3).) The Court also

entered a declaratory judgment providing that all class members, as well as "any person," "shall have the right to inspect and copy . . . any training manuals and instructions provided to assessment personnel employed by or contracted with the Department, that are used in connection with determining individual DD budgets." (Dkt. 301 at 2.) Class members have now had access to not just the SIB-R booklet, but screenshots of the SIB-R software as well as the detailed instructions that assessors follow in completing the SIB-R too, for over six years. (*Cf.* Dkt. 200 ¶ 19 & Dkt. 200-3 (public filing of the assessment manual that assessors use in conducting the SIB-R).) There is no evidence that Houghton Mifflin has suffered any economic harm whatsoever, nor any evidence that the validity of the SIB-R has been undermined in any way. Nonetheless, despite the law of the case, the Department is now attempting to relitigate this very same issue.

I.      **THE SIS**

The SIS-A is the assessment process that IDHW chose to use for its new budget system. The SIS-A generates a score, called the "Support Needs Index" or "SNI," that IDHW will use to place class members into a budget level. (Dkt. 539-2 at page 11 of 34.) That budget level determines each class member's total budget for Medicaid services for the year, using budget tables for different living situations. (*Id.* at pages 19–21 of 34.) It's the SIS-A User's Manual ("Manual") that sets forth the detailed instructions for administering and scoring the assessment.

(Manual[1] at 1 3.) The manual also gives detailed descriptions of each of the SIS-A items, identifying the critical questions assessors must answer when making ratings and the essential elements they must consider for those ratings to be valid, and prescribes enumerated guidelines that assessors must follow. (Manual at 1 3, 2 11–14, 3 27, 2 15–17.) The manual also explains how to score the assessment, and then provides apparently the only source for the tables used to convert a "raw" score to a "standard" score and then a standard score to an SNI, the number IDHW will use to determine class members' budgets. (Manual at 2 18–20, 94, 96.) And, among other vital information for verifying and challenging an assessment, the manual also reports the SIS-A's "Standard Error of Measurement" specifications, margins of error used for calculating the range across which a class member's score may actually fall. (Manual at 92, 107–08.)

Class members may challenge their budgets at administrative hearings, at which IDHW will attempt to rely on the SIS-A SNI score as the basis for each class member's budget amount. With only the so-called "Family Friendly Report" IDHW proposes to provide (Dkt. 539-3) and the extremely general overview information AAIDD makes publicly available, class members will be helpless to effectively question their SNI or cross-examine their assessor on whether their SIS-A was conducted correctly.

_____

[1] Plaintiffs have "lodged" copies of the SIS-A User's Manual, 2nd edition, (Decl. Eppink ex. 1) as well as the prior edition ("2015 Manual") (Decl. Eppink ex. 2), with the Court. Except where noted, all references in this brief to the "Manual" are to the 2nd edition, as class counsel understand IDHW intends to use the 2nd edition for implementation. There are only a handful of differences, however, between the 2nd edition and the earlier edition. (Manual at 1 4–5.) As has published literature about the SIS-A, Plaintiffs reference portions of the manuals here, but as a courtesy considering the pending motion have not publicly filed the manuals or reproduced lengthy excerpts from them. The Court's thorough review of the manuals, however, will reveal how essential they are for deciding whether to challenge an assessment score and cross-examining an assessor.

## II. ARGUMENT

**A.    The Department's Motion Should be Denied Because it Seeks to Overturn the Established Law of the Case**

The Department's motion for this Court to endorse its ban on dissemination of the SIS manual is nothing more than a motion to reconsider the summary judgment decision in this case on the same legal issue. Though that decision concerned the SIB-R, not the SIS-A, the Department's arguments this time around are the same (and the evidentiary support is even thinner). The law of the case doctrine and public policy both dictate that this Court must avoid reargument over issues it has already decided. Indeed, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." *Dickinson Frozen Foods, Inc. v. FPS Food Process Solutions Corp.*, No. 1:17-CV-00519-DCN, 2020 WL 2841517, at *13 (D. Idaho June 1, 2020) (quoting *Official Committee of Unsecured Creditors of Color Tile v. Coopers & Lybrand, LLP,* 322 F.3d 147, 167 (2d Cir. 2003)); *cf. Pepper v. United States,* 562 U.S. 476, 506 (2011) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (citation omitted)). Only a change in controlling law, new evidence, clear error, or a need to correct manifest injustice can justify reconsideration. *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369 n. 5 (9th Cir. 1989). The only ground that could apply here might be the availability of new evidence, but IDHW has not offered any evidence, admissible or otherwise, that could change the summary judgment analysis.[2] So the Court should stop there and deny IDHW's motion, and remind Defendants that "the *Mathews* analysis compels a finding of a due process violation" once again, because IDHW once again seeks to "prevent[]

_____

[2] As demonstrated in Plaintiff's evidentiary objections, Defendant's motion relies upon hearsay, unsworn documents, speculation, and documents that lack sufficient (in fact, any) foundation for this Court to consider them, let alone make any findings.

participants from challenging errors or effectively cross-examining IAPs who claim their assessments are accurate." *K.W.*, 180 F. Supp. 3d at 717.

