Richard Eppink
reppink@acluidaho.org
Idaho State Bar no. 7503
Dina Flores-Brewer
DfloresBrewer@acluidaho.org
Idaho State Bar no. 6141
**AMERICAN CIVIL LIBERTIES UNION
OF IDAHO FOUNDATION**
P.O. Box 1897
Boise, Idaho 83701
(208) 742-6789 ext. 3

James M. Piotrowski, ISB No. 5911
Marty Durand, ISB No. 5111
**PIOTROWSKI DURAND, PLLC**
P.O. Box 2864
Boise, Idaho 83701
(208) 331-9200
(208) 331-9201 (fax)
James@idunionlaw.com
Marty@idunionlaw.com

Daniel L. Brown
Katherine Anne Boy Skipsey
**SHEPPARD, MULLIN, RICHTER
& HAMPTON, LLP**
30 Rockefeller Plaza
Floor 39
New York, New York 10112
(212) 634-3095
*Admitted pro hac vice*

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| K.W., by his next friend D.W, *et al.*, | ) | Case No. 1:12-cv-00022-BLW |
| | ) | (lead case) |
| Plaintiffs, | ) | |
| | ) | **BRIEF IN SUPPORT OF** |
| vs. | ) | **MOTION FOR CIVIL** |
| | ) | **CONTEMPT REMEDIES** |
| RICHARD ARMSTRONG, in his official capacity | ) | **TO ENFORCE SETTLEMENT** |
| as Director of the Idaho Department of Health and | ) | **AGREEMENT** |
| Welfare, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

# **Table of Contents**

I.      Litigation Background.................................................................................................1

II.     Legal Standards and Authority....................................................................................5

III.    Defendants Should Be Held In Contempt Because They Have Failed to Comply with
        Both the CASA and This Court's Orders.....................................................................6

IV.     The Significant Delay in Final Implementation of the Settlement Agreement Has Caused
        and Continues to Cause Significant Harm...................................................................8

        A.    Continued Use of the The Budget Tool Is Causing Practical, Constitutional and
              Financial Harm..................................................................................................8

        B.    The Budget Tool Is Based on Outdated Assumptions about the Cost of Services.....10

        C.    The Extensive Delay Has Exacerbated Harms Across the DD Services Program.....11

V.      The Court Should Appoint a Special Master and Update Bridge Period Safeguards.........12

        A.    The Court Should Appoint a Special Master to Oversee Settlement Implementation,
              Because IDHW Has Proved Unable to Adequately Oversee It on Its Own..............12

              1.    A Special Master to Facilitate Settlement Implementation Is Especially
                    Appropriate for this Complex Case....................................................................13

              2.    Special Master Selection, Qualifications, Duties, and Compensation................16

        B.    The Court Should Protect the Class from the Outdated, Unconstitutional Budget
              Tool by Modifying Bridge Period Safeguards.........................................................18

              1.    Opt-In Budgeting Comports with IDHW Processes and Laws.........................20

              2.    The Bridge Period Training Program Should be Modified to Help Class
                    Members Navigate the Modified Bridge Period Safeguards.............................21

        C.    The Court Should Apply the General 42 U.S.C. § 1988 Rule that Defendants
              Must Pay Fees for All of Class Counsel's Monitoring Work.....................................22

VI.     Conclusion....................................................................................................................24

# **Table of Authorities**

**Federal Cases**

*Plata v. Schwarzenegger*,
  No. C01-1351 TEH, 2005 WL 2932253, (N.D. Cal. Oct. 3, 2005) ........................................ 13

*Alexander v. Hill*,
  707 F.2d 780 (4th Cir. 1983) ................................................. 14

*Balla v. Idaho State Bd. of Corr.*
  No. 1:81-cv-1165-BLW, 2011 WL 108727, (D. Idaho Jan. 6, 2011) .................................... 16

*Balla v. Idaho*,
  677 F.3d 910 (9th Cir. 2012) ................................................. 22

*Callie v. Near*,
  829 F.2d 888 (9th Cir. 1987) ................................................. 5

*City of N.Y. v. Mickalis Pawn Shop, L.L.C.*,
  645 F.3d 114 (2d Cir. 2011) ................................................. 14

*Concilio de Salud. v. Perez-Perdomo*,
  551 F.3d 10 (1st Cir. 2008) ................................................. 15

*Covington v. N.C.*,
  No. 1:15-CV-399, 2018 WL 8060397, (M.D.N.C. Mar. 22, 2018) ........................................ 18

*Dietz v. Bouldin*,
  136 S. Ct. 1885 (2016) ................................................. 5

*Dixon v. Barry*,
  967 F. Supp. 535 (D.D.C. 1997) ................................................. 13

*Frew v. Hawkins*,
  540 U.S. 431 (2004) ................................................. 6

*FTC v. Enforma Nat'l Prods.*,
  362 F.3d 1204 (9th Cir. 2004) ................................................. 12

*Gary W. v. Louisiana*,
  601 F.2d 240 (5th Cir. 1979) ................................................. 15

*Gary W. v. Louisiana*,
  No. 74-2412, 1990 WL 17537 (E.D. La. Feb. 26, 1990) ........................................ 13

*Glover v. Johnson*,
  934 F.2d 703 (6th Cir. 1991) ................................................. 14

*Gonzales on behalf of A.G. v. Burley High Sch.*,
  No. 4:18-cv-00092-DCN, 2020 WL 7047747 (D. Idaho Nov. 30, 2020) .............................. 23

*Halderman v. Pennhurst State Sch. & Hosp.*,
    612 F.2d 84 (3d Cir. 1979) ...................................................................... 15

*Hook v. Arizona*,
    120 F.3d 921 (9th Cir. 1997) ................................................................... 14

*Hutto v. Finney*,
    437 U.S. 678 (1978) ..................................................................................... 6

*In re Crystal Palace Gambling Hall, Inc.*,
    817 F.2d 1361 (9th Cir. 1987) ................................................................... 6

*Juan F. v. Weicker*,
    37 F.3d 874 (2d Cir. 1994) ...................................................................... 15

*K.W. v. Armstrong*,
    No. 1:12-cv-00022-BLW, 2023 WL 5431801 (D. Idaho Aug. 23, 2023) ............................... 4

*K.W. v. Armstrong*,
    180 F. Supp. 703 (D. Idaho 2016) ................................................. 2, 3,  8, 9, 10, 14, 18, 21, 22

*K.W. ex rel. D.W. v. Armstrong*,
    789 F.3d 962 (9th Cir. 2015).................................................................... 17

*Kelly v. Wengler*,
    822 F.3d 1085 (9th Cir. 2016) ...................................................... 23, 5-6, 6

