UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| K.W., by his next friend D.W., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>RICHARD ARMSTRONG, in his official capacity as Director of the Idaho Department of Health and Welfare, *et al.*,<br><br>        Defendants. | Case No.  1:12-cv-00022-BLW<br><br>**MEMORANDUM DECISION & ORDER** |

**INTRODUCTION**

Before the Court is Plaintiffs' Renewed Motion for Civil Contempt Remedies to Enforce Settlement Agreement. For the reasons explained below, the Court will grant the motion in part and deny it in part, as follows: The Court will find Defendant in civil contempt and order it to pay class counsel's reasonable monitoring fees for a one-year period. The motion will be denied in all other respects.

# BACKGROUND

## A. The Lawsuit and the Settlement Agreement

Plaintiffs are developmentally disabled adults who qualify for benefits under Medicaid. They are eligible for long-term institutional care but choose to live instead in their own homes or in community settings. Over a decade ago, when their Medicaid payments were reduced, plaintiffs sued the Idaho Department of Health & Welfare ("IDHW" or "the Department"). Plaintiffs' central concerns were that: (1) the notices IDHW sent telling them about the budget reductions were insufficient; (2) the new tool IDHW used to develop their budgets was insufficient; and (3) the appeals hearing procedures were insufficient.

The Court certified a class consisting of "All persons who are participants in or applicants to the Adult Developmental Disability Services program ('DDS program'), administered by IDHW as part of the Idaho Medicaid program, and who undergo the annual eligibility determination or reevaluation process." *See* Dkt. 224. In March 2016, the Court partially granted plaintiffs' summary judgment motion on the class-wide claims. *See* Dkt. 270. In granting the motion for summary judgment, the Court found that: (1) the budget tool's unreliability and arbitrary nature violated plaintiffs' right to due process of law; (2) the notices utilized by IDHW were inadequate to satisfy due process; and (3) to ensure due process, IDHW had to "receive a commitment from a suitable representative to assist the

participant before proceeding to informal review and taking any action to confirm a budget reduction produced by the budget tool." *See id.* at 20.

After the Court granted partial summary judgment, the parties settled, memorializing the terms of their agreement in a written Class Action Settlement Agreement (CASA). *See* Dkt. 306-1. In January 2017, the Court conducted a fairness hearing and approved the Settlement Agreement. *See* Dkt. 331. A key component of the settlement was the Department's agreement to develop and implement a new, constitutionally adequate budget tool to replace the old one. *See* CASA §§ III.A.1 & V.A (referring to the budget tool as "resource allocation model"). The parties also agreed that this Court would retain jurisdiction for the purpose of enforcing the obligations in the Settlement Agreement.

## B. IDHW's Obligation to Development and Implement a New Budget Tool

To fulfill its obligation to replace the old budget tool with a new one, IDHW eventually chose a software program called the Supports Intensity Scale—Adult Version, or the "SIS-A." (The old budget tool utilizes inputs from an assessment known as Scales of Independent Behavior – Revised, or the "SIB-R"). Of course, the Department could not instantly implement a new tool, so the parties negotiated a set of protections that would apply while the new tool was being developed and while the old budget tool would still be in use. Among other things, during this "Bridge Period," class members could revert to budgets calculated under the

previous budgeting system, if it was higher—that is, the budgets they had before the SIB-R was in use. *See* CASA §§ III.A.1 (defining "Bridge Period"); *id.* §§ III.A.9 (defining "Injunction Budget"); *id.* §§ V.B. (outlining Bridge Period protections).)

The parties set a goal of having the new budget tool in place within 24 months, or by 2019. *See* CASA, at 8-9;[1] *see also Mtn. Mem.*, Dkt. 629-1, at 2. But they also anticipated that this 24-month goal might not be reached: the Settlement Agreement provides that if the Department had not implemented the new tool within three years (no later than January 2020), the plaintiffs could then ask the Court "to set a reasonable completion deadline." CASA, at 9. After the Department did not complete its work within that 36-month period, both sides asked the Court to impose their version of a reasonable completion deadline.