**B.    In Any Event, the Department's Motion Should be Denied Because Withholding the SIS Manual from Class Members Violates Due Process**

If the Court were to reengage with the due process jurisprudence to decide IDHW's motion, nothing would change. As the Supreme Court reminded in the landmark case, *Goldberg v. Kelly*, governing due process in programs for the indigent like Medicaid, "[c]ertain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." 397 U.S. 254, 270 (1970) (quoting *Greene v. McElroy*, 360 U.S. 474, 496–497 (1959)). The SIS-A assessment, as the SIB-R before it, is a fact-finding proceeding. *Waldrop v. New Mexico Human Services Department*, No. CV 14-047 JH/KBM, 2015 WL 13665460, at *23 (D.N.M. Mar. 10, 2015) ("[T]he SIS assessment and reassessment are essentially fact-finding proceedings to determine the level of benefits to which the DD Waiver recipient is entitled."). As a result, the method assessors follow to find facts using the SIS-A method, which the SIS manual spells out, is fundamental to any budget appeal. Indeed, as *Goldberg* made clear, "[w]elfare recipients must therefore be given an opportunity to confront and cross-examine the witnesses relied on by the department." 397 U.S. at 270. Process "closely approximating a judicial trial is necessary" under *Goldberg. Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The Medicaid regulations also incorporate the *Goldberg* requirements, mandating that class members "must be given an opportunity to . . . [e]stablish all pertinent facts and circumstances" and "[q]uestion or refute any testimony or evidence, including opportunity to confront and cross-examine adverse witnesses." 42 CFR § 431.242I, I.

In reviewing a particular process, the Court can turn to the *Mathews v. Eldridge* balancing analysis, as this Court already did in ruling that IDHW's ban on the SIB-R booklet violated due process. 424 U.S. at 335. In that analysis, the Court weighs (1) the private interest involved; (2) the risk of erroneous deprivation including "the fairness and reliability" of existing procedures and the "probable value, if any, of additional procedural safeguards"; and (3) "the public interest," including administrative burden and other societal costs. *Id.* at 335, 343. Because the interest at stake here is medical assistance for the indigent, it has long been established that due process requires the most extensive agency-level protections there are. *See Mathews*, 424 U.S. at 333. Determinations demand more when, as with IDHW's processes, "a wide variety of information may be deemed relevant" and decision-making criteria depend on subjective evaluations. *Id.,* at 343; c*f. Gary v. Nichols*, 447 F. Supp. 320, 325 (D. Idaho 1978) ("[W]hen the criteria by which termination is to be based are subjective rather than objective, possibly rendering credibility crucial, greater due process may be required . . . .").

The use of undisclosed information in adjudications, in particular, is presumptively unconstitutional under *Mathews. American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1070 (9ᵗʰ Cir. 1995). This Court must be "necessarily wary of one-sided process," because "fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Id.* at 1069 (quoting *Anti–Fascist Committee v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring)). The Ninth Circuit would not even allow the United States to withhold classified national security information, in proceedings against noncitizens, to protect the Government's confidential sources investigating terrorist organizations, holding that "the very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *Id.*; *see also Kiareldeen v. Reno*, 71 F. Supp. 2d

402, 414 (D.N.J. 1999) (holding that government reliance on secret evidence "patently failed the *Mathews* test of constitutional sufficiency"); *Rafeedie v. INS*, 795 F. Supp. 13, 19 (D.D.C. 1992) (holding that government reliance on "undisclosed confidential information" deprives plaintiff "of any opportunity to confront the critical adverse evidence" and therefore violates due process, despite potentially grave national security interests). "[F]undamental fairness—the 'touchstone' to determining whether a plaintiff received due process—requires that a party against whom an agency has proceeded be allowed to rebut evidence offered by the agency if that evidence is relevant." *ASSE Int'l v. Kerry*, 803 F.3d 1059, 1076 (9th Cir. 2015) (cleaned up).

It doesn't matter that IDHW may not itself offer the SIS manual into evidence against a class member. "[T]he fact that the Agency relied indirectly rather than directly on the evidence at issue [does] not excuse the Agency from making the evidence available" to satisfy due process. *Ramirez v. DHS*, 975 F.3d 1342, 1351 (Fed. Cir. 2020). Even the opportunity to have an opposing expert (which most class members couldn't retain, anyhow) does not suffice, because due process must include the ability to check whether the Agency's assessor "tabulated the responses accurately [and] interpreted them according to appropriate criteria," as "the question of what methods and standards [the Agency's assessor] applied in reaching the interpretations" is critical. *Id.* at 1352; *see also M.A. v. Norwood*, 133 F. Supp. 3d 1093, 1098 (N.D. Ill. 2015) ("To ensure fairness and to prevent arbitrary decision making, due process requires eligibility for government assistance programs to be determined according to articulated standards.").