*Kelly v. Wengler*,
    979 F. Supp. 2d 1104 (D. Idaho 2013) ...................................................... 5

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ..................................................................................... 5

*Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*,
    564 F.3d 1115 (9th Cir. 2009) ................................................................... 6

*Lelsz v. Kavanagh*,
    112 F.R.D. 367 (N.D. Tex. 1986) ............................................................ 15

*Little Rock Sch. Dist. v. Arkansas*,
    127 F.3d 693 (8th Cir. 1997) ................................................................... 23

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995) ........................................................ 14

*N.Y.S. Ass'n for Retarded Children v. Carey*,
    706 F.2d 956 (2d Cir. 1983) ................................................................... 15

*Nat'l Org. for Reform of Marijuana Laws v. Mullen,*
  828 F.2d 536 (9th Cir. 1987) ................................................................ 13

*Prison Legal News v. Schwarzenegger,*
  608 F.3d 446 (9th Cir. 2010) ................................................................ 22

*Reed v. Cleveland Bd. of Educ.,*
  607 F.2d 737 (6th Cir. 1979) ................................................................ 13

*Reed v. Rhodes,*
  642 F.2d 186 (6th Cir. 1981) ................................................................ 14

*Riverside v. Rivera,*
  477 U.S. 561 (1986) ............................................................................. 23

*Schwimmer v. United States,*
  232 F.2d 855 (8th Cir. 1956) ................................................................ 13

*SEC v. Hickey,*
  322 F.3d 1123 (9th Cir. 2003) .............................................................. 12

*SEC v. Hickey,*
  335 F.3d 834 (9th Cir. 2003) ................................................................ 12

*Spallone v. United States,*
  493 U.S. 265 (1990) ............................................................................. 12

*United States v. Bright,*
  596 F.3d 683 (9th Cir. 2010) .................................................................. 6

*United States v. Horton,*
  622 F.2d 144 (5th Cir. 1980) ................................................................ 15

*United States v. Suquamish Indian Tribe,*
  901 F.2d 772 (9th Cir. 1990) ................................................................ 14

**Federal Statutes**

28 U.S.C. § 636 ........................................................................................ 4

42 U.S.C. § 1988 .................................................................................... 23

**State Statutes**

Idaho Code § 56-255 .............................................................................. 21

Idaho Administrative Code § 16.03.09.390 ............................................. 20

Idaho Administrative Code § 16.03.10.020.01.b ..................................... 20

Idaho Administrative Code § 16.03.10.036.02.b ..................................... 20

Idaho Administrative Code § 16.03.10.075 ............................................. 20

Idaho Administrative Code §§ 16.03.10.316–317 ................................... 20

Idaho Administrative Code § 16.03.10.507 ................................................................. 20

Idaho Administrative Code §§ 16.03.10.508.15, 17–20 ............................................. 20

Idaho Administrative Code § 16.03.10.513................................................................. 20

Idaho Administrative Code §16.03.10.514.01.b ........................................................ 20

Idaho Administrative Code §16.03.10.515.3.a .......................................................... 20

**Rules**

Fed. R. Civ. P. 53 ................................................................... 13, 16, 12, 13, 18

Fed. R. Civ. P. 72 ............................................................................................. 4

Defendants (referred to here as IDHW or the Department) spent years developing a new Medicaid budgeting and assessment system without telling anyone that it would rely on the same kinds of secret methods that this Court previously held unconstitutional, resulting in the 2016 summary judgment against IDHW. The case is now at a standstill because, even though IDHW agreed to full implementation by 2020 (almost four years ago now), the Department still has no clear plan to implement a new budget tool. Plaintiffs cannot wait another half decade for the constitutional remedy this Court ordered in 2016. The ancient budget tool still in effect today is based on cost data from 2009–2011 and, even with the Settlement Agreement's interim safeguards, is so old that it is causing ongoing harm to *thousands* of class members.

This Court must intervene to get this case back on track. Plaintiffs ask that the Court:

1. Hold IDHW in civil contempt;

2. Appoint a special master to oversee settlement implementation;

3. Update the interim safeguards so that the old, unreliable budget tool is opt-in only, adjusting the accompanying Suitable Representative training curriculum accordingly; and,

4. Modify the CASA-based obligations to incentivize IDHW to complete the remedies it agreed to.

## I.    Litigation Background

This case, in which the Court held that Idaho's Medicaid assessment and budgeting system was unconstitutional, is now nearly 12 years old. After IDHW refused to disclose the formula it used to cut class members' budgets for Medicaid services in 2011—claiming the formula was a "trade secret" (Dkt. 5-11)—Plaintiffs sued and quickly got an injunction to see the secret formula. (Dkt. 41.) The Court then certified a class of all Idahoans who get assessed and assigned an individual budget as part of IDHW's Medicaid "DD Services" program for adults with developmental disabilities. (Dkt. 130; *cf.* Dkt. 224.) The class now numbers over 6,600 directly impacted, indigent people on Medicaid, all across the state. (Decl. Piotrowski ex. 6; *see*

*also* Dkt. 428 at 3.) However, as a result of IDHW's failure to abide by the parties' court approved settlement agreement, those class members still must contend with the assessment and budgeting system this Court held unconstitutional in 2016. At this point, more than 40% of them entered the system after July 2011 and therefore do not get the benefit of reverting to a budget calculated before the unconstitutional system took effect. (Decl. Piotrowski ex. 6; *see also* CASA §§ V.B.1 and III.A.9.)

This Court has already ruled that the existing budget tool is so unreliable that it violates due process. *K.W.*, 180 F. Supp. 703, 718 (D. Idaho 2016). In 2017 the Court approved and ordered a comprehensive Class Action Settlement Agreement (the "CASA") outlining the work IDHW must undertake to finally bring remedy and justice to the class. (*See* Dkt. 331; *cf.* Dkt. 331, 337, 338.) The Settlement Agreement called for the work to be completed by 2019, with Court intervention if IDHW had not finished by 2020. (Dkt. 306-1 at 8 [PDF p. 9] [hereinafter "CASA"].) In the meantime, a package of temporary interim safeguards, called the "Bridge Period," prevented budget reductions, let class members rely on previous budgets, and established a robust training program so that class members and their Suitable Representatives could learn how to navigate those interim safeguards. (CASA § V.B.) In July 2019, after IDHW revealed that it would not meet the CASA's deadline, litigation over the implementation deadline ensued and continued throughout 2020. (Dkt. 353 and linked events.) Ultimately, the Court gave IDHW until June 2022 to implement its new budget tool. (Dkt. 429.)