---

[1] The relevant provision states: "Action Steps and Estimated Completion . . . . The Department will develop estimated dates for completion with HSRI [an outside consultant] as the project moves forward, *with the goal of completing the last action step below within 24 months of the inaugural meeting with HSRI described in action step one below*. If the last action step below is not completed within 24 months of the inaugural meeting, the Parties shall meet and confer in an effort to identify an agreed completion deadline; if the Parties have not agreed on a completion deadline and the last action step below is not completed within 36 months of the inaugural meeting, class counsel may initiate the dispute resolution process set forth in Section V.M. below and, if the deadline remains disputed after that process is completed, Plaintiffs may file an appropriate motion and the Court shall set a reasonable completion deadline."

**C. The Reasonable Completion Deadline & IDHW's Efforts to Comply**

In December 2020, after hearing the parties' arguments, the Court ordered a reasonable completion deadline of June 2022 and later awarded plaintiffs' counsel $115,380 in attorneys' fees related to that effort. *See* Dkts. 429, 463. The Department did not meet the June 2022 deadline. In fact, as of this writing, IDHW still hasn't implemented a new budget tool. Plaintiffs say this is so because the Department has been dragging its feet and taking "big gambles" with their obligations under the Settlement Agreement by doing things "such as trying to push through a secret assessment method like the SIS-A." *Mtn. Mem.*, Dkt. 629-1, at 19. The Department, on the other hand, says it has substantially complied with the Settlement Agreement but that "[a] number of unforeseen problems hampered the implementation progress and then disaster struck." *Opp.*, Dkt. 633, at 3.

**D. The Pending Motion & The Special Master**

The parties are currently working with a Special Master in an effort to select and implement a new budget tool. *See Nov. 12, 2024 Order Appointing Special Master*, Dkt. 638. In the meantime, plaintiffs ask the Court to hold the Department in contempt for its failure to comply with the Settlement Agreement. To remedy this allegedly contemptuous conduct, they ask the Court to do two things: (1) order defendants to pay class counsel's monitoring fees; and (2) "adjust the Bridge Period safeguards to restore equity between Plaintiffs and IDHW." *Mtn. Mem.,*

Dkt. 629-1, at 4. Plaintiffs also asked the Court to appoint a special master to oversee implementation of a new assessment and budgeting system, but that request is moot. The Court has already appointed a special master, and she recently filed her first report. *See Mar. 25, 2025 Report*, Dkt. 649.

## THE GOVERNING LEGAL STANDARD

To establish that a litigant is in civil contempt, the moving party must show "by clear and convincing evidence that the contemnors violated a specific and definite order of the court." *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (citations omitted). The burden then shifts "to the contemnors to demonstrate why they were unable to comply." *Id*. (citations omitted). Substantial compliance with a court order is a defense to civil contempt. *See, e.g., Coleman v. Newsom* ___ F.4th ___, 2025 WL 851077, at *4 (9th Cir. Mar. 19, 2025). To establish a substantial-compliance defense, the alleged contemnor must show it "has taken all reasonable steps to comply with applicable court orders, resulting in merely technical or inadvertent violations of those orders. In other words, the substantial compliance defense excuses an alleged contemnor who, despite not achieving total compliance, has achieved near-total compliance through the exhaustion of all reasonable efforts." *Id.* (quotation marks and internal citations omitted; cleaned up).

An alleged contemnor may also assert an "impossibility" defense. *See id.*;

*F.T.C. v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999). To establish this defense, a party must show "categorically and in detail" why compliance was impossible. *FTC*, 179 F.3d at 1241–42. It is not enough to show that compliance would have been difficult or expensive; the alleged contemnor must shoulder "the heavier burden of establishing that compliance was 'factually impossible.'" *Coleman*, 2025 WL 851077, at *8 (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)).

If a litigant is in contempt, a court may impose sanctions for either or both of two purposes: to coerce compliance with a court order or compensate the aggrieved party for losses sustained. *See United States v. United Mine Workers*, 330 U.S. 258, 303-04 (1947). In cases such as this one—where the Court has been overseeing a settlement involving large state agency for a long period of time— deference to the district court's civil contempt order is heightened. *See Coleman*, 2025 WL 851077, at *4 (citing *Stone*, 968 F.2d at 856).