That an assessment's methodology might be proprietary does not matter, either. When the Houston public schools adopted a proprietary teacher evaluation system, called EVAAS, the federal court considering it acknowledged "the tension between the understandable secrecy surrounding proprietary algorithms developed by private commercial enterprises, on the one

hand, and the Fourteenth Amendment due process protections against substantively unfair or

mistaken deprivations of life, liberty, or property, on the other." *Houston Federation of Teachers*

*v. Houston Independent School Dist.*, 251 F. Supp. 3d 1168, 1171 (S.D. Tex. 2017). Without

teacher access to the evaluation method, however, "HISD flunks the minimum procedural due

process standard of providing the reason for termination in sufficient detail to enable [the

teacher] to show any error that may exist." *Id.* at 1177 (quotation marks omitted). That HISD

provided some information about EVAAS to teachers—such as an overview materials, a general

description of the EVAAS test methods and how they are applied, and how to read the EVAAS

report—did not alleviate the due process violation. *Id.* at 1179 (footnotes omitted). Due process

required disclosing the proprietary method, because "trade secrets do not empower, much less

compel, HISD to violate the constitutional rights of its employees." *Id.* at 1179. Numerous

decisions demonstrate that these principles absolutely apply to Medicaid determinations. *See,*

*e.g., Smart v. State*, 237 P.3d 1010, 1012-13 (Alaska 2010) (finding notice to Medicaid provider

that did not disclose "the statistical methodology used" violated due process); *Baker v. State*, 191

P.3d 1005, 1011–13 (Alaska 2008) ("The goal of the assessment process is to take raw

information from the service recipient and translate it into hours of service needed. This requires

analysis, and it follows that documentation of that analysis, to the extent that it exists, should be

provided to the recipient."); *Kuehl v. Dep't of Soc. & Health Servs*., No. 41076-1-II, 2011 Wash.

App. LEXIS 2351, at *19-22 (Ct. App. Oct. 12, 2011) (holding the "13-page worksheet 'PCAT'

that the recipient's case worker would use in interviewing and reevaluating each recipient's

eligibility for continued services . . . .  may well contribute to the recipient's decision to initiate"

an appeal); *see also Darjee v. Betlach*, No. CV-16-00489-TUC-RM (DTF), 2019 U.S. Dist.

LEXIS 20929, at *34-35 (D. Ariz. Feb. 7, 2019) (noting that recipient must have sufficient

information to test the accuracy of the decision to reduce or deny benefits and determine if a mistake was made); *Perdue v. Gargano*, 964 N.E.2d 825, 838 (Ind. 2012) ("Merely offering applicants information from which they could potentially deduce the reasons for a denial is no process at all."). In Ohio, for example, the Medicaid program there adopted an assessment called the Ohio Developmental Disability Profile ("ODDP"), but refused to allow Medicaid recipients to examine the assessment's methodology. *Mocznianski v. Ohio Dept. of Job & Family Services*, 960 N.E.2d 522, 524–25, 527 (Ohio 2011). When challenged, the court found a due process violation, quoting the *Goldberg* requirement that decisions like these "must rest solely on the legal rules and evidence adduced at the hearing," it held that "[i]t is simply unimaginable that the operation of such a device should not be disclosed to an individual whose benefits are in jeopardy by its application." *Id.* at 529.  Just as this Court already decided the first time IDHW tried to ban class members from verifying and replicating their assessment results, the Court must require due process as to the SIS-A as well.[3]

**C.    A *Mathews* Balancing Analysis Confirms the Due Process Violation**

Though the law of the case and clear due process precedent alone resolve IDHW's motion, if this Court reengaged the *Mathews* balancing analysis, it would reach the same result.

### *(1) The Private Interest at Stake*

The private interest at stake could hardly be greater: class members risk losing medically necessary services that their extraordinary disabilities require. *K.W.*, 180 F. Supp. 3d at 715 ("[T]here is no dispute that a reduction in benefits impinges on a substantial private interest."). By definition, all class members are at risk of institutionalization if they cannot get the services

---

[3] Implementing the SIS-A without allowing class members access to the assessment methodology is especially troubling as it will be the first time most class members encounter the SIS-A at all.

they need. *Id.* at 708. Indeed, the SIS-A manual itself flags that using the SIS-A to set individual budgets for people with disabilities is "decision making with high stakes . . . ." (Manual at 6 83.)