Class counsel next discovered serious flaws with the proposed new assessment and budgeting system that IDHW had developed with its consultant, Human Services Research Institute (HSRI). The final report on the new system flagged "shortcomings in the self-directed service mixes/budgets" that will lead to inadequate budgets for many class members. (HSRI, *Resource Allocation Model Final Report* 72 (Jan. 31, 2022) (Dkt. 539-10),

https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?
id=21240&dbid=0&repo=PUBLIC-DOCUMENTS.) The report noted that the percentage of
class members with self-directed budgets was already 25% and expected to grow. *Id.* at 77. In
addition to these self-directed class members against whom the new system discriminates, class
counsel's early analysis revealed other significant problems with the proposed assessment and
budgeting system.

Class counsel alerted the Court to the existence of these issues at a January 2022 status
conference. (*See* Dkt. 473.) The parties discovered that some of the issues could be resolved
depending on how IDHW chose to implement requirements of the American Rescue Plan Act
(ARP) (Pub. L. 117-2), enacted in response to COVID-19. (*See* Dkt. 478.) Because Idaho
accepted ARP funds, it accepted ARP's "maintenance of effort" provision prohibiting IDHW
from imposing stricter eligibility for, or from reducing the amount or scope of Medicaid services
available. While the parties tried to hash out the ARP issues, they began litigating over other
issues integral to implementation, including problems with the transparency of IDHW's newly
proposed system. (*See, e.g.,* Dkt. 522.)

In particular, IDHW chose the Supports Intensity Scale–Adult, known as the SIS-A or
sometimes just the SIS, as a new assessment tool that each class member would undergo to
establish a new budget. When IDHW consulted with stakeholders about selecting a new
assessment tool, Class counsel, class members, and advocates for people with disabilities all told
IDHW that transparency of any new assessment instrument was so important as to be a "deal
breaker," weighing **10** on a scale of 1 to 5. (Dkt. 593-1 ex. 1, at 4, 10.) But in 2022, IDHW
confessed that it had not, in fact, ensured its assessment tool would be transparent. A Court order
was required just for class counsel to see a complete copy of the Idaho contract with the SIS-A
publisher, AAIDD (American Association on Intellectual and Developmental Disabilities). (Dkt.

509 at 8.) Then, this spring, IDHW suddenly moved the Court for an expedited order precluding class members from seeing the SIS-A User's Manual at all, even though the Manual delineates assessment criteria and methods that would determine class members' budgets. (Dkt. 536, 539.) Though IDHW moved to expedite its motion, after the Court heard argument on it the Department withdrew its motion… and then reinstated it… and then tried to delay decision yet again after the Court heard argument on the motion a second time. (Dkt. 573, 577, 593.)

The Court ultimately denied IDHW's motion, re-emphasizing the same due process fundamentals that IDHW has resisted for over a decade now, stating that "[w]ithout access to the User's Manual, the SIS-A assessment remains a black box for participants" and that withholding the manual "prevents the participant from challenging errors or effectively cross-examining [assessors] who claim their assessments are accurate." *K.W.*, No. 1:12-cv-00022-BLW, 2023 WL 5431801, at *7 (D. Idaho Aug. 23, 2023). The Court held, forcefully, that "unconditionally precluding class members' access to information in the User's Manual through the entirety of the resource allocation process, most specifically during the appeals process, defies logic and is antithetical to principles of due process." *Id.*

The Department did not object to the order under Fed. R. Civ. P. 72(a). Despite that, it filed an appeal (Dkt. 597), which the Ninth Circuit quickly dismissed (Dkt. 602). Yet still, IDHW is maneuvering to delay this case once again, now filing a "Motion to Vacate" the Court's decision on the SIS-A manual, contending that Judge Winmill erred in making a 28 U.S.C. § 636(b)(1)(A) magistrate referral despite that Judge Dale made a point to check that the referral was proper—and Defendants' counsel agreed that it was. (Dkt. 582, at 5:17–7:23.)

This case began because IDHW kept its assessment and budgeting methods a secret from class members. Now, over a decade later, half a dozen years since settlement approval, and more than a year beyond IDHW's final and already extended deadline, IDHW **still** has not

implemented an assessment and budgeting **system** that is transparent, fair, or constitutional, and it persists in efforts to get this Court to let it implement a secret system. At this point, five of the 13 class representatives have died while waiting for IDHW to honor their fundamental rights. As Plaintiffs have repeatedly made clear, delay wreaks ongoing and irreparable harm on the vulnerable class members.

This Court can no longer leave IDHW primarily responsible for settlement implementation. It should appoint a special master to facilitate and bring final closure to this case. In the meantime, the Court should adjust the Bridge Period safeguards to restore equity between Plaintiffs and IDHW.

## II.    Legal Standards and Authority

The Court approved the CASA on January 12, 2017. (Dkt. 331.) Because IDHW still has not satisfied the terms of the CASA, pursuant to the CASA this Court maintains jurisdiction over its enforcement. (Dkt. 331, 337, 338; see *also* CASA § V.K.3); *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378-81 (1994) (noting that a district court has ancillary jurisdiction to "manage its proceedings, vindicate its authority, and effectuate its decrees"); *see also Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987) ("It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it.").[1]

As this Motion is brought to remedy the violation of the CASA, which is an order of this Court, this Court is also vested with multiple broad powers to remedy the Defendants' violation. Federal courts possess inherent contempt power, the purpose of which "is to coerce compliance with a court order or to compensate another party for the harm caused by the contemnor." *Kelly*

---

[1] This Court also has the inherent authority to manage its docket to ensure expeditious settlement implementation and prevent delays. The Supreme Court "has long recognized that a district court possesses inherent powers that are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Dietz v. Bouldin*, 136 S. Ct. 1885, 1890 (2016) (citations omitted).

*v. Wengler*, 979 F. Supp. 2d 1104, 1108 (D. Idaho 2013), *aff'd*, 822 F.3d 1085 (9th Cir. 2016); *see also United States v. Bright*, 596 F.3d 683, 695-96 (9th Cir. 2010) ("Civil contempt is characterized by the court's desire to compel obedience to a court order or to compensate the contemnor's adversary for the injuries which result from the noncompliance."). A stipulated settlement agreement over which this Court retains jurisdiction may be enforced through contempt proceedings. *Kelly*, 822 F.3d at 1091; *see also Frew v. Hawkins*, 540 U.S. 431, 432 (2004) ("Federal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, that decree may be enforced."). If a party believes an order is inappropriate, it must affirmatively seek relief from it; it may not instead "disobey a court order and later argue that there were 'exceptional circumstances' for doing so." *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987). Federal courts also possess all powers necessary to remedy constitutional violations. *Hutto v. Finney*, 437 U.S. 678, 687 n.9 (1978) (citing *Milliken v. Bradley*, 433 U.S. 267, 280-81 (1977)).