## DISCUSSION

### A. Jurisdiction

Before it can decide whether the Department should be held in contempt, the Court must decide whether it has jurisdiction to do so. The Department says it cannot be held in contempt because there is no court order adopting or incorporating the terms of the Settlement Agreement. *See Response,* Dkt. 633, at 3.

This argument lacks merit because the Court has entered orders requiring the Department to comply with the Settlement Agreement. As noted above, in January 2017, the Court conducted a hearing on the Settlement Agreement and approved its terms, having found them to be "fair, reasonable, and adequate." *See* Dkt. 331. During that hearing, the Court granted the parties' then-pending motion to administratively terminate the class-action claims. The parties jointly filed that motion, and they agreed upon terms of a proposed order containing this verbiage:

> The parties have negotiated a stipulated settlement agreement which this Court has approved. That settlement agreement, attached, is hereby incorporated in full (including all of the settlement agreement's attachments) into this Order."

CASA § V.O., at 33, Ex. 5 thereto; *see also Proposed Order,* Dkt. 306-2. The parties submitted that proposed order to the Court in September 2016, a few months before the Court conducted the January 2017 hearing. *See* Dkt. 306-2. The Court did not enter the agreed-upon proposed order, but after having reviewed the record, the Court finds this was an oversight. During that January 2017 hearing, the Court orally granted the motion to terminate the class claims but then neglected to follow up by signing and docketing the parties' proposed written order.[2] That

---

[2] The Court's Minute Entry does not reflect that the Court orally granted this motion. But the Court checked the transcript of the hearing, which confirms the ruling. *See Jan. 12, 2017 Tr.*, Dkt. 650, at 24:1-2 ("I will grant the request that the Court administratively terminate the class action portion of the case.")

oversight is easily remedied; the Court will grant plaintiffs' oral request—made during the hearing on this contempt motion—and enter that stipulated order *nunc pro tunc*.

But even absent this *nunc pro tunc* order, the record shows that the parties intended the Settlement Agreement be enforceable as a court order. Shortly after signing the Settlement Agreement, the Department described it as follows: "The settlement agreement will become part of a court-approved consent decree, and the Court will retain jurisdiction to enforce it." *See Nov. 28, 2016 Reply,* Dkt. 316, at 5. Moreover, after the Court approved the Settlement Agreement, it later enter two orders approving amendments to the agreement, and the terms of both amendments were incorporated into the orders. *See* Dkts. 338, 352. (The Court reads those orders as incorporating the amendments only, but at one point during this litigation, IDHW said it viewed one of those orders as having "incorporated the terms of the Settlement Agreement . . . ." *Reply*, Dkt. 387, at 8 n.2.) Finally, in December 2020, the Court ordered the Department to comply with a June 2022 "reasonable completion deadline." *Dec. 14, 2020 Minute Entry,* Dkt. 429; *Dec. 14, 2020 Tr.*, Dkt. 437. Given this factual record, the Court is not persuaded by the Department's argument that there is no court order requiring it to comply with the terms of the Settlement Agreement.

The Department's citation to *Kokkonen v. Guardian Life Ins. Co. of*

*America*, 511 U.S. 375 (1994) does not change the analysis. In *Kokkonen*, the

parties settled and then filed a Stipulation and Order of Dismissal with Prejudice.

The district judge signed that document over the notation "It is so ordered."

Critically, though, "[t]he Stipulation and Order did not reserve jurisdiction in the

District Court to enforce the settlement agreement; indeed it did not so much as

refer to the settlement agreement." *Id.* at 377. Later, when a dispute developed, the

aggrieved party asked the district court to enforce the settlement agreement. The

Supreme Court determined that the district court lacked jurisdiction to do so. But it

signaled that jurisdiction would have existed if the parties had *either* incorporated

the settlement agreement into the dismissal order *or* included a retention-of-

jurisdiction provision in the settlement agreement:

> The situation would be quite different if the parties' obligation to
> comply with the terms of the settlement agreement had been made
> part of the order of dismissal—either by separate provision (such as a
> provision "retaining jurisdiction" over the settlement agreement) or by
> incorporating the terms of the settlement agreement in the order. In
> that event, a breach of the agreement would be a violation of the
> order, and ancillary jurisdiction to enforce the agreement would
> therefore exist."