### (2) The Risk of Erroneous Deprivation

A difference of just one point on one SIS-A item could deprive class members of tens of thousands of dollars of Medicaid services. Here's just one example: take SIS-A item 2.B.6, "Shopping and Purchasing Goods and Services." (Manual at 3 34.) The assessor's "Primary Considerations" when rating this item include assessing what support the person needs for "Paying for items." (*Id.*) If the assessor forgot to ask about paying for things (Manual at 2 13 (cautioning that "it is critical that interviewers refer to the detailed descriptions of each item in the SIS-A's Section 1 and Section 2"), or if respondents told the assessor that the person rarely shops and never pays for anything, the assessor might score the "Frequency" for this item low, or even zero, despite that the person would need support every time they paid for something. (*See id.* at 2 12.) As a "Primary Consideration," though, paying for items is one of the "essential elements that are critical for all adults." (*Id.* at 3 27.) The assessor also "must assume maximal opportunities for an individual to participate in the listed community activities are present (even if in reality the individual remains home quite a bit of the time)." (*Id.* at 3 32.) And even when the person has no intention of doing certain activities, "the person's support needs still must be rated as if they were running errands and using public services in community settings on a regular basis." (*Id.* at 3 28.) So, if the assessor properly followed the manual, the "Frequency" rating for item 2.B.6 might go up to 2, or even 3. (*See id.* at 2 12.) Even if it just went up one point, that would increase the person's raw score on item 2.B.6 by one point as well. A one-point raw score increase could easily result in a one-point standard score increase. (*See id.* at 94 (consider a person whose subscale 2B raw score is 70, resulting in a standard score for that subscale of 16; if the raw score increased to 71, the standard score would then be 17).) In turn, a

one-point increase in a standard score could easily result in a one-point increase in the person's

Support Needs Index. (*See id.* at 96 (consider a person whose sum of subscale scores is 53,

resulting in an SNI of 88; if the sum of subscales score increased to 54, the SNI would increase

to 89).) An SNI increase from 88 to 89 moves the person from a Level 1 budget to a Level 2

budget in IDHW's system. (Dkt. 539-2 at page 16 of 34.) But if the assessor made this mistake

on item 2.B.6, they could have made a similar mistake on many of the other 56 items in the

seven subscales on the SIS-A. A difference of one or two points on just a handful of items could

increase the raw score by dozens of points and the SNI by 20 or more. (*See* Manual at 94, 96.)

And that kind of change could result in a class member jumping from a Level 1 to a Level 3

budget. (*See* Dkt. 539-2 at page 16 of 34.) The difference between a Level 1 budget and a Level

2 budget is **$36,959.40** for some class members, and the difference between a Level 1 and Level

3 budget is **$67,053.80** for some. (*Id.* at page 19 of 34.)

 Compounding the significant sensitivity of the SIS-A, and thus IDHW's level system, to

such small errors, both AAIDD (the SIS-A's publisher) and HSRI (the consultant who developed

IDHW's new system) stress that SIS-A assessments critically depend on the skill and quality of

the assessors conducting them. The SIS-A manual itself warns that "[r]esults from the SIS-A will

only be valid if interviewers are conscientious about gathering accurate information . . . *There is*

*no antidote for inaccurate information*." (Manual at 2 7 (emphasis added).) In its "Final Report"

on the new IDHW budgeting system, HSRI emphasized that "[e]xtensive training is required for

assessors to promote the interrater reliability and reliability over time of the SIS-A," making

clear that "[i]n order for the new resource allocation model to be fairly applied," the quality of

IDHW's SIS-A assessors is essential. (Dkt. 539-10 at 33, 78.) HSRI has repeatedly stressed this,

stating in an earlier report that "the importance of ongoing quality assurance processes cannot be overstated when the SIS-A is being used to assign support levels and budgets."[4]

HSRI also studied the implementation of the SIS-A in Virginia, comparing it with Oregon's SIS-A implementation.[5] Once again, it stressed there that "[a] resource allocation model based on completed SIS assessments depends first and foremost on the presence of trained and qualified SIS interviewers." *Id.* at 6. Though HSRI noted that Oregon was considered a "model state" for training and quality of SIS-A assessors, thanks to multi-stage training over several months together with systematic testing, HSRI recommended that Virginia, in contrast, "[s]uspend SIS assessments immediately and disregard completed assessments for resource allocation purposes" because of inadequate training and quality assurance. *Id.* at 6, 21. Despite that Virginia had "applied significant resources to conducting SIS assessments," because Virginia could not ensure its assessors were adequate, the assessments "will embed unknown error into the models," and "we cannot know which scores are accurate and which are not." *Id.* at 21–22. One critical aspect of assessor quality, the report indicates, is whether "the Interviewer asked about the support needs in such a way to accurately determine" the appropriate SIS-A ratings. *Id.,* Appendix C at 2.

Because the Virginia HSRI study details the assessor training practices that both Oregon and Virginia used, *id.* at 11–12 (Table 3), we can compare Idaho's to them. (Decl. Eppink ex. 3 at Bates '40475–40485 [lodged with the Court].) Idaho's training program seems better than Virginia's, but no match for Oregon's "model" program. (Compare *id.* with *Findings and*

---

[4] HSRI, *Pre-Implementation Review Findings* 55 (July 2021), https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?id=19317&dbid=0&repo=PUBLIC-DOCUMENTS.