A party seeking an order of civil contempt has the initial burden to establish by clear and convincing evidence that the contemnor (1) "violated the court order," (2) "beyond substantial compliance," (3) "not based on a good faith and reasonable interpretation of the order." *Lab./Cmty Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009). Plaintiffs easily meet that burden here, as IDHW has indisputably failed to comply with the completion deadline and implement a new resource allocation model as required by the Court-ordered CASA. It is now well after the final deadline this Court set following protracted litigation over that deadline.

## III. Defendants Should Be Held In Contempt Because They Have Failed to Comply with Both the CASA and This Court's Orders

The Department has now violated the CASA and this Court's order (Dkt. 429) setting June 2022 as IDHW's completion deadline, and it is well past the January 2020 deadline

contemplated in the CASA itself (§ V.A.2).[2] By ignoring the deadline, IDHW has therefore also violated the two provisions that form the CASA's nucleus:

- § V.A: requiring IDHW to "adopt and implement a new resource allocation model . . . which will replace the Budget Tool," and

- § V.A.2: requiring IDHW to complete 24 action steps. The Department has failed to complete most of these steps: nos. 5, 7, 8, and 12–24.

These three related violations—ignoring the June 2022 deadline, failing to replace the old Budget Tool, and failing to complete the required action steps— all amount to the same root cause for contempt: IDHW agreed in the CASA to remedy the constitutional violations this Court identified at summary judgment, but has failed to do it. The case is at a standstill, and the class has now waited more than a decade, and counting, for their fundamental rights.

The heart of the CASA and the constitutional violations this Court identified in its summary judgment decision is to put an end to unconstitutional methods IDHW was using to administer its DD Services program. The Department has had its chance. It even got a significant extension, and now more than a year after that final deadline has still failed to "adopt and implement a new resource allocation model . . . which will replace the Budget Tool," to complete

---

[2] Plaintiffs regret that they didn't file a contempt motion praying for this Court's intervention sooner. Class counsel warned a year ago that they might have to seek to compel implementation (*see* Dkt. 517 at 2), but at the time were awaiting a proposed implementation timeline from IDHW (Dkt. 595 at 13:24–15:2). The timeline IDHW then proposed raised many concerns (*see* Dkt. 522 at 2, 22–23), so class counsel asked this Court to intervene immediately and sought a scheduling and discovery order that would advance the case towards compliance and final termination (Dkt. 522 at 30–31). The Court denied discovery and instead urged the parties to work collaboratively toward implementation. (Dkt. 534 at 4.) But a week later, IDHW filed its motion to bar class members from accessing the SIS-A manual. (Dkt. 539.) Litigation over that issue has diverted the case for the past eight months, with IDHW withdrawing their motion after oral argument (Dkt. 573) and then reinstating it (Dkt. 577), and then—after a second oral argument on it—asking the Court to delay ruling on it (Dkt. 593 at 4), which Plaintiffs opposed (Dkt. 594). Then, causing only more delay, after IDHW lost the motion, it filed an appeal so groundless that IDHW itself moved to voluntarily dismiss it. (*See* Dkt. 602.) Now, IDHW has no implementation plan at all, much less any timeline, and is more than a year past its final deadline.

CASA action steps 5, 7, 8, and 12–24, or to propose adequate Suitable Representative or Testing plans for their new system, which now is not even pending implementation. The Court should now intervene to remedy this continuing violation, hold Defendants in contempt, and appoint a special master to set this case on track to be closed at long last.

## IV.    The Significant Delay in Final Implementation of the Settlement Agreement Has Caused and Continues to Cause Significant Harm

### A.    Continued Use of the Budget Tool Is Causing Practical, Constitutional and Financial Harm

This Court previously noted that even "IDHW estimates that the [existing] budget tool will not produce an adequate budget for up to 15% of the participants." (Dkt. 270, p. 12.) That was when the budget tool was based on cost data that was only a few years old. *K.W. v. Armstrong*, 180 F. Supp. 3d 703, 711 (D. Idaho 2016) (explaining that IDHW used 2009–2010 data to build the tool). The tool is now over twelve years old, seven years older than it was at summary judgment. But IDHW has not sufficiently updated it to match mounting prices, reimbursement rates, or wages.

The Department implemented the existing tool in 2011. As the Court explained, the tool needs to be frequently updated to reflect the needs of participants and the costs of the services they require. *Id.* at 712 ("[A]lthough IDHW knows that the tool needs to be recalculated annually, IDHW has not done that.") Instead, the tool now, at best, poorly reflects the funds required to meet the class's needs in the market a decade ago. The tool is based on application of a "constant" and a series of budget additions and subtractions corresponding to certain assessment ratings. *Id.* at 709. The "constant" when the Budget Tool was rolled out in 2011, and when the court entered its summary judgment was $24,476. *Id*. But IDHW has not updated either the "constant" or any of the additions or subtractions to reflect current realities. (Decl. Piotrowski

exs. 1 and 2.) Indeed, the Budget Tool still used to this day is nearly identical to that used since July 2011, and has not been updated at all since 2018. (*Id.*)

Plaintiffs agreed to a short-term continuation of this unconstitutional and dated system, until, at the latest, 2020. But now, almost eight years later, the Budget Tool is still determining budgets that the Court already held were "arbitrary," and would result in inadequate budgets approximately 15% of the time. *K.W.,* 180 F. Supp. 3d at 711, 718. While the "injunction budget" or "KW budget" method set out in the CASA prevents budget reductions, it does not correct a brand-new budget that is too low as a result of the Budget Tool's known flaws. Instead, as of the last check, more than 40% of class members (2,687 of them) never received a budget before the new Budget Tool was created and so do not have a pre-Budget Tool budget to rely on. (Decl. Piotrowski ex. 6.) Those individuals are all stuck with either a budget based on bad data or must appeal merely to get an adequate budget. The number of new entrants to the program increases each year as Idaho's population grows and as people in the Medicaid youth DD services program age out of that program. The Department has not even updated its tool to reflect current Medicaid rates, despite that those rates have increased significantly since both 2011, when it first implemented the tool, and 2018, when it last updated it. (*See id*. exs. 1, 2, 4, 5.) As this Court has already observed, this means that the tool cannot meet class member needs. (Dkt. 189-40 at 74:14–22 (Dep. IDHW) ("Q. . . . [I]f all of the services and equipment that participants in the program used had doubled in costs since 2009, and we were still using a calculation based on the 2009 information, those budgets would not be adequate to meet real life costs? A. That's correct. That's why we intended it to run the budget modeling annually to catch up with those changes.")); *cf. K.W.*, 180 F. Supp. 3d at 712.