*Kokkonen,* 511 U.S. at 381. *Kokkonen* is easily distinguishable. Here, the

Settlement Agreement contains an explicit retention-of-jurisdiction provision *and*

the Settlement Agreement itself has been incorporated into a court order.

Accordingly, the failure to comply with the terms of the Settlement Agreement is

sanctionable as contempt, and the Court has the fully panoply of contempt remedies at its disposal, including the power to modify the terms of the Settlement Agreement in changed circumstances. *See Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) ("Courts have long had inherent power to modify court orders in changed circumstances.")*. With this threshold dispute resolved, the Court will turn to the merits.

**B.    IDHW's Defenses**

There is no dispute that the Department violated its obligations under the Settlement Agreement. Most significantly, it failed to develop and implement a new budget tool by June 2022. The burden thus shifts to the Department to show that it was impossible for it comply with the Settlement Agreement, or, alternatively, that it substantially complied. The Department asserts both defenses. In broad strokes, the Department says it substantially complied with the Settlement Agreement because by May of 2022, it was nearly ready to roll out the new budget tool, but then three developments made that impossible: (1) Idaho's acceptance of federal matching funds under the American Rescue Plan of 2021 and CMS's related refusal to approve the rollout of the SIS-A as planned; (2) the SIS-A's publisher's refusal to share the user's manual with the public; and (3) plaintiffs' refusal to approve IDHW's proffered suitable-representative and testing plans. *See generally Charron Dec.* ¶ 7, Dkt. 633-13. The Court is not persuaded by either

defense. The impossibility defense, in particular, lacks persuasive force. The

"substantial compliance" argument, however, is a close call. There is no question

that IDHW has made serious and significant efforts to comply with its obligations

under the Settlement Agreement. The problem, however, is that it hasn't taken

"every reasonable step" to comply. Therefore, the Court will find IDHW in

contempt.

### 1. Delayed CMS Approval

The Court will begin with the Department's contention that CMS's delayed

approval rendered compliance impossible. *See Response,* Dkt. 633, at 12, 13. This

contention requires a short explanation regarding the American Rescue Plan Act of

2021 (ARP) and Idaho's acceptance of federal funds. Congress enacted ARP on

March 11, 2021 to redress the harmful effects of the pandemic on the economy and

the healthcare system. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2,

135 Stat. 4. One feature of ARP was increased federal matching funds for

qualifying state Medicaid expenditures. *See* Pub. L. No. 117-2, §§ 9814–15, 9817,

135 Stat. at 215–17. The State of Idaho accepted increased Medicaid funding, *see*

Dkt. 478, and those funds had be used to supplement, and not supplant, the level of

State funds expended for home and community-based services for eligible

individuals through programs in effect as of April 1, 2021. ARP, § 9817(b)(1). The

parties generally refer to this requirement as the "maintenance-of-effort" requirement, or the MOE or ARP-MOE requirement.

The Department says that just as it was preparing to implement the new budget tool (the SIS-A), CMS informed the Department that it would need to run the SIS-A and the SIB-R side by side during the ARP-MOE period. The Department says it ultimately decided the increased burden of requiring class members to participate in both assessments was unfavorable to participants and that it was left with no realistic choice but to delay implementation of the new budget tool until after March 2024, when the additional ARP requirements expired. *See Anderson Dec.*, *Ex. A thereto*, Dkt. 633-1, 633-2.

Plaintiffs don't share this view. They say CMS was content to allow IDHW to implement the new tool—so long as IDHW would assign new class members the highest budget calculated for them between the old and the new tool—but that the Department unilaterally chose to delay implementation of the new tool and then begged CMS to bless its delay. *See Reply,* Dkt. 634, at 4. Plaintiffs also point out that IDHW's assessment contractor said it could staff implementation, even with the additional ARP requirements, and that IDHW didn't make any attempt to find state or federal money to cover implementation costs.