[5] HSRI, *Findings and Recommendations Pertaining to a Review of the Administration of the Supports Intensity Scale in Virginia* (Nov. 5, 2013), https://dbhds.virginia.gov/library/developmental%20services/eval%20of%20sis%20admin%20final%202-20-14.pdf.

*Recommendations Pertaining to a Review of the Administration of the Supports Intensity Scale in Virginia* at 11–12 (Table 3).) And Idaho's training program, employing hybrid virtual and in-person delivery, does not follow AAIDD's recommended best practice. (Manual at 2 8 (noting that "face-to-face training," as opposed to virtual training, is "best practice").) The testimony of Kyle Hildreth, Lead Assessor and Training Director for Idaho's SIS-A implementation, confirms there is grave cause for concern that Idaho's assessors are improperly trained. (Dkt. 539-13.) Hildreth states that Idaho assessors "are trained to obtain an agreed-upon rating for each item before moving on to the next item." (*Id.* ¶ 6.) This directly conflicts with the SIS-A manual, which instructs that "[r]espondents may have different perspectives and may disagree on ratings," and stresses that "*[i]t is particularly important for interviewers to understand that their role is not to bring respondents to consensus.*" (Manual at 2 8–9 (emphasis added).) The manual even goes on to highlight that "[o]ne respondent may know the person better in one context, and another in a different context," directing assessors that "[t]he unique perspectives that different respondents bring to the SIS-A interview should be acknowledged and respected by the interviewer." (*Id.* at 2 8–9.) Hildreth's testimony, combined with IDHW's limited training program, only heighten the risk of erroneous deprivation inherent in the subjective SIS-A process.

That risk increases astronomically when class members can't hold assessors accountable to the SIS-A manual that details how assessors must conduct the assessment. Page after page in the manual details the essential information for checking whether an assessment was properly done and for cross-examining an assessor. This information includes:

- Necessary qualifications for assessors (Manual at 2 8)
- Instructions about handling respondent disagreements (Manual at 2 8–9)
- The importance of, and best practices for, including people with developmental disabilities in their SIS-A assessment (Manual at 2 8–9)

- Best practices for interviewing respondents (Manual at 2 10, 6 82–84)
- That face-to-face interviews, as opposed to virtual interviews, should be done "whenever possible" (Manual at 2 10)
- The requirement that assessors complete all items within each subscale before moving to another subscale (Manual at 3 27)
- Notes about situations where the SIS-A may not be valid (*e.g.*, Manual at 6 81), and studies that suggest SIS-A limitations (*e.g.*, Manual at 6 86)
- A table of all peer-reviewed literature about the SIS-A (Manual at 98–104) and a list of other references and materials about the SIS-A (Manual at 127–134)

Even more critically, the manual details the essential instructions that assessors must follow for an assessment to be valid, including:

- The precise "critical" questions that the assessor must probe when deciding on each rating (Manual at 2 11–14, 3 24, 26, 39)
- Specific and detailed "Guidelines for Interviewers" that assessors "must consider" when conducting the SIS-A (Manual at 2 15–17)
- Specific descriptions of each item on the SIS-A, providing details about what the needs and activities are included in each item, including "Primary Considerations," all of which are "essential elements" that the assessor must consider (Manual at 3 23–53)
- The bolded admonition that the assessor must complete all items, "whether or not the person is interested in participating in the activity," and the requirement that "even when a person has no intention of using community services," the assessor still must rate them as if they were doing those activities "on a regular basis" (Manual at 3 28)
- Specific instructions about the assumptions and factors the assessor must take into account as to each subscale (Manual at 3 28, 32, 35, 38–39, 43–44, 47, 50)
- Instructions and conversion tables for computing a standard score from a raw score and a Support Needs Index (SNI) from a standard score (Manual at 2 21, 94, 96)
- Caveats and disclaimers about using the SIS-A, as IDHW will, to produce individual budgets, including that "the SIS-A provides only one piece of the puzzle" for budgeting and that "[p]rocesses must be in place to address the needs of those who require exceptional or unique supports that fall outside the level framework" (Manual at 5 70)

Also of note, the manual contains statistical specifications and tables (Manual at 91–92, 107, 108), noting the "clinical value" of the standard error of measurement figures, because they

reveal that a person's "true score" actually falls within a range that can span across several SNIs, and therefore multiple IDHW budget levels. (Manual at 108.) Only with these figures can class members compute their score range. (Decl. Remington ¶ 6–7.) Indeed, these tables reveal that a class member's true SNI score might in fact be at least two points higher. (*Id.* ¶ 6.)

Class members and their advocates simply cannot get this information from the "Family Friendly Report" IDHW provides (*e.g.* Dkt. 539-3), the AAIDD Respondent Handbook, or IDHW's budget notice (Dkt. 539-2). The only place to find this information is in the SIS-A manual. The value of ensuring class members have access to the manual—so they can decide whether to appeal their assessment score and, if they do, to prepare an appeal—is overwhelming. Indeed, in *Mathews* itself, the Court noted that one important "safeguard against mistake is the policy of allowing the disability recipient's representative full access to all information relied upon by the state agency." *Mathews,* 424 U.S. at 345–46.