**B.**    **The Budget Tool Is Based on Outdated Assumptions about the Cost of Services**

While the Budget Tool has remained largely unchanged over the past decade, the costs of many of the services and supports class members rely on have dramatically increased. (*See* Decl. Piotrowski exs. 4, 5.) The Budget Tool is designed to provide an amount of money that a program participant can use to purchase DD services. While the Budget Tool has remained static, the reimbursement rates for DD services have continued to rise. The Budget Tool is based upon data about the costs of DD services in 2009 and 2010, *K.W.*, 180 F. Supp. 3d at 711, but rates for almost all DD services have increased considerably since this lawsuit began, and especially in the period since the Settlement Agreement was approved. The DD Services program serves over 4,000 Class Members in the "Traditional Waiver" services. (*Id.* ex. 6.) Traditional Waiver services include services such as Supported Living Intense, Supported Living High, and Developmental Therapy, among others. Intense Level Supported Living, for example, was reimbursed at $263.66 per day when the Budget Tool was created, and is now reimbursed at $756.48 per day, an increase of 287%. (Decl. Piotrowski exs. 4, 5.) High Level Supported Living has increased from $221.06 to $410.88, a 185% increase over the same period. (*Id.*) Developmental Therapy has undergone a number of changes over that period, but the reimbursement rate which Class Members need to account for in their budget has increased from $12.06 in 2011 to $16.68 per unit, a 138% increase in price. (*Id.*)

These reimbursement changes comport with the overall rate of inflation, though they are far below the general rate of wage inflation in many parts of Idaho. The Bureau of Labor Statistics calculates that the growth in the Consumer Price Index was approximately 136% between 2011 and 2023. *See* United States Bureau of Labor Statistics, *CPI Inflation Calculator*, https://www.bls.gov/data/inflation_calculator.htm. As a result of general price inflation, but particularly as a result of reimbursement rate growth for DD Services, the Budget Tool generates

a budget with far less real value than it did in 2011 or even 2016. Thus, the problem the Court and the Plaintiffs sought to correct has gotten far worse, rather than better.

Though the Department previously made some adjustments to account for a few of these increases (such as a Tool update for increased costs of Supported Living and Certified Family Home placements), those adjustments were last made sometime prior to 2018 and reimbursement rates for those services have increased further since then. (Decl. Piotrowski exs. 1, 2, 4, 5.) The current adjustments use, for example, a Supported Living Intense daily rate of $509.76, while the current reimbursement rate for that service has risen to $756.48, or 48% more than the amount used in the current Budget Tool. (*Id.* exs. 2, 5.) Not only have rates increased since the Budget Tool was created, but reimbursement rates have also now outstripped the adjustments that IDHW has made to try to keep up.

### C. The Extensive Delay Has Exacerbated Harms Across the DD Services Program

While class members have waited patiently for IDHW to implement the remedies it promised to, the DD services program has been disintegrating because the budget tool and associated rates have not kept up with the economic realities facing class members, their families, and their providers. The "dire situation" class members now suffer prompted a full study by the Idaho Legislature's Office of Performance Evaluations, which found a growing shortfall of the direct care workers that class members spend their individual budgets on. Office of Performance Evaluations, Idaho Legislature, *Sustainability of Idaho's Direct Care Workforce* 5 (2023), https://legislature.idaho.gov/ope/reports/r2202/. Idaho's shortage is already 13% below national staffing levels. *Id.* The reason for the shortage: Idaho's Medicaid program does "not support sustainable competitive wages for direct care workers.*" Id.* at 6. This puts class members' health and safety directly at risk, as many lack backup support, creating "troubling and dangerous situations." *Id.* at 7. Support brokers assisting class members are also impacted, and

"despite repeated requests" to IDHW to remedy the crisis, "they have not received help from the division to address these concerns." *Id.* at 49. For class members with limited English proficiency, the crisis has left them without means to understand what's happening to them in the Medicaid process or to meaningfully communicate with their providers and IDHW itself. *Id.*

Idaho's disability experts and organizations working daily with class members, including Idaho's Council on Developmental Disabilities (a state agency), confirm the worsening crisis that Idaho's study found. (Decl. Pisani ¶¶ 9, 11; Decl. Camacho ¶ 12, 15, 16; Decl. Durrant ¶¶ 10–15.) They also lamentingly report that IDHW is no longer meaningfully communicating with class members despite its CASA responsibilities to "encourage engagement and active involvement of class members" (CASA § V.A.5). (Decl. Pisani ¶ 6; Decl. Durrant ¶ 9.) These experts support the remedies that the class seeks, given IDHW's failure to implement the CASA on time and as promised. (Decl. Durrant ¶¶ 6–21; Decl. Pisani ¶¶ 8–14.)

## V.    The Court Should Appoint a Special Master and Update Bridge Period Safeguards

### A.    The Court Should Appoint a Special Master to Oversee Settlement Implementation, Because IDHW Has Proved Unable to Adequately Oversee It on Its Own

As explained above, Defendants should be held in contempt because there is "clear and convincing evidence that [IDHW] violated a specific and definite order of the court." *FTC v. Enforma Nat'l Prods.*, 362 F.3d 1204, 1211 (9th Cir. 2004); *see also Spallone v. United States*, 493 U.S. 265, 276 (1990) (upholding imposition of contempt sanctions against the City of Yonkers for failing to comply with a consent decree). The Court possesses broad and various powers to remedy a contempt. *SEC v. Hickey*, 322 F.3d 1123, 1128 (9th Cir. 2003), *as amended, SEC v. Hickey*, 335 F.3d 834 (9th Cir. 2003) ("District courts have broad equitable power to order appropriate relief in civil contempt proceedings."). Fed. R. Civ. P. 53 ("Masters") outlines how a court may appoint a special master when warranted by some exceptional condition, Fed.

R. Civ. P. 53(a)(1)(B)(i), or to address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district, Fed. R. Civ. P. 53(a)(1)(C).

Beyond Fed. R. Civ. P. 53, a district court also "has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'" *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956) (quoting *Ex parte Peterson*, 253 U.S. 300, 311 (1920)); *see also Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 746 (6th Cir. 1979). Courts may also order the appointment of an expert, monitor, or special master without a finding of contempt. *See Plata v. Schwarzenegger*, No. C01-1351 TEH, 2005 WL 2932253, at *35 (N.D. Cal. Oct. 3, 2005) (appointing a subject-matter expert to recommend remedial orders to the court); *Gary W. v. Louisiana*, No. 74-2412, 1990 WL 17537, at *3, *14, *29 (E.D. La. Feb. 26, 1990) (appointing a special master and requiring the creation of an independent monitor unit); *Dixon v. Barry*, 967 F. Supp. 535, 539, 540, 554 (D.D.C. 1997) (discussing appointments of a "technical expert" to oversee the implementation of a compliance plan and special master to oversee the consent decree, compliance plan, and prior court orders).