Under these circumstances, the Court cannot conclude that compliance was impossible or that IDHW took every reasonable step to timely implement the new

budget tool. Although IDHW's overall desire not to run two systems simultaneously has merit, it was not reasonable for the Department to unilaterally make that decision, particularly as it did not even attempt to find additional funding to cover dual implementation. Additionally, rather than unilaterally deciding to delay rolling out the SIS-A (notwithstanding that June 2022 deadline), the Department could have brought the issue to the fore by asking the Court to extend the reasonable-completion deadline due to changed circumstances. In choosing to unilaterally delay the entire process, the Department thus failed to take every reasonable step to comply with its obligations under the Settlement Agreement. Granted, if the Department had sought to move forward with dual implementation, it may well have been stymied by disputes over disclosure of the SIS-A user's manual. (That issue is discussed in the next section.) But the larger point is that by unilaterally deciding not to implement the SIS-A, the Department delayed the entire process and thus failed to take every reasonable step to comply with its obligations under the Settlement Agreement.

## 2. The SIS-A User's Manual

The disputes over disclosure of the SIS-A User's Manual arose in 2021, when plaintiffs asked the Department make that manual available to class members in some instances. The Department was willing to provide the user's manual to the plaintiffs, but the creator of the tool, the American Association on Intellectual and

Developmental Disabilities (AAIDD), refused. *See* Dkt. 561-3 ¶ 10.

The parties litigated the issue and the Court ruled in favor of the plaintiffs. *See* Dkt. 624. That ruling ended up derailing the settlement, as the Department now has to start fresh in selecting a new tool. (AAIDD is no longer willing to work with Idaho.) IDHW feared this would happen; when the parties briefed the issue, it repeatedly warned of this eventuality and said it was litigating the issue only in an effort to prevent AAIDD from terminating the contract. *See, e.g., Charron Dec.* ¶ 8, Dkt. 561-3.

The Department says it was essentially caught in the middle, but plaintiffs blame the Department. They say the record shows IDHW has a penchant for taking "big gambles" "such as [by] trying to push through a secret assessment method like the SIS-A." Plaintiffs' rhetoric suggests that IDHW didn't take its obligations under the settlement agreement seriously—that it carelessly selected a "secret assessment tool" and then purposely hid the "black-box due-process problems" from class counsel. *See, e.g., Reply,* Dkt. 634, at 6. But the SIS-A was selected after a working group—consisting of various parties including class counsel—met and evaluated three different tools that were being considered, including the SIS-

A.[3] *Vazquez Dec.* ¶ 2, Dkt. 539-9; *see also Final Report,* Dkt. 539-10, at 23-28 (describing the process by which the SIS-A was selected). The Department selected the tool based on that working group's review and recommendations, discussions with HSRI, and internal considerations. And while plaintiffs fault IDHW for selecting a "secret" assessment tool, it doesn't appear anyone anticipated this issue when selecting the tool. That issue didn't arise until later, when class counsel asked to see a copy of the user's manual. *See Charron Dec.* ¶ 10, Dkt. 561-3.

Under these circumstances, although the Court has decided that the user's manual needs to be made available in some instances, the Court cannot say IDHW acted unreasonably in selecting the tool or that it took a "big gamble" by trying to "push through a secret tool." It's more accurate to say that the problems with the assessment tool were unforeseen. Accordingly, the Court concludes that in terms of initially evaluating and selecting the SIS-A, IDHW took all reasonable steps to comply with its obligations under the Settlement Agreement. With the benefit of hindsight, it's fair to say that IDHW did not take every *possible* step to comply. In

---

[3] The working group that met to discuss the three tools being considered included representatives from: (1) Idaho's Children's Developmental Disability Services; (2) Adult Developmental Disability Services; (3) the Office of Medicaid; (4) the Office of Attorney General; (5) Liberty Healthcare; (6) the American Civil Liberties Union of Idaho (ACLU, which included class counsel in this matter); (7) Disability Rights Idaho (DRI); and (7) the Developmental Disabilities Council. *See Vasquez Dec.* ¶ 2, Dkt. 539-9.

that scenario, IDHW would've had the foresight to ask whether the User's Manual could be made public. But that is not the relevant inquiry.