### (3) The Public Interest

The public interest also weighs in favor of the limited disclosure[6] Plaintiffs propose. Medicaid regulations explicitly protect the right of Medicaid beneficiaries to "establish all pertinent facts and circumstances," and "question or refute any evidence" on which the state relies in setting benefits. 42 CFR § 431.242(e). The same regulations require Medicaid agencies

---

[6] The purportedly proprietary SIB-R booklet is currently disclosed to class members once they have signed a form acknowledging potential copyright restrictions and IDHW's statement that it believes disclosure may undermine the SIB-R's value. (Dkt. 306-1 at 78 (ex. 3).) The Department offers no argument that disclosing that booklet to class members has in fact undermined the SIB-R at all, nor that a similar form would not address the concerns it raises about the SIS manual. If some class members cannot access the SIS manual at all, however, then the only adequate substitute procedural safeguards Plaintiffs' counsel can imagine are that IDHW either (a) provide class members with independent, trained SIS-A assessors (with access to the manual) who can assist them with challenging their assessment results and testify at hearing if necessary, or (b) allow class members to conclusively change any of their SIS-A ratings by signing a certification attesting to which ones they contest.

such as IDHW to make available to any program "beneficiary or his representative" all "policy materials necessary . . . [t]o determine whether to request a fair hearing; or . . . [t]o prepare for a fair hearing." 42 CFR § 431.18(e)(1), (2).[7]

There is no state interest in preventing disclosure, and thus no public interest served by prohibiting disclosure. And it barely needs but still bears stating "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation and citations omitted).

AAIDD claims, via unsworn hearsay that has never been subject to cross-examination or other discovery, that disclosing the manual to class members might hurt its business. Since the validity of those private interests is also entirely unproven, the Court should reject them. In any event, AAIDD's interests are merely private interests.

In addition, the SIS manual calls for the assessor to be extensively trained, including having access to the manual itself. If it would invalidate the SIS-A if respondents could access the manual, that would render those assessors ineligible to serve as SIS-A respondents since their knowledge of the test would invalidate the SIS-A. Yet, the 2015 manual expressly permits trained assessors to serve as respondents, without invalidating the SIS-A (2015 Manual at 1 5), and nothing in the 2d edition manual changes that (*see* Manual at 1 4–5). If access to the SIS manual were enough to invalidate the SIS-A and ruin AAIDD, then it would have happened already, as trained assessors acting as respondents would by now have invalidated the tool.

---

[7] By requiring in this subsection the production of "policy materials," it is apparent the regulations require disclosure beyond the "regulations and policies" which must also be disclosed to the general public per 42 CFR § 431.18(c). Use of the term "specific policy materials" in subsection (e), and the restriction of their mandatory disclosure to beneficiaries and representatives rather than the general public, implies that different materials are available to different classes of recipients. Class members and their representatives are entitled to materials beyond the formal regulations and statements of policy available to the general public.

Similarly, SIS assessors around the world have been going through the same SIS items with thousands of respondents for years, many of them serving as repeat respondents, and yet the tool has not been invalidated. This is because a disability assessment tool is nothing like an academic examination where the goal of testing is to determine how well a student has learned a particular subject. In a disability assessment, the goal is to evaluate a person's abilities and needs, not to test a student (respondent). As a result, knowing what questions will be asked actually helps ensure valid data is collected. No respondent can "cheat" by knowing the questions ahead of time, as the SIS does not test the respondent's knowledge.

In addition, contrary to Defendants' argument,the SIS manual is not a trade secret or proprietary asset. As it is available for sale on AAIDD's public website. AAIDD, Bookstore: Supports Intensity Scale—Adult Version (SIS-A) 2nd Edition (last visited Mar. 9, 2023), https://www.aaidd.org/publications/bookstore-home/product-listing/supports-intensity-scale-adult-version-(sis-a-)-2nd-edition, *archived at* https://perma.cc/6BNM-KTRF. Though AAIDD has now imposed a so-called "Purchase Qualifications Policy" expressing certain qualifications for sale, https://www.aaidd.org/publications/bookstore-home/purchase-qualifications-policy, its website neither prevents anyone from buying the manual nor, like the SIB-R publisher did, requires purchasers to certify their qualifications. (Dkt. 306-1 at 78 (ex. 3).) The main requirement to access the manual is money: $130 plus shipping and handling.[8]

The Department chose the SIS as its assessment tool knowing full well the transparency that due process would require. It picked the SIS as its new assessment tool in 2016 (*see* Dkt.

---

[8] The Dutch translation of the SIS manual appears to be widely available to anyone, even for sale through Walmart: https://www.walmart.com/ip/Sis-Supports-Intensity-Scale-Versie-NL-1-2-Handleiding-Schaal-Intensiteit-Van-Ondersteuningsbehoeften-Paperback-9789031376919/843169116; *see also* https://www.thriftbooks.com/w/sis-supports-intensity-scale-versie-nl-12-handleiding-schaal-intensiteit-van-ondersteuningsbehoeften-dutch-edition/18764201/?resultid=fd43b716-2b18-4211-b9ad-ffc97f04cfa2#edition=57124778&idiq=41437129, *archived at* https://perma.cc/SZ67-CM44.