### 1. <u>*A Special Master to Facilitate Settlement Implementation Is Especially Appropriate for this Complex Case*</u>

The appointment of a special master is particularly appropriate here for a number of independent reasons. First, "monitoring alleged non-compliance with the court's order is not only "an 'exceptional condition' that justifies reference to a master" under Fed. R. Civ. P. 53, but it is also part of the "inherent power of the court to enforce its orders" under which the court's "reference to a master [is] proper." *Nat'l Org. for Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 542-43 (9th Cir. 1987).

Second, courts have found exceptional circumstances warranting the appointment of a special master based on "the complexity of [the] litigation" or "problems associated with

compliance with the district court order," *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (9th Cir. 1990), including a "history of noncompliance" or a where a court "lack[s] the resources to constantly monitor compliance with the decree," *Hook v. Arizona*, 120 F.3d 921, 926 (9th Cir. 1997).[3] Indeed, federal courts have long acknowledged that implementing multifaceted and complex remedies for noncompliance is more properly delegated to an appointed third party than assumed by the court itself. *City of N.Y. v. Mickalis Pawn Shop, L.L.C.*, 645 F.3d 114, 145 (2d Cir. 2011); *Madrid v. Gomez*, 889 F. Supp. 1146, 1282 (N.D. Cal. 1995) (holding that the "assistance of a Special Master is clearly appropriate" because "[d]eveloping a comprehensive remedy in this case will be a complex undertaking . . . ").

Here, the matters to be resolved—selecting a new Medicaid assessment tool, then designing a resource allocation method, and then implementing a new system to replace the old assessment tool and budgeting system's profound flaws—are complex. Indeed, this Court has described this case as "immensely complex" and taken special note of the complexity of developing a new budget tool, stating that "[p]recisely how to correct the budget tool's deficiencies is a subject vigorously debated by two experts, one for each side." *K.W.*, 180 F. Supp. 3d at 710, 718; *see also Glover v. Johnson*, 934 F.2d 703, 715 (6th Cir. 1991) (affirming the appointment of a "special administrator" to develop a remedial plan); *Reed v. Rhodes*, 642 F.2d 186, 187 (6th Cir. 1981) (affirming appointment of judicial "Administrator" with authority to implement specified remedial orders).

Third, a special master is particularly necessary when the order that a defendant has failed to comply with concerns administering a complex plan for vulnerable populations, which

---

[3] While a history of noncompliance weighs in favor of reference to a special master, the Ninth Circuit has rejected a requirement that a court must find "intentional disregard of court orders before a special master may be appointed." *Nat'l Org. for Reform of Marijuana Laws*, 828 F.2d at 543; *see also Alexander v. Hill*, 707 F.2d 780, 783 (4th Cir. 1983) ("[T]he lack of a finding of contempt or of bad faith should not preclude exercise of inherent equitable powers to achieve fair remedial results.").

is precisely the case here. Court after court overseeing cases like this one has appointed special masters, especially after implementation delays have plagued progress toward resolution. *See, e.g., Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo,* 551 F.3d 10, 18 (1st Cir. 2008) (recommending appointment of special master in case presenting complex Medicaid issues); *Juan F. v. Weicker*, 37 F.3d 874, 876 (2d Cir. 1994) (affirming the appointment of a monitor in a case involving the child welfare system "because of the difficult issues involved, as well as the importance to the plaintiff class of enforcing the decree"); *N.Y.S. Ass'n for Retarded Children v. Carey*, 706 F.2d 956, 962-63 (2d Cir. 1983) ("[B]alancing of the interests of parties with third party employees, [defendants], and community groups is just the sort of 'polycentric problem'" warranting the appointment of a monitor.); *United States v. Horton*, 622 F.2d 144, 148-49 (5th Cir. 1980) (upholding the appointment of a special master in a Medicare reimbursement case); *Gary W. v. Louisiana*, 601 F.2d 240, 244-45 (5th Cir. 1979) (affirming the appointment of a Rule 53 special master to implement order protecting rights of children with intellectual disabilities); *Halderman v. Pennhurst State Sch. & Hosp., 61*2 F.2d 84 (3d Cir. 1979) (appointment of master under Rule 53(b) to implement relief for class of people with intellectual disabilities appropriate where solution will involve a complex and lengthy process); *Lelsz v. Kavanagh*, 112 F.R.D. 367 (N.D. Tex. 1986) (special master appointed to assist in implementation and enforcement of settlement in case involving rights of intellectually disabled persons); *see also* 3 Wright & Miller, Federal Practice and Procedure § 2602.1 (2008) (noting that reliance on a master is appropriate "when a complex decree requires administration or complex policing, particularly when a party has proved resistant or intransigent or special skills are needed").

Given Defendants' continued failures to abide by the deadlines in the CASA, the complexity of the necessary relief (including the formulation of new testing plans and budget

tools), and the vulnerability of the class members here, all with intellectual and developmental disabilities, the Court should appoint a special master.

### 2.    _Special Master Selection, Qualifications, Duties, and Compensation_

When courts appoint special masters, they often allow the two sides an opportunity to agree on a candidate or else propose candidates to the Court according to a prescribed procedure. _See, e.g., Balla v. Idaho State Bd. of Corr.,_ No. 1:81-cv-1165-BLW, 2011 WL 108727, at *2 (D. Idaho Jan. 6, 2011). Then, the Court must issue an order laying out the master's duties, rules governing communication between the master and the parties, the record the master is to keep, compensation terms, and other procedures. Fed. R. Civ. P. 53(b)(2); _cf._ Fed. R. Civ. P. 53(g).

For this case, the Court should give the parties 14 days to either agree on a master or to submit to the Court the names of up to three candidates per side. All proposed candidates should meet the following qualifications:

- The master must have significant experience with people with developmental and intellectual disabilities, including experience working directly with and communicating with diverse groups of people like the class members here.

- The master must be familiar with the federal Medicaid program and Home and Community Based Services programs within it.

- The master must have capacity to oversee complex implementation of both a modified Bridge Period and a new resource allocation system over the next several years.

- The master must be independent from IDHW and class counsel (see also Fed. R. Civ. P. 53(a)(2)).