In sum, based on its review of the record in this case, as well as its familiarity with these proceedings, the Court finds that IDHW took every reasonable step to comply with its obligations under the Settlement Agreement when it initially selected the SIS-A. The problems arose later when, as discussed above, the Department unilaterally decided to delay any effort at implementing the new budget tool during the ARP-MOE period.

### 3. The Suitable-Representative and Testing Plans

Finally, the Department says that implementing the new budget tool was impossible because plaintiffs refused to approve its proffered testing and suitable-representative plans. As detailed in the Settlement Agreement, both such plans must be submitted to the Court. *See* CASA §§ V.A.3, V.A.4. IDHW sought to obtain plaintiffs' approval of the plans before submitting them to the Court. Plaintiffs did not approve either plan, however. While it was entirely reasonable—and constructive—for IDHW to first submit these plans to plaintiffs for approval, *see id.* § 6.a. (obligating IDHW to provide class counsel with notice of the plans), when plaintiffs did not approve the plans, IDHW could have asked for Court approval. Under those circumstances, IDHW cannot say plaintiffs' refusal to approve the plans rendered performance impossible.

## C. The Remedy

Having found the Department in contempt, the Court must determine an appropriate sanction. The goals of a civil-contempt sanction include coercing compliance and compensating the plaintiff for actual losses. *See, e.g., Kelly v. Wengler,* 822 F.3d 1085, 1097 (9th Cir. 2016). As noted above, plaintiffs ask the Court to (1) modify the Bridge Period protections outlined in the Settlement Agreement and (2) order IDHW to pay attorneys' fees for all of class counsel's monitoring work.

### 1. Modification of the Bridge Period

The Court will deny the request to modify the Bridge Period protections. As discussed above, the Bridge Period is that period of time during which old budget tool is still in use and before the new budget tool is implemented. Plaintiffs ask the Court to modify the provisions set out in the Settlement Agreement by imposing the following rules during the Bridge Period:

- A class member should only receive—and IDHW should only consult—a budget computed using the old tool if that class member opts to receive a calculated budget.

- For all class members, their budget should be set by the total annual cost of services that IDHW approves for their annual plan, pursuant to IDHW's existing plan approval processes.

- Robust training for class members, their guardians and families, and their Suitable Representatives, should continue, but be modified to guide them in navigating the modified Bridge Period, including opt-in

calculated budgeting and the increased emphasis on individual planning.

*Mtn. Mem.*, Dkt. 629-1, at 16.

The Department has explained the many difficulties that would attend implementing these modifications. Among other things: (1) any amendment would need to be submitted to CMS and the state legislature for approval, and the Department explains that because of heightened legislative oversight, it's doubtful that the proposed amendment would be approved; (2) the opt-in model would potentially increase costs and lead to program wait lists and cost caps; and (3) implementing this opt-in model would require the same amount of hours as simply implementing a new, sustainable tool.

After having considered the extensive briefing and oral argument on this topic, the Court is convinced that imposing the proposed modifications would be counterproductive and delay final implementation of a new budget tool, which would be detrimental to the class. The Court finds that the more expeditious path forward is for the Department to devote its efforts and resources toward selecting and implementing a new tool.

Further, the record shows that the Department is—and has been—working diligently to comply with the Settlement Agreement. Although it hasn't taken "every reasonable effort" to comply, it's not an easy call. In that regard, this case is

factually distinguishable from *Kelly v. Wengler,* 822 F.3d 1085 (9th Cir. 2016). There, the defendant had materially breached the settlement agreement and falsified records (related to staffing at a prison). And even then, although the district court ordered several remedial measures, it declined to impose others requested by the plaintiffs, such as ordering the prison to discipline more of its staff and requiring submission of reports to the district court. *Id.* at 1093.