539-10 at 23–26.), after this Court had ruled on summary judgment holding that IDHW's ban on the SIB-R booklet violated class members' due process rights because it prevented them from effectively cross-examining assessors. *K.W.*, 180 F. Supp. 3d at 717. When IDHW chose the SIS-A, this Court had also recently entered a declaratory judgment upholding similar transparency requirements (Dkt. 301 at 2) and the parties had just filed their Settlement Agreement requiring the Department to make the SIB-R booklet available to class members despite IDHW's belief that its disclosure could "undermine the value and usefulness of the SIB-R instrument." (Dkt. 306-1 at 78 (ex. 3).)What's more, when IDHW consulted stakeholders to identify the criteria it should use in selecting an assessment tool, those stakeholders—including class counsel—made clear to IDHW at the time that a "Transparent scoring and level process" weighed a **<u>10</u>** on the otherwise 5-point scale, where "5" was "Extremely important and should have a large impact on selection," while "10" was a "deal breaker/deal maker." (Dkt. 539-10 at 25–26 (PDF pp. 30–31).) The Department had every reason to make sure, as it arranged with AAIDD for Idaho to use the SIS, that the assessment tool it picked was fully transparent to class members regardless of any proprietary interests and test validity concerns, which this Court had already ruled could not trump due process.

Without any sworn testimony or other admissible evidence to support it, IDHW contends that AAIDD may refuse to do business with Idaho, forcing Idaho either to implement the SIS without AAIDD's help or identify another assessment that comports with due process. This argument amounts to making Medicaid recipients pay, with their constitutional rights, for IDHW's failure to ensure that the SIS met its "deal breaker" criteria and could satisfy the law of this case. The Department has also repeatedly delayed implementation of the new budget model. The model was supposed to be completed and ready for implementation in 2019. (*See* Dkt. 306-1

at 7-11 (PDF pp. 8-10).) The Department requested a 5-year delay until 2024, and this Court granted a 3-year delay to 2022. (Dkt. 411 at 3; Dkt. 429). Now that the Settlement Agreement is nearly seven years old, IDHW complains that unless Medicaid beneficiaries are denied due process, it may have delay again while it finds a more transparent assessment tool to use, despite knowing that transparency was essential all along. If the public interest weighed against such delay, then IDHW has been acting contrary to that public interest for years now. It should not be permitted to urge delay when it benefits agency operations but decry them when necessary to protect class members' constitutional rights.

The public interests in the *Matthews* analysis weigh in favor of disclosure.

## D. Unchallenged Practices in Other States are Irrelevant

The Department does not offer a single citation to any authority that it may prohibit Medicaid recipients from inspecting and copying the manual that spells out how they are assessed. Because access to the SIS manual has apparently never been specifically litigated, it is just as relevant to say that "no court has refused to order production of the SIS manual" as it is to say that AAIDD so far purported to limit disclosure of the manual to certain people. This Court's own ruling on the SIB-R booklet was apparently the first to specifically address that material, after all. The proper question for this Court is whether the law of the case, or else the requirements of due process and Medicaid regulations, require IDHW to give class members access to the methodology used to assess them and assign them budgets. The answer is "yes."

## E. Equal Protection

By refusing to provide all class members with access to the SIS manual, the Department is also violating class members' equal protection rights, by dividing participants into two groups: those who can get access to the manual and those who cannot. Not only does this distinction deprive class members of their fundamental right to access Medicaid appeal proceedings by

severely restricting their ability to prepare for the proceeding; it also discriminates against class members on the basis of their indigency. There is no constitutionally satisfactory explanation for this arbitrary, irrational, and discriminatory policy.

The Fourteenth Amendment to the U.S. Constitution makes clear that no state shall "deny to any person within its jurisdiction the equal protection of the laws[,]" U.S. CONST. amend. XIV, § 1, and requires that all persons similarly situated receive equal treatment, *City of Cleburne, Tex. V. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Additionally, inadequate access to adjudicatory proceedings due to indigency affords a claim that fits squarely within the few contexts that require heightened scrutiny under the Equal Protection Clause. *See generally Washington v. Glucksberg,* 521 U.S. 702, 720–21 (1997) (stating that infringements of fundamental rights are subject to strict scrutiny); *see also Boddie v. Connecticut*, 401 U.S. 371, 376 (1971) (holding that a State cannot deny access, simply because of one's poverty, to a "judicial proceeding [that is] the only effective means of resolving the dispute at hand."); *United States v. Kras*, 409 U.S. 434, 443-44 (1973) (noting that denial of access to the judicial forum may rise to the same constitutional level as *Boddie* only where the proceeding would materially affect the individual's position in a constitutional sense).