The master must also, of course, be qualified to perform the anticipated duties of the role, which should include:

- In collaboration with class members, class counsel, and IDHW, identifying a plan to implement a new resource allocation system for the DD services program.

- Recommending a timeline and final deadline for implementation.

- Monitoring the modified Bridge Period, including training programs.

BRIEF IN SUPPORT OF MOTION FOR CIVIL CONTEMPT REMEDIES – 16

- Giving status reports to the Court and parties at least every 90 days, including assessments of the parties' efforts, barriers to IDHW's compliance, and areas of noncompliance.

- Making other recommendations and reports as appropriate.

Critically, the master should be mandated to preserve the cornerstones of the CASA requiring ongoing class member engagement (CASA § V.A.5) and transparency (CASA § V.J.) throughout implementation. Accordingly, to preserve transparency, the master should be required to answer any questions and produce any records that class counsel request and also provide class counsel with regular updates, at least every two weeks. (CASA § V.J.1 and 2.) And to maintain class member engagement, the master should be required to "encourage engagement and actively involvement of class members, their guardians, and community stakeholders," regularly report developments in implementation and solicit class members' comments on them, and consistently communicate with class members using "clear language and layout, appropriate to the circumstances of the class members and their guardians." (CASA § V.A.5.)

Obviously, Plaintiffs are unable to pay the costs of a master. Per the class definition itself, Plaintiffs are all people with developmental and intellectual disabilities who are so indigent that they qualify for Medicaid. *K.W. v. Armstrong*, 298 F.R.D. 479, 494 (D. Idaho 2014); *cf.* Idaho Admin. Code [IDAPA] §§ 16.03.10.020.01.b, 16.03.05.787 (establishing income and asset limits for eligibility for home and community-based Medicaid services in Idaho). They could not even collectively afford the filing fee in this case. (*See* Dkt. 2 (in forma pauperis applications).) Defendants, on the other hand, have means to compensate a master and are the ones responsible for the need to appoint one in the first place—both because of their failure to comply with the CASA and their unconstitutional assessment and budgeting system that the CASA sought to remedy in the first place. *See* Fed. R. Civ. P. 53(g) (requiring Court to consider parties' means

and "the extent to which any party is more responsible than other parties for the reference to a master" when allocating payment); *Covington v. N.C.*, No. 1:15-CV-399, 2018 WL 8060397, at *3 (M.D.N.C. Mar. 22, 2018) ("[I]t would be unfair to require [Plaintiffs] to pay for the services of a Special Master when it was the State's actions that led to the need for those services."). As the Advisory Committee notes to Fed. R. Civ. P. 53 expressly flag, "parties pursuing matters of public interest, for example, may deserve special protection" from paying special master costs. Fed. R. Civ. P. 53(h) Advisory Cmte. Note (2003).

## B.    The Court Should Protect the Class from the Outdated, Unconstitutional Budget Tool by Modifying Bridge Period Safeguards

Over seven years ago now, this Court found that IDHW's old budget tool was unreliable and held that it "arbitrarily deprives participants of their property rights and hence violates due process." *K.W.*, 180 F. Supp. 3d at 718. That unconstitutional tool was already quite old then, based as it is on (faulty) 2009 and 2010 data. *Id.* at 711. The tool, therefore, is now still spitting out arbitrary budget limits for class members based on data from *14 years ago*.

Plaintiffs agreed in the CASA, as a stopgap measure, that IDHW could keep using its unconstitutional tool for just two years—until 2019, or 2020 at latest. (CASA § V.A.2 (contemplating replacement of the old tool within 24 months, and no more than 36 months, from settlement).) To provide some measure of protection for class members during that 24-month period, class members were provided the benefit of reverting to budgets calculated under the previous budgeting system, if it was higher. (CASA §§ III.A.9 (defining "Injunction Budget"), V.B.1.) This is a fundamental component of what the CASA refers to as the "Bridge Period," a package of interim safeguards meant to patch over some of the constitutional deficiencies of IDHW's assessment and budgeting system while a new one was built. (*See* CASA §§ III.A.1 (defining "Bridge Period"), V.B (outlining Bridge Period protections).) The Bridge Period included robust training for class members, their families, and Suitable Representatives on how

to navigate the various Bridge Period protections. (CASA § V.B.5 (including a comprehensive training curriculum set out at § V.B.5.i).)

But the Bridge Period was only to be a temporary safeguard and was never contemplated to endure for even half a decade, much less the seven years that have passed since the parties signed the CASA. Now, over 40% of class members have entered the program since July 2011. (Decl. Piotrowski ex. 6.) Those thousands of class members have only ever had an unreliable, arbitrary budget computed for them by IDHW's unconstitutional tool, and have no prior budget to fall back on. The time to retire the unconstitutional tool is long overdue, yet IDHW has failed to implement the replacement it agreed to.

Class counsel have consulted with the class and found that many class members agree that the Court should end use of this ancient budget tool; however, some class members and their guardians remain anxious to retain *some* budget number as an anchor to assist them with planning the services they need each year. Accordingly, the Court should adopt a modified Bridge Period to remain in place until a new assessment and budgeting system is fully implemented under a special master's oversight. During that modified Bridge Period:

- A class member should only receive—and IDHW should only consult—a budget computed using the old tool if that class member opts in to receive a calculated budget.

- For all class members, their budget should be set by the total annual cost of services that IDHW approves for their annual plan, pursuant to IDHW's existing plan approval processes.

- Robust training for class members, their guardians and families, and their Suitable Representatives, should continue, but be modified to guide them in navigating the modified Bridge Period, including opt-in calculated budgeting and the increased emphasis on individual planning.

### 1. *Opt-In Budgeting Comports with IDHW Processes and Laws*

The Department's existing, unreliable budget tool is redundant. Idaho's Medicaid program for adults with developmental disabilities is a system of defined medical services. Only

services expressly included in the Medicaid Basic Plan, or the Medicaid Enhanced Plan are available for those who are eligible. IDAPA § 16.03.10.075. Developmental Disability Services, the services at issue in this case, are narrowly defined. Even among the services that may be permitted, there are additional limitations and safeguards.