This Court likewise will not impose all remedies plaintiffs are seeking. In the thirteen-plus years that it has presided over this case, the undersigned judge has learned—some might say the hard way—that federal courts aren't at their best when supervising complex settlement agreements such as this one, which are aimed at reforming entire departments of important state agencies. Still, though, the Court has gained a reasonably good understanding of the inner workings of the Department, and it is convinced that forcing IDHW to implement the modifications plaintiffs are suggesting would be counterproductive and fail to serve the goals meant to be effectuated by a civil contempt remedy. *Cf. Lab./Cmty Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (concluding that, "[t]he district court, armed with a decade of knowledge about the case, was uniquely positioned to determine whether there had been substantial compliance") (citing *Thompson v. United States Dep't of Housing & Urban Dev.*, 404 F.3d 821, 827 (4th Cir. 2005) (observing that "[o]ver time, the district court gains an intimate

understanding of the workings of an institution and learns what specific changes are needed within that institution in order to achieve the goals of the consent decree") (citations omitted)); *see also Ruiz v. Lynaugh*, 811 F.2d 856, 861 (5th Cir. 1987) (discussing deference due district court in institutional reform cases "because it is intimately involved in the often complex process of institutional reformation" and "has the personal knowledge, experience, and insight necessary to evaluate the parties' intentions, performances, and capabilities").

## 2. Attorneys' Fees

The Court will, however, partly grant class counsel's request for monitoring fees. In the Settlement Agreement, the parties agreed to bear their own attorneys' fees and costs relating to ordinary monitoring of and compliance with the Agreement. Plaintiffs ask the Court to modify that provision for three reasons. First, they say class counsel has "already been conscripted into many more years of monitoring work than they bargained for, and may face many more years." *Motion Memo,* Dkt. 629-1, at 19. Second, they assert that such a modification "will incentivize IDHW to expedite settlement implementation and work more carefully and collaboratively with the class and their counsel to that end." *Id.* Third, plaintiffs say that modification would advance the purpose of 42 U.S.C. § 1988 because the private market for legal services has failed to provide many victims of civil rights violations with effective access to judicial process. *Id.* at 20.

The Court is only partly persuaded. The Court finds that a partial award is necessary to incentivize IDHW to comply with the Settlement Agreement. As noted above, during the ARP-MOE period, IDHW unilaterally made a decision that delayed the progress on this case, which means class counsel will need to spend additional time on the case. For that reason—because of those changed circumstances—the Court will modify the agreement such that class counsel is entitled to recover reasonable attorneys' fees for monitoring work for an additional one-year period, beginning on the date this Order is signed.

The Court is aware that the delay may well extend beyond one year. But based on the record before it, and considering the many efforts the Department has undertaken, the Court finds that a partial award is sufficient at this time.[4]

---

[4] In limiting reimbursement to a one-year period, the Court is mindful that circumstances may develop where the Court will need to reconsider this limitation. For example, the Department's conduct may be so uncooperative as to demand that extensive monitoring be conducted beyond that one-year period. But, the current record does not suggest that will occur. Likewise, the Special Master's recent report indicates that a timeline and final deadline for completion of the case will be provided to the Court by May 30, 2025. Whether the Special Master is able to meet that benchmark and the details of her May 30, 2025 report may cause the Court to reconsider the issue of ongoing monitoring. However, the Court will not invite motions from the Plaintiffs to reconsider the one-year limitation on reimbursement, but will consider the issue *sua sponte* as the case progresses.

## ORDER

**IT IS ORDERED that:**

1. Plaintiffs' Renewed Motion to Enforce Settlement Agreement through Civil Contempt Remedies (Dkt. 629) is **GRANTED in part, DENIED in part, and DEEMED MOOT in part** as follows:

   a. Plaintiffs' request for an award of attorneys' fees is GRANTED to the extent the Department is ordered to reimburse class counsel for ordinary monitoring fees for a one-year period. That one-year period will begin on the date this Order is entered.

   b. Plaintiffs' request for an award of attorneys' fees is DENIED in all other respects.

   c. Plaintiffs' request for an order modifying the Bridge Period Protections is **DENIED**;

   d. Plaintiffs' request for appointment of a special master is **DEEMED MOOT** by virtue of the previously entered Order Appointing a Special Master.

2. Plaintiffs' unopposed Motion to Seal (Dkt. 631) is **GRANTED**.

3. Plaintiffs' request, made during the hearing on this matter, that the Court enter the proposed order the parties submitted back in 2016 (see Dkt. 306-2)

is **GRANTED**. Accordingly, the Court will separately enter that order,

which will be effective as of January 12, 2017.

DATED: March 31, 2025

B. Lynn Winmill
U.S. District Court Judge