Here, the Department's refusal to disseminate the SIS manual violates its equal protection obligations under both strict scrutiny and rational basis review.

### *(1) Restricting Access to the User Manual Violates the Equal Protection Clause Because It Restricts Class Members' Access to Medicaid Appeals Proceedings*

When Medicaid enrollees are unable to adequately prepare for a budget appeal, they are deprived of a fundamental interest. Where the state maintains exclusive control over the establishment, enforcement, and dissolution of a fundamental right, the State may not deny access, simply because of one's indigency, to an adjudicatory proceeding that is the only

effective means of resolving the dispute at hand. *See Kras*, 409 U.S. 434, 443-44 (1973) (discussing *Boddie*, 401 U.S., at 376).

Such infringements of fundamental rights are subject to strict scrutiny. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997). Under the strict scrutiny standard, the government must demonstrate a compelling interest to justify the discriminatory policy being challenged, and must use the least restrictive means to achieve that interest. *Johnson v. California*, 543 U.S. 499, 505 (2005). Under this standard, the Department's ban on class members accessing the manual so they can decide whether to appeal and, if they do appeal, prepare for hearing and cross-examine the assessor, is a violation of the Equal Protection Clause because it prevents those class members from meaningful access to Medicaid appeal proceedings.

Access to a Medicaid administrative hearing regarding a budget appeal includes the opportunity to prepare for the appeal by understanding the information that was used to allocate the budget. As explained above, under current policies, without the SIS-A User Manual class members cannot evaluate whether their assessment was done correctly and cannot meaningfully cross-examine their assessor. As a result, only individuals who can purchase the manual online or know someone who can get the manual are able to adequately appeal for a higher standard score and a higher budget.

Meanwhile, class members who cannot purchase or find some other way to get the manual are left without any meaningful opportunity to prepare for administrative hearings, a predicament that this Court rejected as violative of class members' due process. *K.W.*, 180 F. Supp. 3d at 717 ("IDHW's ban prevents participants from challenging errors or effectively cross-examining IAPs who claim their assessments are accurate."). Unlike the individuals who are able to pay for access to the manual, these class members have no way of knowing how the

assessment was supposed to be done, and therefore have no way to point out if and how it was done wrong. Unlike the individuals who have access, class members do not have the instructions and methodology spelled out for assessors in the manual.

Thus, the Department's refusal to disseminate the SIS manual cannot survive the strict scrutiny that is required when a law burdens a fundamental right—because doing so does not further any compelling interest.

### (2) At a Minimum, Prohibiting Public Access to the User Manual Violates the Equal Protection Clause Because There is No Rational Basis for Withholding Access from Only Some Class Members

Because the SIS manual is for sale, at least to some people, it will be available to some but not all class members. Equal protection demands, at a minimum, that a statutory classification "bear a rational relationship to an independent and legitimate legislative end." *Romer v. Evans*, 517 U.S. 620, 633 (1996). Allowing only those class members who themselves or, through a family member, provider, or advocate, can access the manual and evaluate whether to appeal an assessment score and prepare for hearing makes no sense at all. Thus, the Department's refusal to disseminate the manual to class members fails rational basis review.

Some class members will have a provider, family member, or advocate who has or can buy the SIS-A manual. Others will not be able to access the manual at all, if IDHW gets its way. Only those with access to the manual can understand how answers to the assessment may have impacted their raw score, examine whether the assessor conducted the assessment correctly, check that their raw scores were properly converted to a standard score and Support Needs Index (SNI), and adequately prepare for budget appeals. Meanwhile, other class members receive no meaningful avenue to ensure that their assessment was properly done. Therefore, restricting access to the manual does not further any legitimate government interest, and there is no rational

basis for the Department to withhold access to the manual for an assessment that determines the amount of care that indigent Idahoans with disabilities are entitled to.

## III. CONCLUSION

AAIDD's proprietary interests do not trump the United States Constitution. Whatever restrictions AAIDD may wish to impose on dissemination of the SIS-A manual, they do not empower, much less compel, IDHW to violate class members' constitutional rights. "When a public agency adopts a policy of making high stakes . . . decisions based on secret algorithms incompatible with minimum due process, the proper remedy is to overturn the policy, while leaving the trade secrets intact." *Houston Federation of Teachers*, 251 F. Supp. 3d at 1179.

The Court should deny IDHW's motion.

Respectfully submitted,

ACLU OF IDAHO FOUNDATION

/s/ Richard Eppink
Richard Eppink

/s/ Dina Flores-Brewer
Dina Flores-Brewer

PIOTROWSKI DURAND, PLLC

/s/ James M. Piotrowski
James M. Piotrowski

/s/ Marty Durand
Marty Durand
*Attorneys for Plaintiffs*

SHEPPARD, MULLIN, RICHTER, & HAMPTON, LLP

/s/ Daniel L. Brown
Daniel L. Brown

/s/ Katherine Anne Boy Skipsey
Katherine Anne Boy Skipsey