As a general limitation, DD Services are not available to any Medicaid participant unless there is a detailed written treatment plan. IDAPA § 16.03.10.513. Home and Community Based Services are doubly subjected to the written, detailed service plan requirement. IDAPA § 16.03.10.316–317. The Department must approve all service plans through its Prior Authorization system, during which IDHW reviews the services to ensure they are covered and appropriate. IDAPA § 16.03.10.507. Part of prior authorization is to make sure that the requested services meet medical necessity criteria set out in both federal and state law. *See, e.g.*, IDAPA §§ 16.03.10.508.15, 16.03.10.514.01.b, 16.03.10.515.3.a. The prior authorization process also ensures that the proposed plan of care is the "right care" (requiring that the care be an accepted treatment for a defined diagnosis and also consistent with best practices), that it is to be delivered in the "right place" (the most integrated setting in which they normally occur), that it be at the "right price," and that the service will achieve the "right outcomes." IDAPA § 16.03.10.508.17–20. Idaho Administrative Code § 16.03.09.390 also lists dozens of excluded services and entire fields of treatment that Medicaid simply will not pay for. Finally, IDHW also sets reimbursement rates that serve as an upper limit on all adult DD Services. IDAPA § 16.03.10.036.02.b.

Though Idaho statute requires IDHW to determine a "budget" for class members pursuant to rule, it leaves IDHW discretion in establishing how the budget is set. Idaho Code § 56-255(3) (e)(ii). That provision explicitly states its purpose is to "enable individuals to have greater freedom to manage their own care" through budgeting and calls for budget increases "when needed to obtain or maintain employment or when health and safety issues are identified and

meet the criteria as defined in department rule." *Id.* The Department may, accordingly, set class member budgets based on the cost of each class member's approved service plan, rather than the automated, calculated budget that the old, unreliable budget tool spits out. Such a budget would be based on the cost of all medically necessary services, rather than faulty 2009–2010 data that is many, many years out of date. *See K.W.*, 180 F. Supp. 3d at 711–12.

      **2.**      *The Bridge Period Training Program Should be Modified to Help Class Members Navigate the Modified Bridge Period Safeguards*

An updated budgeting safeguard alone is not enough, as some class members will inevitably need to adjust their budget or appeal IDHW's service plan denial. This Court explained on summary judgment that due process "will mean little, however, if the disabled participant is required to pursue an appeal alone." *K.W.*, 180 F. Supp. 3d at 715. The Court required that IDHW ensure each class member has a "suitable representative" to help them get the budget amount they need. *Id.* For the Bridge Period, the parties agreed that a robust training program would make up a fundamental part of the interim suitable representative remedy. (CASA § V.B.5.) An independent training provider would deliver an extensive curriculum available at no cost to class members, their families, and their Suitable Representatives. (*Id.*)

Upon modifying the Bridge Period budgeting safeguard so that the old, unreliable budget tool is opt-in only, this training regime will need to be modified as well. The focus will turn toward individualized planning, combined with skills and knowledge for appealing plan approval decisions when they do not leave a class member with the services or budget they need. The details of these changes can be overseen by the Special Master as an early task.

**C.**     **The Court Should Apply the General 42 U.S.C. § 1988 Rule that Defendants Must Pay Fees for All of Class Counsel's Monitoring Work**

As a compromise to achieve a settlement that was supposed to replace the old unconstitutional budget tool within 24 months, Plaintiffs agreed to bear their own attorney fees

and costs for ordinary monitoring of the CASA. (CASA § V.O.2.) Instead, during the implementation and monitoring phase class counsel could seek fees only when the parties had to go to court to resolve a dispute. (*Id.*) That agreement was based on the determination that the Settlement Agreement would require implementation of the new Budget Tool by 2020 at the latest. Class Counsel gave up three to four years of attorney fees as part of the price of settlement. That three to four years has now become eight. That is a windfall to IDHW, as without that agreement the usual rule would apply: Plaintiffs would be entitled to fees for all of class counsel's time spent monitoring the case, regardless of whether Plaintiffs obtained any further relief. *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 452 (9th Cir. 2010). Plaintiffs, after all, are the prevailing party in this case, *see K.W.,* 180 F. Supp. 3d at 710, and their prevailing party status persists through settlement monitoring and implementation. *Balla v. Idaho*, 677 F.3d 910, 917 (9th Cir. 2012) ("'[P]revailing party' status has been obtained and remains in effect when a party has obtained an enforceable settlement agreement or consent decree."). All monitoring work, whether it involves a court motion or not, serves the purpose of ensuring that defendants fulfill their settlement obligations. *Prison Legal News*, 608 F.3d at 451. Class counsel have, at this point, been conscripted into many more years of monitoring work than they bargained for. And in the end class counsel may end up performing monitoring work for a half-decade or longer than Plaintiffs agreed to.

This Court may modify the CASA to address these changed circumstances. *Kelly*, 822 F.3d 1085. The Court should modify the CASA to follow the usual 42 U.S.C. § 1988 settlement monitoring rule that Plaintiffs' counsel are presumptively entitled to attorney fees for all of their time spent on monitoring the settlement, whether or not motion practice or court resolution is necessary. That modification will incentivize IDHW to expedite settlement implementation and work more carefully and collaboratively with the class and their counsel to that end. The longer

IDHW delays implementation, and the bigger gambles it takes (such as trying to push through a secret assessment method like the SIS-A), the more it will have to spend on Plaintiffs' attorney fees. Though class counsel would much rather see a fair system implemented and this case finally terminated (as corroborated by the CASA fee agreement they previously reached), adopting the default § 1988 monitoring fees rule will promote progress through the present morass.

The modification will advance the purposes of § 1988 as well, because "Congress enacted § 1988 specifically because it found that the private market for legal  services failed to provide many victims of civil rights violations with effective access to judicial process. In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case." *Gonzales on behalf of A.G. v. Burley High Sch.*, No. 4:18-cv-00092-DCN, 2020 WL 7047747, at *2 (D. Idaho Nov. 30, 2020) (quoting *City of Riverside v. Rivera*, 477 U.S. 561, 576, 578 (1986), internal citations omitted); *see also Little Rock Sch. Dist. v. Arkansas*, 127 F.3d 693, 696 (8th Cir. 1997) ("Enforcing the settlement agreement is the equivalent of enforcing a constitutionally required remedy.").

## VI.    Conclusion

The Court should grant Plaintiffs' motion, hold IDHW in civil contempt, appoint a special master, modify the Bridge Period Safeguards to remedy the out-of-date Budget Tool, and adopt the usual rule governing attorney fees for monitoring in civil rights actions like this one.

Respectfully submitted,

ACLU OF IDAHO FOUNDATION

SHEPPARD, MULLIN, RICHTER, & HAMPTON, LLP

/s/ Richard Eppink
Richard Eppink

/s/ Daniel L. Brown
Daniel L. Brown

/s/ Dina Flores-Brewer
Dina Flores-Brewer

/s/ Katherine Anne Boy Skipsey
Katherine Anne Boy Skipsey

PIOTROWSKI DURAND, PLLC

/s/ James M. Piotrowski
James M. Piotrowski

/s/ Marty Durand
Marty Durand

*Attorneys for Plaintiffs*